**PUBLISHED**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **JIMMY ADAMS, *et al.*,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:02cv00044 |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| **THE BRINK'S COMPANY, *et al.*,** | ) | |
| | ) | By: Pamela Meade Sargent |
| Defendants. | ) | United States Magistrate Judge |
| | ) | |

This case involves the claims of 123 plaintiffs against their current or former employer, Paramont Coal Corporation, ("Paramont"), its current parent company, the Brink's Company, ("Brink's"), the Brink's Company Pension-Retirement Plan, ("the Brink's Plan"), and the Administrative Committee for Brink's Company Pension-Retirement Plan, ("the Administrative Committee"). The plaintiffs seek declaratory and equitable relief as well as damages under various claims related to the administration of the Brink's Plan. Jurisdiction over this matter is based upon federal question jurisdiction, *see* 28 U.S.C. § 1331, under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 *et seq.* The case is before the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) (1).

Plaintiffs originally filed their Complaint in the United States District Court for the Eastern District of Tennessee on December 19, 2001. The Complaint sought recovery based on claims alleging breach of contract, estoppel, the creation of an informal plan, the reduction of accrued benefits and breach of fiduciary duty. In response, the defendants filed a motion to dismiss for failure to exhaust administrative remedies and a motion to dismiss based upon improper venue, or, in the alternative, to transfer venue to the Western District of Virginia. The court denied both motions to dismiss, but granted the defendants' motion to transfer.

Defendants filed their Answer to the Complaint in the Western District of Virginia on April 4, 2002. (Docket Item No. 23.) On September 6, 2002, the defendants filed a Motion For Summary Judgment seeking dismissal as a matter of law of all plaintiffs' claims. (Docket Item No. 36.) By Memorandum Opinion and Order entered November 18, 2003, the court granted in part and denied in part the defendants' Motion For Summary Judgment. (Docket Item No. 85.) As a result, the court granted summary judgment in favor of the defendants on the plaintiffs' claims alleging breach of contract, estoppel, the creation of an informal plan and the reduction of accrued benefits. The court denied the defendants' Motion For Summary Judgment on the plaintiffs' claims alleging breach of fiduciary duty.

By agreed order entered August 20, 2004, the parties consented to the transfer of this case to the undersigned magistrate judge. (Docket Item No. 108.) By agreed order entered October 7, 2004, the parties agreed to sever the claims of five of the 123 plaintiffs to be tried to the court first. (Docket Item No. 112.) The remaining breach

of fiduciary claims of those five plaintiffs, Christopher Brooks Addington, Jack Blanton, Alton Lawson Jr., Ricky D. Meade and Donald Ratliff, were tried to the court February 22 to March 1, 2005. Based on the evidence presented, the court now issues its formal findings of fact and conclusions of law.

## I. SUMMARY OF EVIDENCE

At trial, the parties submitted a number of stipulated facts to the court. The parties stipulate that The Pittston Company, ("Pittston"), changed its name to The Brink's Company, and the Pension-Retirement Plan of The Pittston Company and its Subsidiaries changed its name to The Brink's Company Pension-Retirement Plan in 2003. The parties agree, therefore, that any references to "Pittston" and "Brink's" would be interchangeable and would refer to The Brink's Company. The parties further agree that any references to the "Brink's Plan" or the "Pittston Plan" would be interchangeable and would refer to the Brink's Company Pension-Retirement Plan.

The parties agree that Pyxis Resources, ("Pyxis"), then a subsidiary of Pittston, acquired Paramont on July 7, 1986, and that Pyxis was a Participating Company in the Pittston Plan since before January 1, 1988. The parties further agree that, at the time of its acquisition by Pyxis, Paramont's employees all were participants in one of two identical defined-benefit pension plans, the Salaried Employees' Pension Plan of Paramont Coal Corporation or the Hourly Employees' Pension Plan of Paramont Coal Corporation, (Exhibits 105 and 106 respectively) (collectively, "the Paramont Plans"). The Paramont Plans did not require any employee contributions and provided a

- 3 -

maximum monthly retirement benefit of $350 for 20 years of service with Paramont. Under the Paramont Plans, all Paramont employees, regardless of their salary, earned the same retirement benefit for the same years of service.

The parties have stipulated that Exhibits 496 to 505 contain complete and authentic copies of the Pittston Plan in effect as of the dates indicated. The Pittston Plan also is a defined-benefit plan. Under the Pittston Plan, a Participant's retirement benefits are calculated based on multiplying a percentage of an Average Salary by the number of years of "Benefit Accrual Service." Section 4.04 of the December 11, 1987, and the January 1, 1989, Plans, (Exhibits 499 and 500, respectively),  states: "Service Prior to Participation.  The Board [of Directors] shall determine to what extent Benefit Accrual Service shall be credited to any Participant for service for any Subsidiary or Division prior to the date such Subsidiary or Division became a Company."

On September 9, 1988, Pittston's Board of Directors amended the 1987 Plan to allow the Administrative Committee to adopt amendments to the Plan. On November 18, 1988, the Administrative Committee amended the 1987 Plan to add Exhibit G. Exhibit G merged the Paramont Plans into the Pittston Plan effective January 1, 1989. Exhibit G is entitled "Special Provisions Applicable to Former Participants in the Pension Plans of Paramont Coal Corporation."   The initial paragraph of Exhibit G states: "In connection with such mergers, the provisions of this Exhibit G shall apply, effective January 1, 1989, notwithstanding any provisions elsewhere in the Plan to the contrary." Exhibit G further states in part:

- 4 -

(ii)  The accrued pension benefit of each Paramont Participant under the Plan in respect of periods of service prior to January 1, 1989 shall be determined solely in accordance with the provisions of the Paramont Plan in which he was a Participant, as in effect immediately prior to January 1, 1989, based solely on his "Benefit Service" (as defined in such Paramont Plan) on December 31, 1988 or any earlier date on which the Paramont Participant ceases to be an employee of Paramont Coal Corporation....

(iii)  The accrued pension benefit of each Paramont Participant in respect of periods of service as an employee of Paramont from and after January 1, 1989 ... shall be determined solely in accordance with the provisions of the Plan....

This court previously found that the language of Exhibit G is clear and unambiguous and does not provide for the inclusion of plaintiffs' years of service with Paramont prior to January 1, 1989, in the calculation of their retirement benefits under the Pittston Plan. *See Adams v. The Pittston Company*, Civ. No. 2:02cv00044, Docket Item No. 80 (W.D. Va. July 28, 2003) (Report and Recommendation), Docket Item No. 85 (W.D. Va. Nov. 18, 2003) (Order adopting Report and Recommendation) and Docket Item No. 130 (W.D. Va. Jan. 18, 2005) (Memorandum Opinion on Plaintiffs' Motion for Reconsideration).

The parties agree that, as of December 11, 1987, the Pittston Plan provided a single life annuity normal retirement pension benefit equal to the sum of 2.1 percent of the employee's Average Salary multiplied by his number of years of Benefit Accrual Service not to exceed 25 plus 1 percent of his Average Salary multiplied by his number of years of Benefit Accrual Service in excess of 25 less 1.25 percent of his Social Security Benefit multiplied by his number of years of Benefit Accrual Service not to

- 5 -

exceed 40, ("Pittston Plan Old Formula"). In other words, a single life annuity at normal retirement under the Pittston Plan Old Formula = (.021)(FAE)(BAS up to 25) + (.01)(FAE)(BAS over 25) - (.0125)(SS)(BAS up to 40) where FAE = Average Salary, BAS = Benefit Accrual Service and SS = Social Security Benefits.

The parties also agree that, as of March 7, 1990, the Pittston Plan provided a single life annuity normal retirement pension benefit equal to the sum of 2.1 percent of the employee's Average Salary multiplied by his number of years of Benefit Accrual Service not to exceed 25 plus 1 percent of his Average Salary multiplied by his number of years of Benefit Accrual Service in excess of 25 less .55 percent of his Covered Compensation Base (up to his Final Covered Compensation) multiplied by the number of years of Benefit Accrual Service (including fractions thereof) not to exceed 35, ("Pittston Plan New Formula"). In other words, a single life annuity at normal retirement under the Pittston Plan New Formula = (.021)(FAE)(BAS up to 25) + (.01)(FAE)(BAS over 25) - (.0055)(CCB up to FCC)(BAS up to 35) where FAE = Average Salary, BAS = Benefit Accrual Service, CCB = Covered Compensation Base and FCC = Final Covered Compensation.

Through 1998, the Pittston Plan provided Annual Benefit Statements to each of the Pittston Plan Participants. These Annual Benefit Statements included an estimate of a participant's future Pittston Plan retirement benefit assuming the participant continued to work at a Pittston Plan Participating Company until his Normal Retirement Date (age 65) and elected a single life annuity benefit at that time. Annual Benefit Statements estimated benefits as of January 1 of the year stated on the benefit

- 6 -

statement. Annual Benefit Statements also included an estimate of the participant's accrued benefit as of January 1 of the year stated on the benefit statement. This accrued benefit is the benefit that a participant would receive at age 65 if the participant did not earn any additional Benefit Accrual Service after the year reflected in the Annual Benefit Statement.

The parties agree that Paramont hired Christopher Brooks Addington, ("Addington"), on April 1, 1976, and that he was an employee of Paramont on July 7, 1986, the date it was acquired by Pyxis. As of January 1, 1989, Addington was entitled to receive monthly retirement benefits of $223.13 under the Paramont Plans. Addington retired from Pyxis on December 30, 1994. Addington's Normal Retirement Date was November 1, 1997. There are 8.8333 years of Benefit Accrual Service between January 1, 1989, and November 1, 1997. There are six years of Benefit Accrual Service from January 1, 1989, to December 30, 1994. From April 1, 1976, to December 30, 1994, there are 19 years of service.

In 1991, Addington's estimated Average Salary was $64,260.50, and his estimated Covered Compensation Base was $28,200. Using Addington's 1991 estimated Average Salary of $64,260.50, his estimated Covered Compensation Base of $28,200 and 8.8333 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $879.18 per month. Addington's 1991 Annual Benefit Statement estimated his future monthly retirement benefits as $1,102. The benefit estimate printed on Addington's 1991 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on

- 7 -

the Annual Benefit Statement.  Addington's 1991 Annual Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1991, was $422.

In 1992, Addington's estimated Average Salary was $67,210, and his estimated Covered Compensation Base was $28,200.   Using Addington's 1992 estimated Average Salary of $67,210, his estimated Covered Compensation Base of $28,200 and 8.8333 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $924.78 per month.  Addington's 1992 Annual Benefit Statement estimated his future monthly retirement benefits as $223 from the Paramont  Plans and $924 from the Pittston Plan. The benefit estimate printed on Addington's 1992 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement.  Addington's 1992 Annual Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1992, was $527.

In 1993, Addington's estimated Average Salary was $70,564, and his estimated Covered Compensation Base was $28,200.   Using Addington's 1993 estimated Average Salary of $70,564, his estimated Covered Compensation Base of $28,200 and 8.8333 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $976.63  per month.  Addington's 1993 Annual Benefit Statement estimated his future monthly retirement benefits as $223 from the Paramont  Plans and $976 from the Pittston Plan. The benefit estimate printed on Addington's 1993 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit statement.  Addington's 1993 Annual

- 8 -

Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1993, was $653.

In 1994, Addington's estimated Average Salary was $73,740, and his estimated Covered Compensation Base was $29,088. Using Addington's 1994 estimated Average Salary of $73,740, his estimated Covered Compensation Base of $29,088 and 8.8333 years of Benefits Accrual Service, the Pittston Plan New Formula produces a result of $1,022.13 per month. Addington's 1994 Annual Benefit Statement estimated his future monthly retirement benefits as $223 from the Paramont Plans and $1,022 from the Pittston Plan. The benefit estimate printed on Addington's 1994 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Addington's 1994 Annual Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1994, was $788.

Addington's 1994 Annual Benefit Statement also estimated that if Addington retired early on November 1, 1994, his early retirement benefit would be $766 per month. If Addington retired on November 1, 1994, and using an Average Salary of $74,054.12, a Covered Compensation Base of $29,088 and 5.8333 years of Benefit Accrual Service, Addington's pension benefit, including both his Pittston Plan New Formal benefit and his Paramont Plans benefit would be $766.13.

In 1995, Addington's estimated Average Salary was $74,486, and his estimated Covered Compensation Base was $29,148. Using Addington's 1995 estimated

Average Salary of $74,486, his estimated Covered Compensation Base of $29,148 and 8.8333 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,033.42 per month. Addington's 1995 Annual Benefit Statement estimated his future monthly retirement benefits as $223 from the Paramont Plans and $1,033 from the Pittston Plan. The benefit estimate printed on Addington's 1995 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Addington's 1995 Annual Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1995, was $925.

Using Addington's actual Average Salary of $75,935.28, Benefit Accrual Service of six years and his Covered Compensation Base of $29,088, the Pittston Plan New Formula produces a result of $717.33. Adding Addington's Paramont Plans benefit of $223.13 and reducing his benefit by an early retirement reduction factor of .858 produces a result of $806.91 per month. Using Addington's actual Average Salary of $75,935.28, Benefit Accrual Service of 19 years and his Covered Compensation Base of $29,088, the Pittston Plan New Formula produces a result of $2,271.54. Adding Addington's Paramont Plans benefit of $223.13 and reducing his benefit by an early retirement reduction factor of .858 produces a result of $2,140.43 per month.

The parties agree that Paramont hired Jack Blanton, ("Blanton"), on July 8, 1974, and that he was an employee of Paramont on July 7, 1986, the date it was acquired by Pyxis. Blanton terminated employment with Paramont on December 13, 2002. As of January 1, 1989, Blanton was entitled to receive a monthly retirement

benefit of $153.79 under the Paramont Plans. Blanton's Normal Retirement Date was June 1, 2018. There are 29.4166 years of Benefit Accrual Service between January 1, 1989, and June 1, 2018. There are 14 years of Benefit Accrual Service from January 1, 1989, to December 13, 2002. From July 8, 1974, to December 13, 2002, there are 28.621 years of service.

In 1992, Blanton's estimated Average Salary was $45,888.66, and his estimated Covered Compensation Base was $45,888. Using Blanton's 1992 estimated Average Salary of $45,888.66, his estimated Covered Compensation Base of $45,888 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,557.82 per month. Blanton's 1992 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,557 from the Pittston Plan. The benefit estimate printed on Blanton's 1992 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1992 Annual Benefit Statement estimated that Addington's accrued monthly benefits as of January 1, 1992, was $331.

In 1993, Blanton's estimated Average Salary was $46,346, and his estimated Covered Compensation Base was $46,346. Using Blanton's 1993 estimated Average Salary of $46,346, his estimated Covered Compensation Base of $46,346 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,573.35 per month. Blanton's 1993 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,573 from the Pittston Plan. The benefit estimate printed on Blanton's 1993 Annual Benefit Statement

was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1993 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1993, was $393.

In 1994, Blanton's estimated Average Salary was $45,144, and his estimated Covered Compensation Base was $45,144. Using Blanton's 1994 estimated Average Salary of $45,144, his estimated Covered Compensation Base of $45,144 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,532.54 per month. Blanton's 1994 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,532 from the Pittston Plan. The benefit estimate printed on Blanton's 1994 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1994 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1994, was $445.

In 1995, Blanton's estimated Average Salary was $44,980.66, and his estimated Covered Compensation Base was $44,980.66. Using Blanton's 1995 estimated Average Salary of $44,980.66, his estimated Covered Compensation Base of $44,980.66 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,526.99 per month. Blanton's 1995 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,526 from the Pittston Plan. The benefit estimate printed on Blanton's

1995 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1995 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1995, was $502.

In 1996, Blanton's estimated Average Salary was $44,166.33, and his estimated Covered Compensation Base was $44,166.33. Using Blanton's 1996 estimated Average Salary of $44,166.33, his estimated Covered Compensation Base of $44,166.33 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,499.35 per month. Blanton's 1996 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,499 from the Pittston Plan. The benefit estimate printed on Blanton's 1996 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1996 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1996, was $553.

In 1997, Blanton's estimated Average Salary was $45,176.33, and his estimated Covered Compensation Base was $45,176.33. Using Blanton's 1997 estimated Average Salary of $45,176.33, his estimated Covered Compensation Base of $45,176.33 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,533.64 per month. Blanton's 1997 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,533 from the Pittston Plan. The benefit estimate printed on Blanton's

- 13 -

1997 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1997 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1997, was $620.

In 1998, Blanton's estimated Average Salary was $47,283.33, and his estimated Covered Compensation Base was $47,283.33. Using Blanton's 1998 estimated Average Salary of $47,283.33, his estimated Covered Compensation Base of $47,283.33 and 29.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,605.17 per month. Blanton's 1998 Annual Benefit Statement estimated his future monthly retirement benefits as $153 from the Paramont Plans and $1,605 from the Pittston Plan. The benefit estimate printed on Blanton's 1998 Annual Benefit Statement was calculated by counting years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statement. Blanton's 1998 Annual Benefit Statement estimated that Blanton's accrued monthly benefits as of January 1, 1998, was $703.

Using Blanton's December 31, 2000, estimated Average Salary of $47,137.41, his estimated Covered Compensation Base of $45,358.33 and 12 years of Benefit Accrual Service (years between January 1, 1989, and December 31, 2000), the Pittston Plan New Formula produces a result of $740.41. Blanton received a pension estimate on or about November 30, 2000, that provided that his accrued benefit as of December 31, 2000, would be $153.79 under the Paramont Plans and $740.42 under the Pittston Plan, for a total monthly benefit of $894.21.

- 14 -

Using Blanton's actual Average Salary of $47,137.41, Benefit Accrual Service of 14 years and his Final Covered Compensation Base of $41,816.04, the Pittston Plan New Formula produces a result of $886.55. Adding Blanton's Paramont Plans benefit of $153.79 and, assuming he retires on his Normal Retirement Date and elects a single life annuity, produces a result of $1,040.34 per month. Using Blanton's actual Average Salary of $47,137.41, Benefit Accrual Service of 28.621 years and his Covered Compensation Base of $41,816.04, the Pittston Plan New Formula produces a result of $1,655.96. Adding Blanton's Paramont Plans benefit of $153.79 and, assuming he retires on his Normal Retirement Date and elects a single life annuity, produces a result of $1,809.75 per month.

The parties agree that Paramont hired Alton Lawson Jr., ("Lawson"), on February 2, 1976, and that he was an employee of Paramont on July 7, 1986, the date it was acquired by Pyxis. On January 1, 1988, Lawson transferred to Pyxis. Pyxis laid off Lawson effective February 15, 1988. As of January 1, 1988, Lawson was entitled to receive a monthly retirement benefit of $170 under the Paramont Plans. Lawson worked for non-Pittston companies and did not participate in the Pittston Plan between his layoff on February 15, 1988, and September 10, 1990. On September 10, 1990, Holston Mining, Inc., a participating Company in the Pittston Plan, hired Lawson. Lawson worked for participating Companies in the Pittston Plan from September 10, 1990, until December 13, 2002. Lawson's Normal Retirement Date is August 1, 2010. There are 20 years of Benefit Accrual Service between September 10, 1990, and August 1, 2010. There are 22.5833 years of Benefit Accrual Service from January 1,

- 15 -

1988, to August 1, 2010. Lawson retired on January 1, 2003. From September 10, 1990, to December 13, 2002, there are 12.373 years of service. From February 2, 1976, to February 15, 1988, and from September 10, 1990, to December 13, 2002, there are 24.373 years of service. Lawson received Annual Benefit Statements in 1993, 1994, 1995, 1996, 1997 and 1998.

In 1988, Lawson's estimated Average Salary was $43,680 and his estimated Social Security Benefit was $11,508. Using Lawson's 1988 estimated Average Salary of $43,680, his estimated Social Security Benefit of $11,508 and 22.5833 years of Benefit Accrual Service, the Pittston Plan Old Formula produces a result of $1,455.55 per month. Lawson's 1988 Annual Benefit Statement estimated his future monthly retirement benefits as $1,455. The benefit estimate printed on Lawson's 1988 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Lawson's 1988 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1988, was $0.

In 1992, Lawson's estimated Average Salary was $33,516, and his estimated Covered Compensation Base was $33,516. Using Lawson's 1992 estimated Average Salary of $33,516, his estimated Covered Compensation Base of $33,516 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $865.83 per month. Lawson's 1992 Annual Benefit Statement estimated his future monthly retirement benefits as $1,168 from the Pittston Plan. The benefit estimate printed on Lawson's 1992 Annual Benefit Statement was calculated by counting years

- 16 -

of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1992 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1992, was $573.

In 1993, Lawson's estimated Average Salary was $37,400, and his estimated Covered Compensation Base was $37,400. Using Lawson's 1993 estimated Average Salary of $37,400, his estimated Covered Compensation Base of $37,400 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $966.17 per month. Lawson's 1993 Annual Benefit Statement estimated his future monthly retirement benefits as $ 1,303 from the Pittston Plan. The benefit estimate printed on Lawson's 1993 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1993 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1993, was $496.

In 1994, Lawson's estimated Average Salary was $44,900 and his estimated Covered Compensation Base was $44,900. Using Lawson's 1994 estimated Average Salary of $44,900, his estimated Covered Compensation Base of $44,900 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,159.92 per month. Lawson's 1994 Annual Benefit Statement estimated his future monthly retirement benefits as $1,564 from the Pittston Plan. The benefit estimate printed on Lawson's 1994 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1994 Annual Benefit Statement estimated that Lawson's

accrued monthly benefits as of January 1, 1994, was $872.

In 1995, Lawson's estimated Average Salary was $54,042.66, and his estimated Covered Compensation Base was $50,160. Using Lawson's 1995 estimated Average Salary of $54,042.66, his estimated Covered Compensation Base of $50,160 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,431.69 per month. Lawson's 1995 Annual Benefit Statement estimated his future monthly retirement benefits as $1,940 from the Pittston Plan. The benefit estimate printed on Lawson's 1995 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1995 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1995, was $1,163.

In 1996, Lawson's estimated Average Salary was $57,091.66, and his estimated Covered Compensation Base was $54,588. Using Lawson's 1996 estimated Average Salary of $57,091.66, his estimated Covered Compensation Base of $54,588 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,497.82 per month. Lawson's 1996 Annual Benefit Statement estimated his future monthly retirement benefits as $2,026 from the Pittston Plan. The benefit estimate printed on Lawson's 1996 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1996 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1996, was $1,291.

In 1997, Lawson's estimated Average Salary was $55,040.33, and his estimated Covered Compensation Base was $52,008. Using Lawson's 1997 estimated Average Salary of $55,040.33, his estimated Covered Compensation Base of $52,008 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,449.67 per month. Lawson's 1997 Annual Benefit Statement estimated his future monthly retirement benefits as $1,962 from the Pittston Plan. The benefit estimate printed on Lawson's 1997 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1997 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1997, was $1,322.

In 1998, Lawson's estimated Average Salary was $56,996, and his estimated Covered Compensation Base was $53,208. Using Lawson's 1998 estimated Average Salary of $56,996, his estimated Covered Compensation Base of $53,208 and 20 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,507.12 per month. Lawson's 1998 Annual Benefit Statement estimated his future monthly retirement benefits as $2,041 from the Pittston Plan. The benefit estimate printed on Lawson's 1998 Annual Benefit Statement was calculated by counting years of service from September 11, 1978, although this date was not printed on the Annual Benefit Statement. Lawson's 1998 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1998, was $1,450.

Using Lawson's January 2000 estimated Average Salary of $56,995.92, his estimated Covered Compensation Base of $42,801 and 10 years of Benefit Accrual

Service (accrued between September 10, 1990, and July 31, 2000), the Pittston Plan New Formula produces a result of $801.26. Lawson received a pension estimate on or about January 10, 2000, that provided that his accrued benefit under the Pittson Plan was $971.26, which included $170 in benefits under the Paramont Plans.

Using Lawson's actual Average Salary of $56,995.93, Benefit Accrual Service of 12.373 and his Final Covered Compensation Base of $44,418.81, the Pittston Plan New Formula produces a result of $982.22. Adding Lawson's Paramont Plans benefit of $170 and reducing his benefit by an early retirement reduction factor of .621 produces a result of $779.96 per month. Using Lawson's actual Average Salary of $56,995.93, Benefit Accrual Service of 24.373 years and his Final Covered Compensation Base of $44,418.81, the Pittston Plan New Formula produces a result of $1,934.83. Adding Lawson's Paramont Plans benefit of $170 and reducing his benefit by an early retirement reduction factor of .621 produces a result of $1,371.53 per month.

The parties agree that Paramont hired Ricky D. Meade, ("Meade"), on July 12, 1977. Paramont placed Meade on temporary and then permanent layoff status on July 12, 1985. Meade was not an employee of Paramont on July 7, 1986, the date it was acquired by Pyxis. As of January 1, 1989, Meade was entitled to receive a monthly retirement benefit of $78.48 under the Paramont Plans. On February 19, 1990, Meade became a Pyxis employee. On September 29, 1990, Meade transferred to The Pittston Company. On May 11, 1992, Meade transferred to Pyxis. On January 1, 1995, Meade transferred to Maxim Management Company. On April 1, 1995, Meade transferred to

- 20 -

Pittston Coal Management Company. On September 3, 1996, Meade transferred to Pittston Coal Sales Corporation. On January 1, 1998, Meade transferred to Pittston Coal Management Company. On October 24, 1998, Meade transferred to Pittston Coal Sales Corporation. On January 11, 2001, Meade terminated his employment with all Pittston Plan Participating Companies. Meade became a Pittston Plan Participant on February 19, 1990. Meade's Normal Retirement Date is August 1, 2023. There are 33.4166 years of Benefit Accrual Service between February 19, 1990, and August 1, 2023. From February 19, 1990, to January 11, 2001, there are 11 years of service. From July 12, 1977, to July 12, 1985, and from February 19, 1990, to January 12, 2001, there are 19 years of service. Meade received Annual Benefit Statements in 1991, 1992, 1993, 1995, 1996, 1997 and 1998.

In 1991, Meade's estimated Average Salary was $25,000, and his estimated Covered Compensation Base was $25,000. Using Meade's estimated Average Salary of $25,000, his estimated Covered Compensation Base of $25,000 and 33.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $886.20 per month. Meade's 1991 Annual Benefit Statement estimated his future monthly retirement benefits as $1,041. The benefit estimate printed on Meade's 1991 Annual Benefit Statement was calculated by counting years of service from October 28, 1981, although this date was not printed on the Annual Benefit Statement. Meade's 1991 Annual Benefit Statement estimated that Lawson's accrued monthly benefits as of January 1, 1991, was $296.

In 1992, Meade's estimated Average Salary was $26,750, and his estimated

- 21 -

Covered Compensation Base was $26,750. Using Meade's 1992 estimated Average Salary of $26,750, his estimated Covered Compensation Base of $26,750 and 33.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $948.23 per month. Meade's 1992 Annual Benefit Statement estimated his future monthly retirement benefits as $1,114 from the Pittston Plan. The benefit estimate printed on Meade's 1992 Annual Benefit Statement was calculated by counting years of service from October 28, 1981, although this date was not printed on the Annual Benefit Statement. Meade's 1992 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1992, was $326.

In 1993, Meade's estimated Average Salary was $31,500, and his estimated Covered Compensation Base was $31,500. Using Meade's 1993 estimated Average Salary of $31,500, his estimated Covered Compensation Base of $31,500 and 33.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,116.60 per month. Meade's 1993 Annual Benefit Statement estimated his future monthly retirement benefits as $1,116 from the Pittston Plan. The benefit estimate printed on Meade's 1993 Annual Benefit Statement was calculated by counting years of service from February 19, 1990, although this date was not printed on the Annual Benefit Statement. Meade's 1993 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1993, was $96.

In 1995, Meade's estimated Average Salary was $40,400, and his estimated Covered Compensation Base was $40,400. Using Meade's 1995 estimated Average Salary of $40,400, his estimated Covered Compensation Base of $40,400 and 33.4166

- 22 -

years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,432.09 per month. Meade's 1995 Annual Benefit Statement estimated his future monthly retirement benefits as $1,432 from the Pittston Plan. The benefit estimate printed on Meade's 1995 Annual Benefit Statement was calculated by counting years of service from February 19, 1990, although this date was not printed on the Annual Benefit statement.  Meade's 1995 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1995, was $207.

In 1996, Meade's estimated Average Salary was $48,000,  and his estimated Covered Compensation Base was $48,000.  Using Meade's 1996 estimated Average Salary of $48,000, his estimated Covered Compensation Base of $48,000 and 33.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,701.50 per month. Meade's 1996 Annual Benefit Statement estimated his future monthly retirement benefits as $2,000 from the Pittston Plan. The benefit estimate printed on Meade's 1996 Annual Benefit Statement was calculated by counting years of service from October 28, 1981, although this date was not printed on the Annual Benefit Statement.  Meade's 1996 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1996, was $676.

In 1997, Meade's estimated Average Salary was $52,400,  and his estimated Covered Compensation Base was $52,400.  Using Meade's 1997 estimated Average Salary of $52,400, his estimated Covered Compensation Base of $52,400 and 33.4166 years of Benefits Accrual Service, the Pittston Plan New Formula produces a result of $1,857.47 per month. Meade's 1997 Annual Benefit Statement estimated his future

- 23 -

monthly retirement benefits as $2,183 from the Pittston Plan. The benefit estimate printed on Meade 's 1997 Annual Benefit Statement was calculated by counting years of service from October 28, 1981, although this date was not printed on the Annual Benefit Statement.  Meade's 1997 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1997, was $831.

In 1998, Meade's estimated Average Salary was $52,400, and his estimated Covered Compensation Base was $52,400.  Using Meade's 1998 estimated Average Salary of $52,400, his estimated Covered Compensation Base of $52,400 and 33.4166 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,857.47 per month. Meade's 1998 Annual Benefit Statement estimated his future monthly retirement benefits as $2,183 from the Pittston Plan. The benefit estimate printed on Meade's 1998 Annual Benefit Statement was calculated by counting years of service from October 28, 1981, although this date was not printed on the Annual Benefit Statement.  Meade's 1998 Annual Benefit Statement estimated that Meade's accrued monthly benefits as of January 1, 1998, was $1,006.

Using Meade's December 31, 2000, estimated Average Salary of $62,896.42, his estimated Covered Compensation Base of $55,505.24 and 11 years of Benefit Accrual Service (accrued between February 19, 1990, and December 31, 2000), the Pittston Plan New Formula produces a result of $930.92. Meade received a pension estimate on or about November 30, 2000, that provided that his accrued benefit under the Pittston Plan was $ 930.32 as of December 31, 2000.

- 24 -

Using Meade's actual Average Salary of $67,197.08, Benefit Accrual Service of 11 years and his Final Covered Compensation Base of $63,808.90, the Pittston Plan New Formula produces a result of $971.84. Adding Meade's Paramont Plans benefit of $78.48 and, assuming that Meade will retire on his Normal Retirement Date and elect a single life annuity, produces a result of $1050.32 per month. Using Meade's actual Average Salary of $67,197.08, Benefit Accrual Service of 19 years and his Final Covered Compensation Base of $63,808.90, the Pittston Plan New Formula produces a result of $1,678.63. Adding Meade's Paramont Plans benefit of $78.48 and, assuming that Meade will retire on his Normal Retirement Date and elect a single life annuity, produces a result of $1757.11 per month.

The parties agree that Paramont hired Donald Ratliff, ("Ratliff"), on June 16, 1978, and that he was an employee of Paramont on July 7, 1986, the date it was acquired by Pyxis. On January 1, 1988, Ratliff transferred to Pyxis. As of January 1, 1988, Ratliff was entitled to receive a monthly retirement benefit of $111.19 under the Paramont Plans. On October 1, 1991, Ratliff transferred to Pittston Coal Management Company. On February 1, 1992, Ratliff transferred to Pyxis. On January 1, 1995, Ratliff transferred to Maxim Management Company. On April 1, 1995, Ratliff transferred to Pittston Coal Management Company. On May 17, 1996, Ratliff transferred to Maxim Management Company. On June 1, 1996, Ratliff transferred to Pittston Coal Management Company. On August 24, 2001, Ratliff terminated his employment with all participating Companies in the Pittston Plan. Ratliff's Normal Retirement Date is September 1, 2018. There are 30.6666 years of Benefit Accrual Service between January 1, 1988, and September 1, 2018. From January 1, 1988, to

- 25 -

August 24, 2001, there are 13.934 years of service. From June 16, 1978, to August 24, 2001, there are 23.273 years of service. Ratliff received Annual Benefit Statements in 1988, 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997 and 1998.

In 1988, Ratliff's estimated Average Salary was $43,212, and his estimated Social Security Benefit was $11,796. Using Ratliff's 1988 estimated Average Salary of $43,212, his estimated Social Security Benefit of $11,796 and 30.6666 years of Benefit Accrual Service, the Pittston Plan Old Formula produces a result of $1,717.76 per month. Ratliff's 1988 Annual Benefit Statement estimated his future monthly retirement benefits as $1,717. The benefit estimate printed on Ratliff's 1988 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Ratliff's 1988 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1988, was $0.

In 1989, Ratliff's estimated Average Salary was $46,116, and his estimated Social Security Benefit was $12,528. Using Ratliff's 1989 estimated Average Salary of $46,116, his estimated Social Security Benefit of $12,528 and 30.6666 years of Benefit Accrual Service, the Pittston Plan Old Formula produces a result of $1,835.14 per month. Ratliff's 1989 Annual Benefit Statement estimated his future monthly retirement benefits as $1,835. The benefit estimate printed on Ratliff's 1989 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Ratliff's 1989 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of

January 1, 1989, was $64.

In 1990, Ratliff's estimated Average Salary was $52,019, and his estimated Covered Compensation Base was $50,400. Using Ratliff's 1990 estimated Average Salary of $52,019, his estimated Covered Compensation Base of $50,400 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,813.07 per month. Ratliff's 1990 Annual Benefit Statement estimated his future monthly retirement benefits as $1,813 from the Pittston Plan. The benefit estimate printed on Ratliff's 1990 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Ratliff's 1990 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1990, was $118.

In 1991, Ratliff's estimated Average Salary was $55,146, and his estimated Covered Compensation Base was $52,200. Using Ratliff's 1992 estimated Average Salary of $55,146, his estimated Covered Compensation Base of $52,200 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $1,939.34 per month. Ratliff's 1991 Annual Benefit Statement estimated his future monthly retirement benefits as $2,050 from the Pittston Plan. The benefit estimate printed on Ratliff's 1991 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Ratliff's 1991 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1991, was $296.

In 1992, Ratliff's estimated Average Salary was $70,400, and his estimated

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 27 of 117   Pageid#: 580

Covered Compensation Base was $53,400. Using Ratliff's 1992 estimated Average Salary of $70,400, his estimated Covered Compensation Base of $53,400 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $2,661.88 per month. Ratliff's 1992 Annual Benefit Statement estimated his future monthly retirement benefits as $111 from the Paramont Plans and $3,113 from the Pittston Plan. The benefit estimate printed on Ratliff's 1992 Annual Benefit Statement was calculated by counting years of service from June 16, 1978, although this date was not printed on the Annual Benefit Statement. Ratliff's 1992 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1992, was $1,443.

In 1993, Ratliff's estimated Average Salary was $71,610, and his estimated Covered Compensation Base was $55,200. Using Ratliff's 1993 estimated Average Salary of $71,610, his estimated Covered Compensation Base of $55,200 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $2,695.22 per month. Ratliff's 1993 Annual Benefit Statement estimated his future monthly retirement benefits as $111 from the Paramont Plans and $2,695 from the Pittston Plan. The benefit estimate printed on Ratliff's 1993 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement. Ratliff's 1993 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1993, was $562.

In 1994, Ratliff's estimated Average Salary was $80,464, and his estimated Covered Compensation Base was $57,480. Using Ratliff's 1994 estimated Average

- 28 -

Salary of $80,464, his estimated Covered Compensation Base of $57,480 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $3,092.35 per month. Ratliff's 1994 Annual Benefit Statement estimated his future monthly retirement benefits as $111 for the Paramont Plans and $3,092 from the Pittston Plan. The benefit estimate printed on Ratliff's 1994 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement.  Ratliff's 1994 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1994, was $756.

In 1995, Ratliff's estimated Average Salary was $79,309, and his estimated Covered Compensation Base was $57,900.  Using Ratliff's 1995 estimated Average Salary of $79,309, his estimated Covered Compensation Base of $57,900 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $3,030.46 per month. Ratliff's 1995 Annual Benefit Statement estimated his future monthly retirement benefits as $111 for the Paramont Plans and $3,030 from the Pittston Plan. The benefit estimate printed on Ratliff's 1995 Annual Benefit Statement was calculated by counting years of service from January 1, 1988, although this date was not printed on the Annual Benefit Statement.  Ratliff's 1995 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1995, was $896.

In 1996, Ratliff's estimated Average Salary was $78,469.62,  and his estimated Covered Compensation Base was $61,224.  Using Ratliff's 1996 estimated Average

Salary of $78,469.62, his estimated Covered Compensation Base of $61,224 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $2,943.06 per month. Ratliff's 1996 Annual Benefit Statement estimated his future monthly retirement benefits as $111 for the Paramont Plans and $3,442 from the Pittston Plan. The benefit estimate printed on Ratliff's 1996 Annual Benefit Statement was calculated by counting years of service from June 16, 1978, although this date was not printed on the Annual Benefit Statement. Ratliff's 1996 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1996, was $2,023.

In 1997, Ratliff's estimated Average Salary was $79,000, and his estimated Covered Compensation Base was $60,708. Using Ratliff's 1997 estimated Average Salary of $79,000, his estimated Covered Compensation Base of $60,708 and 30.6666 years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $2,976.02 per month. Ratliff's 1997 Annual Benefit Statement estimated his future monthly retirement benefits as $111 for the Paramont Plans and $3,480 from the Pittston Plan. The benefit estimate printed on Ratliff's 1997 Annual Benefit Statement was calculated by counting years of service from June 16, 1978, although this date was not printed on the Annual Benefit Statement. Ratliff's 1997 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1997, was $2,011.

In 1998, Ratliff's estimated Average Salary was $94,100, and his estimated Covered Compensation Base was $62,592. Using Ratliff's 1998 estimated Average Salary of $94,100, his estimated Covered Compensation Base of $62,592 and 30.6666

years of Benefit Accrual Service, the Pittston Plan New Formula produces a result of $3,681.47 per month. Ratliff's 1998 Annual Benefit Statement estimated his future monthly retirement benefits as $111 for the Paramont Plans and $4,302 from the Pittston Plan. The benefit estimate printed on Ratliff's 1998 Annual Benefit Statement was calculated by counting years of service from June 16, 1978, although this date was not printed on the Annual Benefit Statement. Ratliff's 1998 Annual Benefit Statement estimated that Ratliff's accrued monthly benefits as of January 1, 1998, was $2,356.

Using Ratliff's December 31, 2000, estimated Average Salary of $101,056.19, his estimated Covered Compensation Base of $67,164 and 13 years of Benefit Accrual Service (accrued between January 1, 1988, and December 31, 2000), the Pittston Plan New Formula produces a result of $1,898.84. Ratliff received a pension estimate on or about November 30, 2000, that provided that his accrued benefit under the Pittson Plan, as of December 31, 2000, was $2,010.03, which included $111.19 in benefits under the Paramont Plans.

Using Ratliff's actual Average Salary of $115,728.65, Benefit Accrual Service of 13.934 years and his Covered Compensation Base of $69,444, the Pittston Plan New Formula produces a result of $2,378.49. Adding Ratliff's Paramont Plans benefit of $111.19, and assuming that he retires on his Normal Retirement Date and elects a single life annuity, produces a result of $2,489.68 per month. Using Ratliff's actual Average Salary of $115,728.65, Benefit Accrual Service of 23.273 years and his Covered Compensation Base of $69,444, the Pittston Plan New Formula produces a result of $3,972.62. Adding Ratliff's Paramont Plans benefit of $111.19, and assuming

- 31 -

that he retires on his Normal Retirement Date and elects a single life annuity, produces a result of $4,083.81 per month.

Plaintiffs' remaining claim rests on allegations that certain Pittston Plan representatives misrepresented that plaintiffs would receive credit for their time worked with Paramont prior to July 1, 1989, in the calculation of their retirement benefits under the Pittston Plan. Mike Quillen testified that he began work with Paramont in 1976 and was Paramont's president at the time of its acquisition by Pyxis in 1986. Quillen testified that he made this representation to numerous Paramont employees on numerous occasions.

Quillen testified that, at the time of Paramont's acquisition by Pittston in 1986, Paramont had two defined-benefit retirement plans, the Salaried Employees' Pension Plan of Paramont Coal Corporation and the Hourly Employees' Pension Plan of Paramont Coal Corporation. Quillen further testified that he was a trustee of the Paramont Plans, and that as a trustee he had a duty to understand the terms of the Paramont Plans. Quillen testified that as a trustee of the Paramont Plans he served as a fiduciary of the Paramont Plans. Quillen further testified that when he communicated with employees about the Paramont Plans, he tried to be truthful and that, if he had thought any employees were under a misimpression of their benefits, he would have attempted to correct that. Quillen also testified that he was never a trustee of the Pittston Plan. Quillen testified that he never had any administrative responsibility, any control over or any discretion regarding the Pittston Plan. Quillen further testified that he was never authorized to speak on behalf of the Pittston Plan, other than on the one

- 32 -

occasion when Joseph Farrell, Pittston's Senior or Executive Vice President, asked him to explain the Pittston employee benefits, including the Pittston Plan, to Paramont's employees at the time of its acquisition by Pyxis.

Quillen testified that prior to Pyxis's acquisition of Paramont in 1986 he was asked to travel to Pittston's corporate headquarters in Greenwich, Connecticut, to meet with Farrell. He stated that in this meeting, Farrell expressed to him Pittston's desire for Paramont to remain nonunion after its acquisition by Pyxis. Quillen testified that he and Farrell discussed a number of incentives that could be given to Paramont's employees in an effort to convince them to remain nonunion after Paramont's acquisition by Pyxis. Quillen testified, "the primary thing that we discussed was moving from the current Paramont pension and retirement plan to the Pittston salaried union free pension plan." Quillen also testified that he and Farrell discussed giving Paramont employees credit for their years of service with Paramont in the calculation of their benefits under the Pittston Plan, and that they further discussed the resulting larger pension benefits for Paramont employees under the Pittston Plan.

Many of the questions posed to Quillen on direct examination assumed that Farrell represented to Quillen that, after the acquisition of Paramont by Pyxis, that Paramont's employees would be eligible for benefits under the Pittston Plan and that their years of service with Paramont prior to 1986 would be included in calculating their benefits under the Pittston Plan. Quillen, however, never testified to this fact. In fact, Quillen never specifically testified that Farrell stated that Paramont's employees would be eligible for retirement benefits under the Pittston Plan or that their years of

- 33 -

service with Paramont would be used in the calculation of these benefits. Instead, Quillen simply testified that, after his discussions with Farrell, Farrell instructed him to go to Paramont's employees and "explain their whole benefit package ... -- including the Pittston pension plan." Furthermore, Quillen also admitted that at the time of his discussions with Farrell he did not understand the difference between vesting service and Benefit Accrual Service under the Pittston Plan.

Quillen testified that, as a result of this meeting with Farrell, he returned to Virginia and told Paramont employees that they would be covered by the Pittston Plan at the time of Pyxis's acquisition and that all of their years of service with Paramont would be included in the calculation of their benefits under the Pittston Plan. Exactly why Quillen made these representations to Paramont employees is unclear, based on the fact that the overwhelming evidence in this case shows that Quillen clearly knew that there would be no change in the Paramont employees' benefits at the time of Paramont's acquisition by Pyxis.

Quillen also testified that, prior to Pyxis's acquisition of Paramont, he also had discussions with Farrell regarding the terms of his continuing employment with Paramont after the acquisition. Quillen stated that, on or about July 2, 1986, he sent a letter to Farrell, summarizing a discussion that they had on July 1, 1986, (Exhibit 137) ("Quillen's 7-2-86 Letter"). Quillen's 7-2-86 Letter states in part:

> My understanding of our discussion is that I will retain the title of President, Paramont Coal Corporation and will also assume a position of Senior Vice President, Pyxis Resources, Inc. ... I will also receive credit

for five years prior service upon five years service with Pittston toward my pension; thus, in effect, vesting me at five years equal to ten years in the present pension plan. It is understood that the Pittston Company will internally provide the difference versus the present ERISA approved pension plan.

Despite the content of this letter, Quillen claimed on cross-examination that, at the time he wrote this letter, he thought that he would receive credit for all of his years of service with Paramont in the calculation of his benefits under the Pittston Plan.

Quillen also testified that he received, reviewed and signed, indicating his agreement with, a letter from T. W. Garges, President of Pyxis Resources Company, setting forth the terms of his continuing employment after Pyxis's acquisition of Paramont, (Exhibit 138) ("Garges's 7-8-86 Letter"). Garges's 7-8-86 Letter states in part:

> We would like to confirm the arrangements made with respect to your employment effective from and after the closing ... of our purchase of all of the shares of Paramont Coal Corporation ... under the Stock Purchase Agreement dated June 6, 1986. ...
>
> > 3.     We have also agreed with you that, in determining the amount which will be payable to you as retirement benefit, your "Benefit Accrual Service" as defined in the [Pittston Plan] shall be increased by five years. If your right to a retirement benefit shall have vested under the [Pittston] Plan at the time when your employment ceases, the additional amount payable by virtue of such five-year increase shall be paid as a supplemental pension otherwise than under the [Pittston Plan]. If your right shall not have vested at such time but would have vested if your Benefits Accrual Service

- 35 -

had included such five-year increase, you will be entitled to receive a retirement benefit (which shall be paid otherwise than under the [Pittston Plan]) in the same amount to which you would have been entitled if your Benefit Accrual Service had included such five-year increase. It is, however, understood that, if after giving effect to such five-year increase as though it were Benefit Accrual Service your right to a retirement benefit would not have vested under the [Pittston Plan], you will not have any right to receive a retirement benefit under the [Pittston Plan] or otherwise.

While Quillen was not specific as to the time frame, Quillen testified that Kathy Fox, Assistant Employee Benefits Manager with Pittston met with him and other Paramont administrative personnel at some point to explain Pittston's employee benefits, including their pension plan. Quillen testified that he does not recall Fox ever making any presentation directly to Paramont's employees, but rather she trained Paramont's administrative personnel so that they could explain Pittston's employee benefits. Again, several of the questions posed to Quillen assumed that Fox told Quillen and others that their years with Paramont prior to January 1, 1989, would be included in the calculation of their pension benefits under the Pittston Plan. Again, Quillen never testified to this fact. Instead, Quillen testified that Fox worked certain calculations and that he simply repeated to Paramont employees what Fox had told him, without ever saying exactly what Fox told him.

Quillen admitted that in February 1987, he received a memorandum from Gerry Spindler, President of Pitttston Coal Group, dated February 3, 1987, discussing the fact that Frank Lennon, Vice President of Human Resources and Administration for Pittston, had recommended merging the Paramont Plans' assets with the assets of the

- 36 -

Pittston Plan to reduce management costs and increase returns, (Exhibit 108) ('Spindler's 2-3-87 Memo").  Spindler's 2-3-87 Memo stated in part:

> ... It also raises the question, once again, of the status of Paramont's pension benefits and retiree medical benefits....
>
> By copy of this letter, I am asking Frank Lennon to develop, with Randy Robinette, a task force and an agenda for approaching these issues.

Quillen also admitted that in 1987 and 1988  he signed a number of documents amending the terms of the  Paramont Plans,  (Exhibits 110, 111, 112 , 113, 115, 116, 118, 119).   Quillen stated that when he signed these documents he was not sure whether he was signing them as a trustee of the Plan or as a representative of Paramont.   He also admitted that he was not sure that he fully understood these amendments when he signed them. Quillen stated that when he questioned what these documents were, he was told they were part of the merger of the Paramont Plans into the Pittston Plan, although Quillen did not state who made this representation to him. Despite his claim that these amendments to the Paramont Plans were part of an ongoing process to merge the Paramont Plans, Quillen also repeatedly testified  that when he signed each of these documents, he did not know that the Paramont Plans had not yet been merged into the Pittston Plan. A review of these documents shows that none of them reference a merger of the Paramont Plans into the Pittston Plan in any way.

Quillen testified that in the fall of 1987, a decision was made to transfer certain

- 37 -

Paramont administrative employees to Pyxis. Quillen admitted that when the transfer of these employees was being discussed, he realized that Paramont employees were not covered by the same benefit package as Pyxis employees. Quillen testified that he sent a September 2, 1987, memorandum to Randy Robinette, Paramont's Director of Human Resources, asking that he prepare a benefit package summary for the employees who were to be transferred, (Exhibit 122) ("Quillen 9-2-87 Memo"). Quillen further testified that in response to his request, he received a September 16, 1987, memorandum from Robinette with a benefit comparison attached, (Exhibit 123) ("Robinette's 9-16-87 Memo"). Robinette's 9-16-87 Memo stated in part:

> As requested I have prepared the attached benefit comparison for review. ... The ...Paramont employees anticipated to convert to the Pyxis benefit package should do so during the beginning of the first quarter of 1988.... Any unused vacation, graduated-vacation, or personal leave time would not be carried forward and would be paid by Paramont in 1987 as earnings. These employees would then be subject to the Pyxis schedule with prior Paramont service credited for leave purposes. As to pension matters, employees would be under the Pittston Plan, again, with prior Paramont service credited for vesting purposes. ...
> ... Should you have any questions or comments please advise.

Attached to Robinette's 9-16-87 Memo was a two-page chart comparing Paramont's employee benefits with Pyxis's employee benefits. This chart listed the Paramont pension benefit as:

> $350 per mo.
> @55 20 yr.
> 5 yr. vesting

- 38 -

This chart listed the Pyxis pension benefit as:

2.1% Salary x
x yrs. service
s/s offset
10 yr. vesting

Quillen also testified that he sent a September 23, 1987, memorandum to Lawson explaining his transfer to Pyxis effective January 1, 1988, (Exhibit 54) ("Quillen's 9-23-87 Memo").

Quillen testified that as president of Paramont, he would have known of the content of all employee handbooks distributed to Paramont's employees. Quillen also testified that if any of these employee handbooks had contained inaccurate information, he would have attempted to correct it. Quillen further testified that he signed Paramont's 1988 employee handbook, (Exhibit 2) ("the 1988 Paramont Handbook"), before it was distributed to employees. While Quillen was uncertain as to when he received it, Quillen admitted that he had received an August 15, 1988, memorandum from Lennon to Spindler, (Exhibit 125) ("Lennon's 8-15-88 Memo"). Quillen also admitted that he received an August 24, 1988, memorandum from Robinette in 1988, (Exhibit 126) ("Robinette's 8-24-88 Memo"). Quillen further admitted that he received a copy of a September 12, 1988, memorandum from Lennon to Robinette, (Exhibit 188) ("Lennon's 9-12-88 Memo"). Lennon's 9-12-88 Memo states in part:

Subject:     Merging Paramont Salaried Plan into Pittston PRP
             [Pension-Retirement Plan]
...
My recommendation is that we proceed immediately with this merger so
that it may be accomplished before the January 1, 1989 required date....


Quillen testified that after receiving Lennon's 9-12-88 Memo he wrote on it:


Per Mgmt. Com.
9/14/88
OK to proceed
M.J.Q.


Quillen also admitted that he received a copy of a September 28, 1988, memorandum
from Lennon to Robinette discussing the merger of the Paramont Hourly Plan into the
Pittston Plan, (Exhibit 128) ("Lennon's 9-28-88 Memo").  Lennon's 9-28-88 Memo
states in part:


Foster Higgins has determined the estimated costs of merging the
Paramont hourly Pension Plan into the Pittston Plan so as to provide
parity with the salaried employees. ...
...
Once you, Mike and Jerry have an opportunity to discuss this subject,
pleast let me know if you want to proceed with a January 1, 1989 merger.


Quillen testified that after receiving this memo he wrote on it:


Gerry OK'd
10-6-88


- 40 -

> Will follow up
> w/ memo

Quillen stated that the Gerry he referred to in his notes was Gerry Spindler. Quillen admitted that these two memoranda indicate that he approved the merger of the Paramont Plans into the Pittston Plan in the fall of 1988.

On October 25, 1988, Quillen sent a memorandum to all Paramont employees explaining that there would soon be changes in their benefits, (Exhibit 21) ("Quillen's 10-25-88 Memo"). Quillen's 10-25-88 Memo stated in part:

> RE:  Benefit Changes
>
> Over the next several weeks you will receive several memorandums on benefit changes which you have been hearing about. The two primary subjects are health insurance and pension benefits. Please review these documents carefully and ask questions about whatever concerns you.

Quillen testified that after this, Robinette sent a letter to all Paramont employees explaining the changes in their retirement benefits, (Exhibit 3) ("Robinette's 11-10-88 Letter"). Robinette's 11-10-88 Letter states in part:

> On January 1, we will merge the [Paramont] plans into The Pension-Retirement Plan of The Pittston Company and its subsidiaries. *On that date you will* automatically become a member of The Pittston Plan and *begin to earn pension accruals under The Pittston Plan. When you retire, your pension benefit under this plan will be the combination of what you earned under the Paramont ... Plan prior to January 1, 1989, and what you earn under the Pittston Plan for*

- 41 -

*service beyond January 1, 1989.*

...

<u>Benefits Accrued Under The Paramont Plan Prior to January 1, 1989</u>

When you retire, all pension benefits you have accrued under The Paramont Plan up to January 1, 1989, will be determined in accordance with the provisions of The Paramont Plan as in effect on December 31, 1988.

<u>Benefit Accruals After January 1, 1989</u>

Your pension benefits accrued from and after January 1, 1989, will be determined in accordance with the provisions of The Pittston Pension Plan. ...

(Emphasis added.) This letter continues to explain that the Pittston Plan, like the Paramont Plan, then required five years of vesting service. The letter further states that "[a]ll vesting service under The Paramont Plan will also constitute and count as vesting service under The Pittston Plan." Robinette's 11-10-88 Letter also states:

We all know that pensions are very complicated and technical documents and can be difficult to explain in simple terms. While we have tried hard to explain in simple language how these Plans work, and have written the pension booklet in as relatively clear and simple language as possible, we understand that you may have questions about your pension from time to time. If you have any questions of any kind about your pension under either the Paramont or Pittston Plan, please address your questions in writing to the Human Resources Department.

While Quillen could not recall whether he approved the contents of this letter before

- 42 -

it was sent, Quillen testified that he received and read Robinette's 11-10-88 Letter after it was sent to all Paramont employees. Quillen also testified that it would not have been unusual in 1988 for Pyxis administrative employees, including those employees who transferred from Paramont to Pyxis on January 1, 1988, to see correspondence sent to Paramont employees.

A week later, on November 17, 1988, Quillen sent a memorandum to all Paramont employees, (Exhibit 22) ("Quillen's 11-17-88 Memo"). Quillen's 11-17-88 Memo stated in part:

> ... the Paramont Employee Salary and Hourly Pension Plans will be integrated with The Pittston Company Pension Retirement Plan which will result in significantly improved benefits. You will receive specific information as to how these changes will affect you.

Quillen admits that nothing in Quillen's 11-17-88 Memo contradicts the information in Robinette's 11-10-88 Letter.

Quillen admitted that on or about November 18, 1988, he signed a document entitled "Unanimous Written Consent of Directors," (Exhibit 131) ("11-18-88 Consent of Paramont Directors"). The 11-18-88 Consent of Paramont Directors states in part:

> RESOLVED, that this Company elects to participate as a "Company" under the Pension-Retirement Plan of The Pittston Company and Its Subsidiaries (the "Pittston Plan"), effective as of January 1, 1989, and in connection therewith:
> (i) each of ... the Salaried Employees' Pension Plan of the Company and ... the Hourly Employees' Pension Plan of the

- 43 -

Company (collectively, the "Paramont Plans") shall be merged into the Pittston Plan as of said effective date; ...

...

RESOLVED, that the officers and agents of this Company be and they hereby are authorized and directed to execute all requisite documents and take all such other action as may be necessary or desirable to carry out the terms of the foregoing resolution.

Incredibly, Quillen testified that he is not sure whether or not he read the 11-18-88 Consent of Paramont Directors before he signed it. Attached to the 11-18-88 Consent of Paramont Directors is a copy of Exhibit G, the amendment that was added to the Pittston Plan to effect the merger of the Paramont Plans and the Pittston Plan. Quillen admitted that it was "very likely" that he signed the 11-18-88 Consent of Paramont Directors without reading Exhibit G and without understanding the terms of the merger.

Quillen stated that he saw and read an article regarding Paramont employees' pension benefits changes contained in the December 1988 issue of the Paramont Pride (Exhibit 126) ("Paramont Pride Article"). He further admitted that he never sent out any correspondence to Paramont's employees telling them that the content of the Paramont Pride Article was wrong or telling them to disregard the content of the article.

On or about January 23, 1989, Quillen sent a memorandum to all Paramont employees addressing some concerns regarding the merger of the Paramont Plans into the Pittston Plan, (Exhibit 4) ("Quillen's 1-23-89 Memo"). In particular, Quillen stated that some employees had become concerned that their pension funds might be

- 44 -

commingled with union pension funds.  Quillen's 1-23-89 Memo states in part:

> Based on recent questions I have received, there is some inaccurate information circulating concerning the recent changes to the pension benefits. ...
>
> Hopefully, these comments will clear up some of the misleading rumors, but if you have additional questions, please request your supervisor to contact the appropriate official for the correct answer.

Quillen's 1-23-89 Memo did not address the information contained in Robinette's 11-10-88 Letter or the Paramont Pride Article.  Nor did Quillen's 1-23-89 Memo  attempt to correct the information that Paramont employees previously had received stating that Paramont employees would not receive credit for any of their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan.

Quillen testified that he left his employment with all Pittston-related entities in June 1989 and eventually went to work for Addington, Inc. Pittston eventually acquired Addington, and Quillen entered into negotiations to return to employment with Pittston in 1993.  Quillen testified that as part of those negotiations, he received a couple of letters from Spindler including a letter dated January 5, 1993, (Exhibit 142) ("Spindler's 1-5-94 Letter"). In response to this letter, Quillen sent a letter to James Spurlock, Vice-President - Human Resources with the Pittston Coal Management Company, on February 8, 1994, (Exhibit 143) ("Quillen's 2-8-94 Letter"). Quillen's 2-8-94 Letter states in part: "...we had agreed that my prior service with Paramont, Pyxis and Addington would count toward calculation of my annual vacation benefit...."

- 45 -

Quillen testified that some issues arose with regard to his employee benefits in 1997 and that, as a result of these issues, he sent a letter to Conley Parsley, Personnel and Compensation Manager for Pittston, on or about April 13, 1997, (Exhibit 541) ("Quillen's 4-13-97 Letter"). Quillen's 4-13-97 Letter states in part:

> My original hire date is October 16, 1976. I am eligible for Paramont retirement from 10/16/76 until 7/9/1986. In addition, I am eligible for Pittston retirement from 7/9/81 based on the five years of credit awarded per the attached. [Garges's letter]

After Quillen left employment with any Pittston-related companies, he filed suit against Pittston alleging a breach of his employment contract. In his Motion for Judgment filed in the Circuit Court of Russell County, (Exhibit 139) ("Motion for Judgment"), Quillen alleged:

> In 1986, Pittston Coal Company acquired Paramont. Immediately prior to the acquisition, [Quillen] was president of Paramont and he remained as such thereafter when it was confirmed to him by Pittston that he would receive credit in Pittston's pension plan for five years prior service in Paramont.

Quillen testified that he informed his counsel that the information in this paragraph was incorrect and his counsel subsequently filed a Second Amended Motion For Judgment, (Exhibit 146). Quillen testified that the Second Amended Motion For Judgment corrected this paragraph to state:

> In 1986, Pittston Coal Company acquired Paramont. Immediately prior to the acquisition, Mr. Quillen was president of Paramont. Mr. Quillen

- 46 -

continued as president of Paramont at Pittston's request subsequent to
its acquisition of Paramont after Pittston confirmed to Mr. Quillen that he
would receive, not from Pittston pension plan (the "Plan") but from
Pittston directly, additional compensation upon retirement equal to what
he would receive from the Plan had he been a Pittston employee for 5
years preceding his employment by Pittston. This was represented to
have been accomplished by the purchase of an annuity by Pittston to
cover the five years.

Quillen claimed on redirect that the reason he never put anything in writing to
anyone correcting what he claimed were numerous misstatements regarding the
pension benefits of Paramont employees after its acquisition by Pyxis is that he was
instructed not to because of the then-current labor situation as Pittston anticipated and
endured the 1989 United Mine Workers of America, ("UMWA"), strike. Instead,
Quillen claimed that he continually complained orally about the inaccuracies.

Ratliff testified that, at or around the time of Pxyis's acquisition of Paramont in
1986, Quillen traveled to the various mine sites to notify employees about the
acquisition. Ratliff testified that he was manager of safety for Paramont in 1986 and
routinely traveled to the mine sites with Quillen to conduct required annual safety
training. Ratliff testified that he heard Quillen tell Paramont workers during these mine
site visits that their years with Paramont would count in the calculation of benefits
under the Pittston Plan. Ratliff admitted, however, that Quillen did not discuss benefits
on any of these mine site visits until sometime after Pyxis's acquisition of Paramont.

Ratliff also testified that he repeated Quillen's statements to numerous Paramont
employees over the years. While Ratliff claimed on direct examination that he had

- 47 -

responsibility to communicate with Paramont's workforce concerning employee benefits, he admitted on cross-examination that he did not work in the human resources department until sometime in late 1989 after he was an employee of Pyxis.

Ratliff also testified that Fox came to Paramont's Esserville offices in the fall of 1987 and met with 10 to 12 Paramont employees, including Ratliff, Robinette and Rhonda Miller, Paramont's Manager of Employee Benefits and Insurance, who were going to be transferred to Pyxis effective January 1, 1988. Ratliff testified that Fox went over the Pittston employee benefits package with the employees, including the Pittston retirement benefits. According to Ratliff, Fox wrote the formula used to calculate benefits under the Pittston Plan on a board. In the example that Fox used to work this calculation according to Ratliff, Fox included the employee's time with Paramont in the employee's Benefit Accrual Service, which she used to calculate benefits under the Pittston Plan. Ratliff also testified that he repeated the information given to him by Fox to numerous Paramont employees over the years.

Ratliff admitted that in September 1988 he and all Paramont employees received the 1988 Paramont Handbook, (Exhibit 2). Ratliff testified that he believed the information in the 1988 Paramont Handbook to be correct, and that the information had been approved by Quillen before its distribution. According to the 1988 Paramont Handbook, Paramont's employees continued to be covered by the Paramont Plans, which provided a maximum fixed pension benefit of $350 per month at age 55 to an employee with 20 years of service. The 1988 Paramont Handbook made no mention of Paramont employees being covered under the Pittston Plan or of Paramont

- 48 -

employees getting any credit for years of service worked with Paramont under the Pittston Plan.

Ratliff admitted that he received and read a copy of Robinette's 11-10-88 Letter in November 1988.

Ratliff testified that he never communicated to Robinette or anyone else that he thought the content of Robinette's 11-10-88 Letter was incorrect. He further testified that, to his knowledge, neither Quillen, nor anyone else, ever contacted Robinette to state that the contents of this letter were incorrect. Ratliff also testified that about a month after receiving Robinette's 11-10-88 Letter, he read the Parmont Pride Article explaining the merger of the Paramont Plans into the Pittston Plan, (Exhibit 26). Robinette testified that the Paramont Pride was distributed to all Paramont and Pyxis employees. Robinette also testified that, to his knowledge, Quillen reviewed the content of all editions of the Paramont Pride before it was distributed to the employees.

The content of the Paramont Pride Article was identical to Robinette's 11-10-88 Letter, in that it also states the following:

> On January 1, we will merge the [Paramont] plans into The Pension-Retirement Plan of The Pittston Company and its Subsidiaries. *On that date you will* automatically become a member of The Pittston Plan and *begin to earn pension accruals under The Pittston Plan. When you retire, your pension benefit under this plan will be the combination of what you earned under the Paramont ... Plan prior to*

- 49 -

*January 1, 1989, and what you earn under The Pittston Plan for service beyond January 1, 1989.*

*...*

<u>Benefits Accrued Under The Paramont Plan Prior to January 1, 1989</u>

When you retire, all pension benefits you have accrued under The Paramont Plan up to January 1, 1989, will be determined in accordance with the provisions of The Paramont Plan as in effect on December 31, 1988.

<u>Benefit Accruals After January 1, 1989</u>

Your pension benefits accrued from and after January 1, 1989, will be determined in accordance with the provisions of The Pittston Pension Plan. ...

(Emphasis added). Ratliff testified that he never communicated to anyone that he thought the content of the Paramont Pride Article was incorrect. He further testified that, to his knowledge, neither Quillen, nor anyone else, ever contacted any of the Paramont employees or anyone else to say that the content of the Paramont Pride Article was incorrect.

Ratliff also testified that he participated in a meeting with all the employees of Pyxis's operating companies, including all Paramont employees, held at Clinch Valley College at the conclusion of the Pittston-UMWA strike in early 1990. At this meeting, Spindler, President of Pittston Coal Group, in response to a question raised by an audience member, stated that an employee's time with Paramont would count under the Pittston Plan, according to Ratliff. Ratliff admitted on cross-examination,

- 50 -

however, that he could not recall if Spindler said how the years worked for Paramont would count.

Ratliff testified that he did not notice that the accrued benefit listed on his 1992 Annual Benefit Statement increased by more than $1,000 from his 1991 Annual Benefit Statement. Ratliff likewise testified that he did not notice that the accrued benefit listed on his 1993 Annual Benefit Statement decreased by almost $1,000 from the previous year's Annual Benefit Statement or that the accrued benefit listed on his 1996 Annual Benefit Statement increased by more than $1,000 from the previous year's.

Ratliff testified that he relied on representations that all of his years of service with Parmont would be used to calculate his retirement benefits under the Pittston Plan. In particular, Ratliff testified that, if he had known that he would not receive credit for his time with Paramont in the calculation of his pension benefits under the Pittston Plan, he would have increased his contributions into Pittston's 401(k) plan from 5 percent to 15 percent a year. He also testified that, based on the misrepresentations regarding the calculation of his pension benefits, he chose to stay with Pittston-related companies rather than seek other employment. On cross-examination, however, Ratliff testified that it would have been unlikely that he could have found another job in the coal industry in the immediate area making the salary that he was making with Pittston.

Lawson testified that he worked for Paramont in July 1986 when it was acquired by Pyxis. Lawson transferred to Pyxis along with Ratliff and others effective January

1, 1988.  Lawson was laid off from Pyxis effective February 15, 1988.  According to Lawson, there were no changes in Paramont's employee benefits, including their pension benefits, when Paramont was acquired by Pyxis in 1986.  In fact, Lawson testified that Quillen told him that there would be no change in the Paramont employees' benefits, including their retirement benefits, at the time of the acquisition by Pyxis.

Lawson testified that the first change in his benefits came when he transferred to Pyxis in 1988.  Lawson testified that, prior to his transfer, he received a memorandum from Quillen regarding his transfer. (Exhibit 54.) Attached to this memorandum was a chart comparing Paramont's employee benefits with Pyxis's. Under a category entitled pension benefit, this chart listed the Paramont benefit as:

$350 per mo.
@55 20 yr.
5 yr. vesting

The chart listed the Pyxis retirement benefit as:

2.1% Salary x
x yrs. service
s/s offset
10 yr. vesting

The chart does not explain what is included in the years of service used to calculate benefits.  Lawson testified that Quillen told him that his  "Paramont time was going to count toward pension calculations in the Pittston Plan." Lawson did not testify as to

- 52 -

when Quillen told him this or the circumstances surrounding this statement. Lawson also testified that he was told the same thing by Ratliff, Dennis Rasnick, who worked with Ratliff in Health and Safety, and Randy and Mike Clark, who were in charge of the strip and deep mine operations for Paramont.

Lawson testified that he also attended a meeting in the fall of 1987 with several other Paramont employees who were to be transferred to Pyxis effective January 1, 1988. During this meeting, according to Lawson, Quillen told those present that the Paramont Plans and the Pittston Plan were to be merged and that, when the plans merged, all of their Paramont time would be counted toward retirement in the Pittston Plan. Lawson admitted that Quillen did not state how the time would be counted or when the plans were to be merged. Lawson also testified that he did not remember whether Fox, Robinette or Miller were present at this meeting.

Lawson also testified that, while he was not a Paramont employee and did not see Robinette's 11-10-88 Letter when it was originally sent, he had seen and reviewed the letter in 1999. Lawson further admitted on cross-examination that the contents of Robinette's 11-10-88 Letter was consistent with what Quillen had told employees in 1987 and 1988. Lawson also testified that, since he was not a Paramont or Pyxis employee at the time, he did not attend the meeting at Clinch Valley College held after the settlement of the Pittston-UMWA strike in early 1990.

Lawson was hired by Holston Mining, ("Holston"), a Pyxis subsidiary, in 1990, and in 1991 he transferred to Heartland Resources, Inc., ("Heartland"). Before his

transfer to Heartland, Lawson made a number of inquiries concerning his benefits if he transferred. In response, Lawson received a December 3, 1990, memorandum from Miller which states:

> This is to advise that your previous years of employment will be used in adjusting your hire date for benefit purposes. On July 18, 1994 you will regain your previous years of employment. At that time your adjusted hire date will be August 27, 1978. This adjusted date will be used for calculating vacation benefits.

(Exhibit 60) ("Miller's 12-3-90 Memo"). Lawson also received a letter from Miller explaining the company "policy regarding credit for prior service" (Exhibit 61), ("Miller's 4-30-91 Letter"). Miller's 4-30-91 Letter appears to explain how Lawson's adjusted service date would be calculated. The letter does not state what service date would be used to calculate Lawson's pension benefits under the Pittston Plan.

Lawson also received a June 24, 1991, memorandum from Miller explaining his employee benefits should he transfer to Heartland, (Exhibit 62) ("Miller's 6-24-91 Memo"). Miller's 6-24-91 Memo states in part:

> Retirement -- All hours worked for the Pittston Company and its subsidiaries will count toward years of service for retirement benefits.

Lawson testified that the first time he realized that his years of service with Paramont prior to January 1, 1989, would not be included in the calculation of his pension benefits under the Pittston Plan was in 1999 after he received a November 18, 1999, letter from Spurlock, (Exhibit 73) ("Spurlock's 11-18-99 Letter"). Spurlock's 11-

- 54 -

18-99 Letter explained that Pittston had "discovered an error in the way that some of the [pension benefit] payments had been calculated" and stated that "Pittston must correct these pension payments on a going-forward basis."

In late 1999 or early 2000, Lawson requested and received an estimate of his pension benefits under the Pittston Plan from Parsley. Parsley's cover letter sending this estimate was dated January 10, 2000, (Exhibit 72) ("Lawson's 1-10-00 Pension Estimate"). Lawson's 1-10-00 Pension Estimate stated Lawson was eligible for early retirement and, if he took early retirement, his estimated monthly benefits, if he chose the single life annuity option, would be $485.63 per month. The estimate also stated that if Lawson retired on his Normal Retirement date of August 1, 2010, and assuming he chose the single life annuity option, his current accrued monthly benefits would be $971.26, which included $170 in Paramont Plans benefits. These estimates were based upon 10 years of Benefit Accrual Service.

Lawson testified that after receiving this estimate, he sent a letter to Vaughn Groves, a corporate attorney for Pittston Coal, demanding certain information and informing the company that he believed misrepresentations had been made to employees concerning how their retirement benefits would be calculated under the Pittston Plan. (Exhibit 74.) Lawson testified that he never received a response to this letter. Lawson also testified that he notified Pittston that he was alleging that misrepresentations had been made to Paramont employees concerning how their pension benefits would be calculated under the Pittston Plan by his responses on the 2001 and 2002 Pittston Company and Susidiaries Annual Conduct Questionnaires.

- 55 -

(Exhibits 75 and 76.)

Lawson also testified that while he was employed by Pittston and its subsidiaries, he did not seek any other employment because he believed that his benefits with Pittston "were comparable to anything else in the coal industry." On cross-examination, Lawson admitted that both Holston and Heartland paid "top dollar" in the industry.

Addington testified that he was an employee of Paramont at the time of its acquisition by Pyxis in 1986. Addington, who goes by the nickname "Brooks," testified that he was employed by Paramont from April 1, 1976, to January 1, 1989, when he transferred to Pyxis. Addington stated that he knew that the Paramont Plan and the benefits he was eligible for under the Paramont Plan did not change when Paramont was acquired by Pittston. Addington testified that Quillen first spoke to him about his benefits in the fall of 1988 before he transferred to Pyxis and told him that all his time with Paramont would be considered in the calculation of any Pittston benefits down the road. On cross-examination, however, Addington admitted that Quillen did not tell him how his years with Paramont would count under the Pittston Plan. Addington testified that he continued to work for Pyxis until he took early retirement on January 1, 1995.

Addington testified that he did not receive any pension calculation or estimate of his pension benefit at the time that he completed his paperwork in the fall of 1994 to take early retirement effective January 1, 1995. He stated that all he knew at that

- 56 -

point was that his benefit under the Pittston Plan should be more than the maximum $350 a month under the Paramont Plans. He further testified that he never paid any attention to any of the Annual Benefit Statements he received.

After applying to take early retirement effective January 1, 1995, Addington received a letter from The Pittston Company Administrative Committee dated January 27, 1995, and signed by E. P. Cox, (Exhibit 95) ("Administrative Committee's 1-27-95 Letter"). The Administrative Committee's 1-27-95 Letter states:

> The Administrative Committee has approved your application for early retirement benefits under the provisions of the Company's Pension-Retirement Plan and has determined that you are eligible for a lifetime monthly actuarially reduced benefit of $2,140.43.
> ...
> Please direct all questions and concerns regarding your benefit from the Pension-Retirement Plan to Conley Parsley at the Pittston Coal Group ....

Addington also testified that as a result of the benefits listed in this letter, his wife also chose to take early retirement three months after he retired.

Addington testified that he continued to receive monthly retirement benefits from the Pittston Plan of $2,140.43 for five years. Addington testified that in 1999 he received a call from Spurlock, Ratliff and Dale Kurtz, Manager of Pensions & Group Insurance for the Pittston Company, informing him that there had been an error in the calculation of his retirement benefits and that his correct monthly retirement benefits were $806. Subsequent to that conversation, Addington received a November 8, 1999,

- 57 -

letter from Spurlock, (Exhibit 90) ("Spurlock's 11-8-99 Letter"). Spurlock's 11-8-99 Letter states:

Pittston Coal Company has recently conducted a comprehensive review and audit of the benefits calculated under the Company's Pension-Retirement Plan. As a result, all retiree benefits have been recalculated.

Throughout the recalculation process, our goal has been to ensure that every monthly benefit has been calculated according to the Plan rules, using accurate data. In some cases, discrepancies were found requiring an adjustment to the monthly retirement benefit.

Unfortunately, I must inform you that it has been determined that the amount that you have been receiving under the Pittston Pension-Retirement Plan has been incorrect. The original incorrect calculation has resulted in you being overpaid by the Plan. As explained below, your employment with Paramont from April 1, 1976, through December 31, 1988 was erroneously used when calculating your benefit under the Company's Pension-Retirement Plan. Such service with Paramont is recognized for Vesting Service, but is not recognized under the Pittston Pension-Retirement Plan for Benefit Accrual Service purposes.

Your benefit from the Paramont Pension Plan ($223.13) is added to your benefit under the terms of the Pittston Pension-Retirement Plan to determine your total retirement benefit. Your benefit under the Pension-Retirement Plan is determined using your salary and service after December 31, 1988 (prior to January 1, 1989 you were employed by Paramont, and covered under the Paramont Pension Plan). Unfortunately, when your benefit was originally calculated, service prior to January 1, 1989 was used to calculate your Pension-Retirement Plan benefit. In essence, your service from April 1, 1976 through December 31, 1988 was erroneously used to determine your benefit under both the Paramont Pension Plan and the Pittston Pension-Retirement Plan. As a result of this error, you have been overpaid and your monthly benefit will be reduced by $1,333.52 each month effective January 1, 2000. Your

- 58 -

recalculated monthly benefit will be $806.91.

Addington testified that he currently receives $806.91 in monthly benefits from the Pittston Plan. He further testified that neither he nor his wife would have retired had he and she known that his monthly retirement benefits would be only $806.91.

Addington testified that he attended the meeting in January 1990 with all Pyxis employees at Clinch Valley College. Addington also testified that he recalled Spindler responding to a question and stating that the employee's retirement benefits under the Pittston Plan would include their time with Paramont. On cross-examination, Addington admitted that Spindler did not say how this time would be included under the Pittston Plan.

Blanton testified that he worked for Paramont from July 8, 1974, to December 13, 2002. Blanton testified that he learned of the acquistion of Paramont by Pyxis in 1986 from Quillen when he visited his mine site. In particular, Blanton stated that Quillen told him and the others present that nothing would change regarding their Paramont benefits after the acquisition.

Blanton also testified that he attended the January 1990 meeting a Clinch Valley College. Blanton stated that at this meeting Spindler, in response to a question regarding whether employees would be given credit for their time with Paramont under the the Pittston Plan, stated "nothing will change." Blanton admitted, however, that Spindler did not explain how benefits would be calculated under the Pittston Plan.

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 59 of 117   Pageid#: 612

Blanton testified that before this meeting, he had made some inquiries about obtaining another job, but that after this meeting he withdrew from consideration for those jobs. Blanton admitted that he received a copy of the 1988 Paramont Handbook, (Exhibit 2).

Meade testified that he worked for Paramont from 1977 to 1985. Meade also testified that he was hired by Pyxis in 1990 and continued to work with Pittston-affiliated companies until January 2001. Meade further testified that from approximately 1986 to 1990 he performed contract consulting work for Paramont. Meade stated that sometime in 1987 or 1988, as a result of his consulting work, he was present during a meeting with Quillen and other Paramont workers in the parking lot of Paramont's Esserville offices. At this meeting, according to Meade, Quillen told the employees that they would receive credit for their time worked with Paramont under the Pittston Plan. On cross-examination, however, Meade admitted that he could not remember exactly what Quillen said in this meeting other than that the Paramont Plan was being merged into the Pittston Plan. He admitted that he assumed that this meant that he would receive credit for his time with Paramont under the Pittston Plan.

While Meade was not an employee of Paramont in 1988, his wife was. Meade admitted that it was likely that she had received Robinette's 11-10-88 Letter and that she had shared that letter with him.

Meade testified that in September 1990 he began working in the internal audit department of The Pittston Company at its Lebanon office. At the time that he

- 60 -

accepted this position, Meade received a letter from Joseph G. Jandrasits, Manager of the Southern Audit Region for The Pittston Company, dated September 14, 1990, (Exhibit 43) ("Jandrasits's 9-14-90 Letter").  Jandrasits's 9-14-90 Letter states:

> Your prior employment with Paramont Mining Corporation, July 1977 to June 1985,  ... will be reviewed in order to determine if any of this time can be applied towards vacation or other applicable employee benefits.

Meade testified that, in response to this letter, he called Fox and asked what had been decided.  According to Meade, Fox advised him that his time with Paramont would be included in determing his eligibility for certain employee benefits including retirement benefits under the Pittston Plan.

Meade testified that after he transferred to Pyxis in 1992, he received a copy of a December 21, 1992, memorandum from Eddie W. Neely, Vice-President of Finance for Pyxis, to Gary Sisk, Manager of Human Resources for Pyxis, (Exhibit 44) ("Neely's 12-21-92 Memo"). Neely's 12-21-92 Memo states:

> Please use this memo as your authority to record the benefit and vesting service date of the above referenced individual as October 28, 1981. This date reflects the agreement between Rick and myself at his re-hire date.

On cross-examination, Meade testified that he understood that Neely's 12-21-92 Memo was addressing the company's break in service rules.  He further stated that he and Neely had no conversations about what, if any, effect this would have on his pension benefits.

- 61 -

Meade testified that he relied on statements that his time with Paramont would be counted in calculating his pension benefits under the Pittston Plan in that he chose not to seek other job opportunities. While Meade admitted that he had received a number of Annual Benefit Statements from the Pittston Plan over the years, he stated that he knew these statements were only estimates of his future retirement benefits, and that he did not take any action in reliance on the information contained in these statements.

Robinette also appeared and testified at trial. Robinette stated that he was the director of Human Resources with Paramont when Paramont was acquired by Pyxis in 1986. Robinette stated that, in this position, he reported directly to Quillen, Paramont's President. He also stated that he was the individual primarily responsible for communicating with Paramont employees regarding employee benefits, including pension benefits. Robinette further stated that he served on the Administrative Committee of the Paramont Plans along with Quillen in 1986.

Robinette stated that he was transferred to Pyxis effective January 1, 1988. Robinette stated that after he transferred to Pyxis, he was responsible for human resources for all of Pyxis's various divisions, including Paramont. Robinette left his employment with Pyxis in November 1989.

Robinette testified that there were no changes in the Paramont employees' retirement benefits as a result of the acquisition of Paramont by Pyxis in 1986. He further testified that he never heard Quillen or anyone else tell any Paramont employees

- 62 -

that there would be any change in their retirement benefits as a result of the acquisition.

Robinette testified that in 1987 he participated in a Benefits Review Committee established to review the benefits offered employees in each of Pyxis's divisions. He stated that he, Ray Williams, Lennon and Ed Cox served on this committee. Robinette testified that a number of the benefits changes that this committee considered were set out in a March 30, 1987, Memorandum from Lennon, (Exhibit 13) ("Lennon's 3-30-87 Memo"). Robinette testified that Lennon's 3-30-87 Memo accurately reflected that the committee considered a number of changes, but, as of March 30, 1987, the only change in the benefits of Paramont employees that the committee was recommending was the implementation of a post-retirement medical plan.

Robinette testified that in the fall of 1987 he received a memorandum from Quillen dated September 2, 1987, (Exhibit 122) ("Quillen's 9-2-87 Memo"), advising Robinette that Quillen was considering transferring 15 employees, including Robinette, to Pyxis as part of the "Pyxis/Paramont administrative consolidation." Quillen's 9-2-87 Memo asked Robinette to prepare a benefit package summary for these employees. Robinette stated that he prepared a benefit comparison and returned it to Quillen for his review attached to a September 16, 1987, memorandum, (Exhibit 123) ("Robinette's 9-16-87 Memo").

Robinette stated that Quillen never told him that he had incorrectly stated that the employees' years of service with Paramont would count only for vesting purposes. Instead, Robinette stated, Quillen distributed the two-page chart to all the employees

- 63 -

who were transferring to Pyxis along with a cover memorandum identical to the one sent to Lawson, (Exhibit 54).

Robinette also specifically testified that he was never told, and that he never told anyone who was transferring to Pyxis, that they would receive credit for their years of service with Paramont in their Benefit Accrual Service used to calculate benefits under the Pittston Plan. Robinette testified that he later attended a meeting with all the transferring Paramont employees and Fox at Paramont's Esserville offices. Robinette stated that he does not recall anyone at that meeting telling the employees that their years of service with Paramont would be counted toward the Benefit Accrual Service in calculating benefits under the Pittston Plan. He stated that after the meeting he had the same understanding as before, that their years of service with Paramont would count for vesting purposes under the Pittston Plan.

Robinette also testified that in 1988 Pyxis began considering merging the Paramont Plans into the Pittston Plan because the number of employees participating in the Paramont Plan for salaried employees had fallen below a required minimum participation level. As a result of these discussions, Robinette sent a memorandum dated August 24, 1988, to Quillen, (Exhibit 126) ("Robinette's 8-24-88 Memo"). Robinette's 8-24-88 Memo stated in part:

> The more favored approach is to merge these salaried participants into the Pittston Plan. Since the accrued benefits payable under the Paramont Plan on December 31 of this year cannot be reduced, employees would still be entitled to this benefit as early as age 55 if elected. In addition, for benefit service under the Pittston Plan beginning

- 64 -

January 1 to retirement, benefits payable under this plan would be substantially larger than [those] under the Paramont Plan....

Robinette also testified that after receiving this memorandum, Quillen never told him that he had incorrectly stated that, if the plans merged, Paramont employees would not receive credit for their years of service with Paramont in their Benefit Accrual Service used to calculate benefits under the Pittston Plan.

Robinette testified that after the decision was made to merge the plans, he sent a letter dated November 10, 1988, to all Paramont employees, (Exhibit 3). Robinette also specifically testified that Quillen reviewed this letter before it was distributed to Paramont employees. Robinette further testified that neither Quillen nor anyone else ever told him that any of the information contained in this letter was incorrect. Robinette testified that he never told any Paramont employees that they would receive credit for their years of service with Paramont for any purpose under the Pittston Plan other than for vesting purposes. Robinette also stated that neither Quillen nor anyone else ever told him that the information contained in the Paramont Pride Article, (Exhibit 126), was incorrect. Robinette further stated that he never heard Quillen or anyone else ever tell any Paramont employee that he would get credit for his years of service with Paramont in the calculation of his benefits under the Pittston Plan. Robinette also testified that he did not consider himself a fiduciary under the Pittston Plan because he had no responsibility for plan assets, plan administration or plan documents.

Rhonda Miller Perkins, ("Miller"), also testified at trial. At the time of Pyxis's acquisition of Paramont in 1986, Miller worked in Paramont's human resources

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 65 of 117   Pageid#: 618

department assisting Robinette. Miller testified that at the time of the acquisition of Paramont by Pyxis, she did not hear Quillen or anyone else tell any Paramont employees that their pension benefits would change. In fact, Miller testified that, to her knowledge, Paramont employees' pension benefits did not change based on Pyxis's acquisition of Paramont.

Miller testified that in the fall of 1987 she was notified that she was being transferred to Pyxis effective January 1, 1988. Before this transfer occurred, Miller testified, she attended a meeting, along with other employees who were transferring to Pyxis effective January 1, 1988, at which Fox explained the change in their employee benefits. Miller testified that Fox told the employees present that their pension benefits earned under the Paramont Plans would be frozen effective January 1, 1988, and that, as of that date, they would begin to earn benefits under the Pittston Plan. Miller stated that Fox did tell those present that their years of service with Paramont would count for vesting purposes under the Pittston Plan.

Miller also testifed that as a result of the merger of the Paramont Plan and the Pittston Plan in the fall of 1988, all Paramont employees' pension benefits under the Paramont Plans were frozen as of January 1, 1989, and they would begin to earn benefits under the Pittston Plan from that day forward. Miller also stated that she never told any Paramont employee that they would receive credit for their years of service with Paramont in the calculation of their benefits under the Pittston Plan.

Miller testified that in December 1988 she was the editor of the Paramont Pride.

- 66 -

She also testified that, as editor, she submitted all articles to Quillen for his review before inclusion in the Paramont Pride. Miller specifically testified that Quillen reviewed the Paramont Pride Article, (Exhibit 126), before it was published, and that neither Quillen nor anyone else ever told her that the information contained in this article was inaccurate. Miller further testified that in December 1988, the Paramont Pride was distributed to all Paramont, Motivation and Pyxis employees by mailing it to their home address.

Miller testified that in April 1990 she served as Paramont's Manager of Employee Benefits and Insurance. In this role, she sent a letter to all Paramont employees with a benefit statement for the Paramont Production Incentive Plan, (Exhibit 8) ("Miller's 4-10-90 Letter"). Miller's 4-10-90 Letter states in part:

> Attached you will find your Production Incentive Plan benefit statement for 1989. ... Please remember this is just one portion of your retirement plan. ...

> You will receive a statement on the other two parts of your pension retirement plan in early May as well as a sample form showing how your retirement benefit is calculated. These two parts consist of your pension benefit from the Paramont Plan through December 31, 1988 and your pension benefit from the Pittston Plan from January 1, 1989. You will recall that the Paramont Defined Benefit Plan was frozen on December 31, 1988. All vested Paramont employees will receive a fixed amount calculated as of this date upon retirement. Everyone employed beginning January 1, 1989 will also receive a pension-retirement benefit from the Pittston Plan if vested. Employees vested in the Paramont Plan are also vested in the Pittston Plan. ...

> We all realize that pension-retirement plans are not easily

- 67 -

understood. We try to provide you with as much information on the plans as possible. A summary plan description booklet which explains the Pittston Pension-Retirement Plan will be available soon and will be mailed to you. In the meantime, if you have specific questions, please do not hesitate to contact the Employee Benefits Department.

Miller also testified that she helped prepare and sent a May 15, 1990, letter from Scott Perkins, ("Perkins"), then the President of Paramont, to all Paramont employees, (Exhibit 7) ("Perkins's 5-15-90 Letter"). Perkins's 5-15-90 Letter states in part:

> Many of you have inquired as to the value of your retirement account under the Pittston Pension Retirement Plan and the frozen portion of your Paramont Retirement Plan. The enclosed summary outlines your normal retirement date, estimated monthly retirement pension and estimated social security benefit. It also lists the amount of your fixed Paramont benefit which is included in your estimated monthly retirement pension.

> Enclosed also is a sample calulation of how one's pension benefit may be estimated. The formula for calculating your actual pension benefit is not quite this simple. Perhaps, however, this example may give you a better understanding of the process.

> Please remember that your Pension Retirement Plan is guaranteed upon vesting. These particular amounts are not guaranteed. They are projections which will change with your length of service, wage changes, overtime, etc. If you have any additional questions, please don't hesitate to contact the Employee Benefits Department.

Miller testified that she prepared the sample pension calculation attached to the letter in accordance with her understanding of how the Paramont employees would accrue benefits under the Pittston Plan. This attached sample calculation stated:

- 68 -

Assume one retires at age 63 ... with 8 years of service under the Pittston Pension-Retirement Plan. Prior 14 years of service were with Paramont and benefit was frozen at 12-31-88.

Assume the Average Annual Salary for 36 consecutive months is $52,500.

Covered Compensation Value as established by Social Security guidelines for someone born in 1927 is $21,000.

Social Security Offset Calculation

$21,000 x .0055 x 8 years = $924.00

Life Annuity Calculation

$52,000 x .021 x 8 years = $8,820
$8,820 - $924       = $7,896/12 = $658 Monthly Pension Benefit

Because this person chose to retire at 63, the monthly pension benefit is reduced by 10 percent or $658 x .90 = 592.20

| | |
|---|---|
| Monthly pension benefit under Pittston Plan | $592.20 |
| Frozen pension benefit under Paramont Plan | 214.38 |
| TOTAL MONTHLY PENSION BENEFIT | $806.58 |

Miller testified that the hypothetical individual used in this sample calculation had only eight years of Benefit Accrual Service under the Pittston Plan, but had worked a total of 22 years for Paramont.

Miller testified that after Robinette left Pyxis, she, on occasion, would perform retirement benefits calculations for employees. Miller stated that she did not

- 69 -

specifically remember preparing any such calculation for Addington, but that, if she did prepare such a calculation, she would not have included his years of service with Paramont prior to January 1, 1989, in calculating his benefits under the Pittston Plan. Miller also testified that she never told Lawson that his years with Paramont would be included in determining his Benefit Accrual Service under the Pittston Plan. Miller testified that she prepared and sent Exhibit 62, Miller's 6-24-91 Memo, to Lawson on June 24, 1991.

Fox also testified at trial. Fox testified that she worked with the Pittston Company from sometime in the 1970s until she left her employment in 1994. At the time she left her employment, she was the Employee Benefits Manager of Pittston. Prior to that time, she had been the Assistant Employee Benefits Manager. Fox testified that, as Employee Benefits Manager for Pittston, she had some administrative responsibilities regarding the Pittston Plan, which included recordkeeping, calculations and processing payments. Fox stated that she was never a member of the Administrative Committee of the Pittston Plan. Fox testified that she had no authority to change the terms of the Pittston Plan and no authority to change how employees' Benefit Accrual Service was calculated under the Pittston Plan. She stated that if she had questions regarding the plan language, she took those questions to her supervisor, Ed Cox, who was a member of the Administrative Committee of the Pittston Plan.

Fox testified that she did not recall making a specific trip to Paramont's Esserville offices in 1987 to explain Pittston's employee benefits to a group of Paramont employees who were transferring to Pyxis effective January 1, 1988,

- 70 -

although she admitted that she did travel a lot during that time period to explain Pittston's employee saving investment plan.

Fox stated that she never told any Paramont employees, and she never heard anyone else ever tell any Paramont employees, that their years of service with Paramont prior to January 1, 1989, would be used to calculate their retirement benefits under the Pittston Plan.

Fox admitted that she sent a memorandum to Larry Miller dated May 30, 1991, (Exhibit 302, p. 14) ("Fox's 5-30-91 Memo"), regarding the calculation of his benefit service under the Pittston Plan. Fox's 5-30-91 Memo states that Miller's time with Paramont prior to January 1, 1989, would be included in his Benefit Accrual Service under the Pittston Plan. Despite the language of Fox's 5-30-91 Memo, Fox testified that Miller's Benefit Accrual Service under the terms of the Pittston Plan would not include his years of service with Paramont.

Fox testified that during her tenure at Pittston, she assisted in the production of annual employee benefits statements. Fox stated that the actual statements were produced by an independent firm named Kwasha Lipton from data provided to it by Pittston's various operating groups. Fox testified that microfiche copies were kept of all the data provided to Kwasha Lipton, and that Exhibit 534 was a copy of some of these microfiche copies. Fox testified that in gathering this data, Pittston used location codes to indicate which Pittston-related company the employees worked for. Fox testified that Exhibit 166 contained an explanation of these codes. She stated that "C"

- 71 -

stood for coal-related salaried employees, "E" stood for coal-related hourly employees, "H" stood for Pyxis, "I" stood for Paramont, "J" stood for Motivation, "K" stood for Holston and "M" stood for Heartland.

Spurlock also testified at trial. Spurlock testified that he was the Vice President of Human Resources for Brink's US, a subsidiary of the Brink's Company. Spurlock stated that he has held this position since 1993 and that, before that date, he was the Vice President of Human Resources for Pittston Coal Management Company from 1987. Spurlock stated that he worked from 1986 to 1987 as director of labor relations for the Pittston Coal group companies. Spurlock stated that in 1994 his department began handling some of the administration of employee benefits for Pittston's nonunion coal companies. At that time, Spurlock stated that he had to become familiar with the benefits provided to Paramont employees under the Pittston Plan. Spurlock stated that it was his understanding that, under the Pittston Plan, Paramont employees were entitled to an accrued frozen benefit calculated under the Paramont Plans effective December 31, 1988, and also began receiving credit for benefits under the Pittston Plan effective January 1, 1989.

Spurlock testified that he never instructed anyone working for him to give Paramont employees credit for their time with Paramont prior to January 1, 1989, in the calculation of benefits under the Pittston Plan. Spurlock stated that he first became aware that some of Pittston's annual employee benefit statements had contained inaccurate information regarding pension benefits in late 1998. Spurlock said he learned of the problem when his office was asked to perform a pension benefit

calculation for an employee named David McCarty and the calculation performed by his office was different from the information McCarty had received in his annual benefit statements. Spurlock testified that in 1999 or 2000 Pittston undertook an audit of all pension benefits calculations and that, through this audit, the error in Addington's pension benefits calculation was discovered. As a result of this audit, Spurlock stated that he sent a letter dated November 18, 1999, (Exhibit 73) ("Spurlock's 11-18-99 Letter"), to the employees of all Pittston-affiliated companies. Spurlock's 11-18-99 Letter states in part:

> During a review of some individual retirement payments, we discovered an error in the way that some of the payments had been calculated. This prompted an analysis of all our pension calculations. We have determined that certain monthly retirement benefits paid to Pittston Coal Company retirees were miscalculated. Unfortunately, errors occurred over a period of years, and among many Coal Companies. Some of these retirees have been receiving monthly pension checks that are too high and others are receiving checks that are too low. The majority of our retirees' benefits will remain unchanged, or will increase. Of those retirees affected, the average increase in benefits will be approximately $16 per month with the average decrease being approximately $22 per month. You may have heard that some retirees will see a drastic decrease in their benefit amount. While a handful of retirees will see a rather large decrease in their benefit, this is the exception, and not the norm. There will be far more benefit increases, and some retirees will receive sizeable retroactive payments. ...

> Pittston must correct these pension payments on a going-forward basis. Our pension plan is governed by the Internal Revenue Code and in order to remain in compliance with the rules governing the Plan, as well as to fulfill the Company's responsibilities to all of the Plan participants, the Plan must operate according to its established rules. ...

- 73 -

(Exhibit 73).

Spurlock also testified that, as a result of the audit of pension benefit calculations, errors in annual employee benefits statements also were discovered. As a result, he and Parsley began investigating why inaccurate information had been included in the annual employee benefit statements. As a result of these errors, Pittston decided to no longer send annual employee benefit statements in 1999. Also, as a result of these errors, Pittston went back and recalculated estimated retirement benefits for more than 700 prior and current Pittston employees. Spurlock testified that all current and former Paramont employees were notified by letter from him dated September 25, 2000, (Exhibit 45) ("Spurlock's 9-25-00 Letter"), that they would be provided with new estimated pension calculations. Attached to Spurlock's 9-25-00 Letter was a September 23, 2000, letter from Robert A. McGregor, Paramont's Vice President, explaining how Paramont employees' retirement benefits were calculated under the Pittston Plan. Also attached to Spurlock's 9-25-00 Letter was a May 15, 1990, letter from Perkins, President of Paramont.

Spurlock testified that these new estimated pension calculations were provided to the current and former Paramont employees in November 2000. Spurlock stated that he sent a letter dated November 30, 2000, (Exhibit 46) ("Spurlock's 11-30-00 Letter"), along with a November 30, 2000, letter from McGregor, to each former Paramont employee with the pension benefits estimate attached. Spurlock stated that McGregor's letter with a pension benefits estimate attached went to all current

- 74 -

Paramont employees. Spurlock testified that there were actually two versions of McGregor's 11-30-00 letter, one sent if the employee's 1998 annual benefits statement had been correct and one sent if the employee's 1998 annual benefits statement had been incorrect.

In preparation for his testimony, Spurlock stated that he reviewed each page of Exhibit 534, and that Exhibits 704 and 711 contained an accurate summary of the information contained in Exhibit 534. Spurlock stated that his review of the records contained in Exhibit 534 showed that the plaintiffs in this case had received a total of 836 annual employee benefits statements from 1988 to 1998. Of these 836 statements, only 67 of them, or 8 percent, contained incorrect information. Of the original 132 plaintiffs in this case, only 16 had received one or more incorrect annual employee benefits statement.

Lennon also testified by deposition and live at trial. Lennon stated that he was currently Vice President of Human Resources and Administration for the Brink's Company. Lennon testified that he started work with Pittston in 1977 as director of risk management, insurance and employee benefits. Lennon testified that in 1986 he was Vice President of Human Resources and Administration for Pittston, the same job he currently holds. Lennon testified that he was familiar with the Paramont Plans at the time that Pyxis acquired Paramont in 1986, and that no changes were made in the Paramont employee benefits at the time of the acquisition. He further testified that he never told anyone that there would be any changes in Paramont employee benefits as a result of the merger.

- 75 -

Lennon also testified that he was on the Administrative Committee of the Pittston Plan at the time the decision was made to merge the Paramont Plans into the Pittston Plan. Lennon testified that, pursuant to the terms of the merger of the plans, Paramont's employees would be eligible to receive the benefit they had accrued under the Paramont Plans as of December 31, 1988, and would be eligible to begin accruing benefits under the Pittston Plan effective January 1, 1989. Lennon testified that he never communicated to anyone that the terms of the merger were different, nor did he authorize anyone to communicate any different terms.

Lennon testified that he participated in the drafting of Robinette's 11-10-88 Letter. Lennon further testified that Robinette's 11-10-88 Letter accurately set out his understanding of the merger's effect on Paramont employees' retirement benefits. Lennon stated that he never told any Paramont employees anything inconsistent with Robinette's 11-10-88 Letter, and that he never told anyone else to tell Paramont employees anything inconsistent with Robinette's 11-10-88 Letter. Lennon specifically testified that he never authorized Quillen to tell Paramont employees anything inconsistent with Robinette's 11-10-88 Letter. Lennon also testified that Quillen had no discretionary authority with regard to the Pittston Plan, did not have any authority to change the terms of the Pittston Plan and did not have any authority to grant benefits inconsistent with the terms of the Plan. Lennon also testified that Neeley had no responsibility to communicate with employees about the Pittston Plan. Lennon testified that Fox, Robinette and Miller had no authority to grant benefits under the Pittston Plan beyond those described in the plan.

- 76 -

Lennon testified that, after the merger of the Paramont Plans into the Pittston Plan, the administration of the Pittston Plan was "fairly decentralized" with local human resource offices responsible for most of the direct contact with employees concerning their pension benefits, including answering questions and providing estimates of benefits and benefit calculations. Lennon testified that the administration of the Pittston Plan remained decentralized until some time in the late 1990s when Pittston realized that errors were being made by the local human resources offices and decided to transfer the administration of the Pittston Plan back to its corporate offices.

Lennon testified that he never instructed anyone to give any incorrect information to Kwasha Lipton for use in preparing employees' annual benefits statements. He further testified that he never instructed anyone to use a date before January 1, 1989, for the Benefit Service Accrual date for any Paramont employee under the Pittston Plan.

Lennon testified that in the late 1990s Pittston undertook a comprehensive audit of every pension benefits calculation ever performed and forwarded to the Pittston Plan trustees for payment. Lennon stated that, during this audit process, Spurlock informed him that some of the annual employee benefit statements also had contained inaccurate information. Lennon testified that before Spurlock came to him with this information, he was not aware of incorrect Benefit Service Accrual dates being used to calculate pension benefit estimates for Paramont employees.

Lennon testified that under the terms of Pittston's 401(k) plan, highly

compensated employees were limited to contributions of only five percent of their salary per year from the early 1980s forward so that the plan could meet applicable Internal Revenue Service, ("IRS"), standards.

Lennon also testified that, prior to late 1999 or early 2000, most of the day-to-day administration of the Pittston Plan was handled by the subsidiaries' local human resources offices and their personnel. He stated that if employees had questions about their retirement benefits, they were instructed to contact their local human resources office. He further stated that the Administrative Committee approved of this procedure.

Lennon testified that from 1986 to 1989 the administrator of the Pittston Plan was the Pittston Company and that the Pittston Company delegated this function to the Administrative Committee. Lennon also testified that in the fall of 1988 the Pittston Plan was amended to allow the Administrative Committee to amend the plan. Lennon further testified that the merger of the Paramont Plans into the Pittston Plan was accomplished by an amendment to the Pittston Plan approved by the Administrative Committee. Lennon testified that no one with Pittston or any of its subsidiaries had the authority grant benefits to a plan participant that were inconsistent with the language of the plan. He further testified that the only way benefits could be granted contrary to the language of the plan was for the Administrative Committee to formally amend the plan.

Lennon testified that under the Paramont Plans, all Paramont employees were

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 78 of 117   Pageid#: 631

automatically participants in the Paramont Plans, and that the employees did not make any contributions into the plans. Lennon also testified that when various Paramont employees were transferred to Pittston Plan participating companies, they automatically became participants in the Pittston Plan, they had no election to make and no contribution was required. Lennon further testified that when the Paramont Plans merged into the Pittston Plan on January 1, 1989, all Paramont employees automatically became participants under the Pittston Plan; they had no election to make and no contribution was required.

Perkins also testified at trial. Perkins testified that he began work with Pyxis in 1987. In 1988, Perkins became General Manager of Operations for Paramont and, in 1989, Perkins became Vice President of Pyxis. Perkins testified that, after the merger of the Paramont Plans into the Pittston Plan, he understood that Paramont employees would receive the amount of benefits which they had accrued under the Paramont Plans up until the date of the merger, and that after the merger, they would begin to accrue benefits under the Pittston Plan. Perkins stated that he gained this understanding of the Paramont retirement benefits from various discussions and meetings. Perkins stated that he never heard Quillen or Ratliff tell anyone anything inconsistent with his understanding of how the Plan worked.

Perkins stated that Miller drafted and he reviewed and sent out a May 15, 1990, letter to all Paramont employees, (Exhibit 7) ("Perkins's 5-15-90 Letter"), with a sample calculation showing how their retirement benefits would be calculated. Perkins testified that after this letter was distributed, no one told him that his letter or the

- 79 -

sample calculation was wrong. Perkins stated that he worked with Ratliff on a daily basis at that time.

Parsley also testified at trial. Parsley worked with Pittston in its Lebanon offices from August 1983 to March of 2003. Parsley stated that for the last few years he worked for Pittston, his title was Personnel and Compensation Manager. He stated that he assumed some administrative duties with regard to the Pittston Plan beginning in 1994, including providing calculation of retirement benefits on occasion. Parsley stated that he was never on the Administrative Committee of the Pittston Plan and that he had no authority to change the terms of the Pittston Plan.

Parsley stated that he performed a pension benefit calculation for Addington sometime in late 1994 or early 1995. After doing the calculation, Parsley said he sent the calculation to Pittston's corporate headquarters for approval, which was the procedure. He stated that he was notified by Pittston's corporate office to change Addington's Benefit Service date to January 1, 1989, and recalculate his benefits. Parsley testified that he changed Addington's Benefit Service date to January 1, 1989, in one field of the computer program, but did not change the date in another field, and that when he recalculated the benefits, this error led to Addington's retirement benefits being incorrectly calculated by including his years of service with Paramont prior to January 1, 1989, (Exhibit 419) ("Addington's 1-9-95 Pension Calculation"). Parsley testified that, by providing this inaccurate calculation to Addington, he did not mean to grant him credit toward calculation of his retirement benefit for any years of service not provided for by the Pittston Plan.

- 80 -

Parsley testified that he first learned that incorrect information had been provided in some of Pittston's annual employee benefit statements when McCarty informed him that a pension calculation Parsley had provided to him was different from his annual benefit statement. Parsley stated that he discovered that the wrong Benefit Service Accrual date had been used to calculate the estimated pension benefits listed on McCarty's annual benefit statement. Parsley said that he also discovered errors in other annual benefit statements and so he notified Pittston's corporate headquarters of the problems he had found.

Ralph Dado also testified at trial. Dado testified that he worked for Pittston-affiliated companies from 1972 until he retired in 1999. He became Vice President for Operations of Pyxis in 1992. In this role, Dado said that he attended numerous meetings at job sites, at which a number of items were discussed with Paramont employees, including pension benefits. Dado stated that he had been present when Ratliff had explained how the Paramont employees' pension would work after the merger of the Paramont Plans into the Pittston Plan. Dado testified that he had heard Ratliff tell employees that, under the Pittston Plan, they would receive the benefit they had accrued under the Paramont Plans at the time of the merger and would begin earning benefits under the Pittston Plan from the time of the merger forward. Dado specifically testified that he never heard Ratliff or anyone else tell any Paramont employee that they would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan.

Tracey Rennie testified by deposition. According to Rennie she worked as a

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 81 of 117   Pageid#: 634

benefits analyst for Pittston from 1999 to October 2000. While she worked for Pittston, her legal married name was Tracey Brown. Rennie stated that she was hired to recalculate pension benefits for employees under an audit that Pittston was performing. Rennie said that she was told that the audit was being conducted because many of the local human resource offices had made errors in the calculation of benefits. Rennie reported to Dale Kurtz. Rennie stated that she remembered that many employees' benefits had to be calculated a number of times based on discrepancies in dates of service. Rennie also remembered that there were issues concerning the years of service that would be included in the calculation of benefits for Paramont employees.

Paul W. Douglas testified by way of deposition. Douglas stated that he had served as Chairman of the Board of Directors and Chief Executive Office of The Pittston Company from 1984 until his retirement in 1991. Douglas testified that he met with Quillen around the time of Pyxis's acquisition of Paramont, but they did not have any discussions regarding Paramont employees receiving credit for their service with Paramont in the calculation of benefits under the Pittston Plan. Douglas testified that Paramont was the first significant nonunion coal operation that Pittston acquired.

Farrell also testified by way of deposition Farrell testified that he retired from his position as Chairman and Chief Executive Officer of The Pittston Company in 1998. Farrell testified that he worked for Pittston for 14 years. He began his work with Pittston in 1984 as senior or executive vice president. Farrell stated that he became President of Pittston in 1990 and Chairman and Chief Executive Officer in 1991.

- 82 -

Farrell testified that he first met Quillen near the time that he was negotiating the acquisition of Paramont by Pyxis. Farrell stated that Quillen did not participate in these discussions because he was not a significant equity owner of Paramont. Farrell stated that, prior to Pyxis's acquisition of Paramont, Pittston did not have any significant nonunion operations, and Pittston's desire to expand into nonunion coal operations was at least part of the motivation for Pyxis's acquisition of Paramont.

Farrell testified that he never told Quillen, and that he never heard Douglas tell Quillen, that after Pyxis's acquisition of Paramont, Pittston would grant Paramont employees Benefit Accrual Service credit under the Pittston Plan for their years of service with Paramont before the Paramont Plans were merged into the Pittston Plan. Farrell also testified that he never made such a representation to anyone at Paramont. In fact, Farrell testified that he specifically told Quillen that Paramont employees would not receive Benefit Accrual Service credit under the Pittston Plan for their years of service with Paramont before the plans were merged.

## II. ANALYSIS

As stated above, the only claim remaining before the court is the plaintiffs' claim that the defendants breached their fiduciary duties by providing plaintiffs inaccurate and untruthful information about the inclusion of their years of service with Paramont prior to January 1, 1989, in the calculation of their retirement benefits under the Pittston Plan. Plaintiffs bring this claim under ERISA § 502(a)(3), which provides:

- 83 -

A civil action may be brought --

(3)    by a participant, beneficiary, or fiduciary ... (B) to obtain other
        appropriate equitable relief (i) to redress such violations or (ii) to
        enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C.A. §1132(a)(3) (West 1999).


In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court recognized

the rights of individual participants to sue a person acting as a fiduciary under an

ERISA plan for breach of fiduciary duty under § 502(a)(3).  To establish such a claim,

a  plaintiff must show 1) that a defendant was a fiduciary of the ERISA plan; 2) that

a defendant breached its fiduciary responsibilities under the plan; and 3) that the

participant is in need of injunctive or "other appropriate equitable relief" to remedy the

breach.  *See Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 470 (M.D. N.C.

2002) (citing *Griggs v. E.I. Dupont De Nemours & Co.*, 237 F.3d 371, 379-80 (4th

Cir. 2001)).[1]


Thus, to determine whether these plaintiffs have proven their breach of fiduciary

_____

[1]  At least one other circuit has stated the elements of a breach of fiduciary
duty claim as "(1) the defendant's status as an ERISA fiduciary acting     as a
fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of
that misrepresentation; and (4) detrimental reliance by the plaintiff on the
misrepresentation." *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3rd Cir.
2001).  It does not appear that the Fourth Circuit has specifically ruled that a
plaintiff must prove materiality or detrimental reliance to prevail on a breach of
fiduciary duty claim based on a misrepresentation. Nonetheless, it would appear
that these elements should be taken into consideration in determining whether
granting relief to a particular plaintiff would be "appropriate."

- 84 -

duty claim entitling them to recovery under § 502(a)(3), the court must answer the following questions:

1. Did anyone provide these plaintiffs with inaccurate and untruthful information concerning their benefits under the Pittston Plan?

2. If someone did provide these plaintiffs with inaccurate and untruthful information concerning their benefits under the Pittston Plan, was that person acting as a "fiduciary" under the Pittston Plan? and

3. If someone acting as a fiduciary provided these plaintiffs with inaccurate and untruthful information concerning their benefits under the Pittston Plan, is injunctive or "other appropriate equitable relief" needed?

The court will address each of these questions in turn, starting with the issue of whether anyone provided these plaintiffs with inaccurate and untruthful information concerning their benefits under the Pittston Plan.

The Court in *Varity* recognized that a fiduciary's intentional misrepresentations would breach the duty owed plan beneficiaries. *See Varity*, 516 U.S. at 506. It is important to note, however, that the Court, in reaching its decision in *Varity,* specifically stated that it was not questioning the lower courts' "findings of serious deception." *Varity*, 516 U.S. at 492. Nonetheless, the Court stated, "To participate knowingly and significantly in deceiving a plan's beneficiaries ... is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity*, 516 U.S. at 506 (quoting ERISA § 404(a)(1), 29 U.S.C.A. § 1104(a)(1) (West 1999); *see also Harte v.*

- 85 -

*Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3rd Cir. 2000) (ERISA administrators have a fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures") (internal quotation marks omitted); *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3rd Cir. 1993) ("when a plan administrator speaks, it must speak truthfully"); *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992) (stating that an employer violates its fiduciary duties by misleading employees regarding the availability of participation in a plan); *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983) ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in [29 U.S.C. § 1104]").

While the Supreme Court in *Varity* held only that a fiduciary's intentional, knowing deception would breach the duty owed plan beneficiaries, courts, including the Fourth Circuit, have since found breaches of fiduciary duty based on much less culpable misrepresentations or, even, a failure to communicate material information. *See Griggs*, 237 F.3d at 380-84. In *Griggs* the Fourth Circuit recognized,

> a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary. ERISA administrators have a fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures."

*Griggs*, 237 F.3d at 380 (quoting *Harte*, 214 F.3d at 452).

In *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir. 1996) (citing

- 86 -

*Central States, Southeast & Southwest Areas Pension Fund v. Central Transport Inc.*, 472 U.S. 559 (1985)), the Fourth Circuit recognized that the fiduciary responsibility provisions under ERISA invoke the common law of trusts, including the trustee's common law duty to give beneficiaries complete and accurate information as to the nature and amount of the trust property upon request.

Throughout this case, the plaintiffs have represented to the court that they were told on numerous occasions by different Pittston representatives that they would receive credit for their years of service with Paramont prior to January 1, 1989, in calculating their benefits under the Pittston Plan. In fact, plaintiffs have asserted that the defendants were involved in a purposeful scheme to deceive Paramont employees into believing that their pension benefits under the Pittston Plan were more generous than they, in fact, were. According to the plaintiffs, this scheme was undertaken by the defendants in an effort to convince Paramont employees to remain nonunion after Paramont's acquisition by Pyxis.

After hearing the evidence at trial, however, it is now evident to the court that, if any such scheme ever existed, the defendants failed miserably in its execution. Of these five plaintiffs, only four were employees of Paramont at the time of its acquisition by Pyxis. Of those four, three -- Addington, Blanton and Lawson -- all admitted that they knew that there was no change in their employee benefits, including their pension benefits, as a result of Pyxis's acquisition of Paramont. The fourth, Ratliff, testified that Quillen told him and others that they would receive credit for their years of work with Paramont in the calculation of their retirement benefits under the

Pittston Plan some time at or around Pyxis's acquisition of Paramont. Upon further questioning, however, Ratliff admitted that Quillen did not make these statements until some time after Pyxis's acquisition of Paramont. Ratliff further admitted that he received a copy of the 1988 Paramont Handbook in September 1988, and that he believed the information contained in the handbook to be accurate. The evidence also established that the 1988 Paramont Handbook was distributed to all Paramont employees. According to the 1988 Paramont Handbook, Paramont employees at that time were covered for pension benefits by only the Paramont Plans.

Furthermore, the uncontradicted evidence shows that, in the fall of 1988, prior to the merger of the Paramont Plans into the Pittston Plan, every then-current employee of Paramont received notice on at least two occasions that they would not receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their retirement benefits under the Pittston Plan. These notices came in the form of Robinette's 11-10-88 Letter, (Exhibit 3), and the Paramont Pride Article, (Exhibit 26). Addington and Blanton were Paramont employees in the fall of 1988. Ratliff was a Pyxis employee at that time, but he admitted that he received both Robinette's 11-10-88 Letter and the Paramont Pride Article. Meade was not an employee of any Pittston-related entity at that time. However, Meade admitted that his wife was an employee of Paramont at that time, and that it was likely that his wife received and shared Robinette's 11-10-88 Letter with him.

A number of other accurate communications also were distributed to Paramont employees after the merger of the Paramont Plans into the Pittston Plan on January 1,

- 88 -

1989. Miller's 4-10-90 Letter was distributed to all Paramont employees. Miller's 4-10-90 Letter states that Paramont employees' pension benefits consisted of two parts, "your pension benefits from the Paramont Plan through December 31, 1988, and your pension benefit from the Pittston Plan from January 1, 1989." Perkins's 5-15-90 Letter also was distributed to all Paramont employees. Attached to Perkins's 5-15-90 Letter was a sample pension benefits calculation. This sample calculation used a hypothetical individual who had 14 years prior service with Paramont and eight years service under the Pittston Plan. The sample did not include the employee's time with Paramont in the calculation of benefits under the Pittston Plan, but instead used only the eight years of service under the Pittston Plan.

With the exception of the five plaintiffs, Quillen and Rennie,[2] every other witness who testified in this case stated that they understood at the time of the merger of the Paramont Plans into the Pittston Plan that Paramont employees' service from only January 1, 1989, forward would be used to calculate their retirement benefits under the Pittston Plan. These witnesses included not only upper level management with Pittston and Pittston Coal, such as Douglas, Farrell, Lennon and Spurlock, but also included management personnel with Paramont and Pyxis, such as Perkins and Dado, Pittston and Pittston Coal human resources personnel, such as Fox and Parsley, and the individuals in the local human resources departments responsible for answering Paramont employee inquiries, such as Robinette and Miller.

---

[2] Rennie's testimony did not address this issue, but was limited to her knowledge of Pittston's audit of pension benefits.

While there is evidence before the court that there were errors in the calculation of retirement benefits provided to Paramont employees through Pittston's Annual Benefit Statements beginning as early as 1991, this evidence also shows that of the 836 Annual Benefit Statements sent to the plaintiffs in this case, only eight percent contained an incorrect calculation of their retirement benefits. In fact, of the 132 original plaintiffs in this case, the evidence shows that only 16 received one or more incorrect Annual Benefit Statements.

Thus, the evidence presented at trial in this case varies greatly from that in *Varity,* in that it does not in any way establish any concerted corporatewide effort to purposefully deceive current and former Paramont employees with regard to what plan they were covered under for pension benefits or with regard to how their pension benefits would be calculated under the Pittston Plan after the merger of the Paramont Plans into it. Therefore, if the plaintiffs in this case are to prevail on their breach of fiduciary duty claim based on alleged misrepresentations, it must be because they have proven that specific misrepresentations were made to them individually.

Based on the evidence introduced at trial, it also is now evident that these five plaintiffs base their breach of fiduciary duty claim on written and oral representations made by only a few individuals. These plaintiffs claim that oral misrepresentations were made to them by only three individuals -- Quillen, Fox and Spindler. Based on the evidence presented at trial, I find that none of these individuals told these plaintiffs that their years of service with Paramont prior to January 1, 1989, would be included in the calculation of their benefits under the Pittston Plan.

- 90 -

Despite the fact that Quillen testified that he did make misrepresentations to all Paramont employees regarding their pension benefits, I specifically find that Quillen did not misrepresent that Paramont employees would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. According to each of these plaintiffs other than Ratliff, Quillen stated no more to them than that their time with Paramont would count under the Pittston Plan, which was not a misrepresentation, in that their years of service with Paramont are counted for vesting purposes under the Pittston Plan. Ratliff is the only plaintiff who testified that Quillen specifically told him and others that Paramont employees would be given credit for their years with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. Based on the evidence presented as a whole at trial, I find Ratliff's testimony on this issue not credible. I base this finding in large part on my finding that Quillen's testimony on this issue also is not credible.

Perhaps the most difficult evidence to reconcile in this case is Quillen's testimony. A review of Quillen's testimony in this case would, at best, lead one to believe that Quillen was wilfully blind with regard to the evidence that Paramont employees would not receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their pension benefits under the Pittston Plan. At worst, it would lead one to believe that it was Quillen, alone, who knowingly and purposefully misrepresented this fact to Paramont's employees.

Quillen insists that he believed that, beginning at the time of Pyxis's acquisition

- 91 -

of Paramont in July 1986, Paramont's employees would immediately be covered by the Pittston Plan and that they would receive credit for all their years of service with Paramont in the calculation of their pension benefits under the Pittston Plan. Quillen further insists that he relayed this information to all the then-current Paramont employees. As noted above, it is unclear why Quillen would make these misrepresentations when the overwhelming evidence in this case shows that Quillen clearly knew that there would be no change in Paramont employees' benefits at the time of Paramont's acquisition by Pyxis.

Quillen stated that he held these beliefs based on his 1986 meeting with Farrell at Pittston's corporate office in Connecticut. Nonetheless, Quillen never actually testified that Farrell told him that Paramont's employees would be covered by the Pittston Plan upon Pyxis's acquisition of Paramont and that they would receive credit for their years of service with Paramont in their calculation of benefits under the Pittston Plan. Farrell, on the other hand, has specifically denied that he ever made any such representation to Quillen.

Quillen's credibility on this issue also is challenged by his own words and by his failure to correct others' statements of which he had knowledge on this issue. For instance, Quillen's 7-2-86 Letter to Farrell purported to summarize his July 1, 1986, discussions with Farrell. Quillen's 7-2-86 Letter stated that his employment agreement called for him to receive credit for five years prior service upon five years service with Pittston. "[T]hus, in effect, vesting me at five years equal to ten years in the present pension plan." Quillen also admitted that he received, reviewed and signed indicating

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 92 of 117   Pageid#: 645

his agreement with Garges's 7-8-86 Letter that reflected that his "Benefit Accrual Service" as defined in the Pittston Plan would be increased by five years. If, as Quillen asserts, he truly believed that all Paramont employees were being brought into the Pittston Plan upon Pyxis's acquisition of Paramont, and that Paramont employees were to receive credit for their years of service with Paramont in the calculation of benefits under the Pittston Plan, then there would have been no need for Quillen to negotiate this agreement. If this agreement was intended to grant him an additional five years of service, he would have been entitled to credit for 20 years under the Pittston Plan after five years of service with Pyxis because he would have received credit for his 10 years of service from 1976 to 1986 with Paramont and he would have immediately been vested under the Pittston Plan, which, at that time, required 10 years vesting service.

Quillen also admitted that from 1986 to January 1, 1989, he received and reviewed numerous documents which clearly stated that Paramont employees continued to be covered by only the Paramont Plans. These documents included Spindler's 2-3-87 Memo which discussed the merging of the Paramont Plans' assets with the assets of the Pittston Plan, Lennon's 8-15-88 Memo, Robinette's 8-24-88 Memo, Lennon's 9-12-88 Memo and Lennon's 9-28-88 Memo, all of which discussed the merging of the Paramont Plans into the Pittston Plan, a number of documents which, as trustee, Quillen signed amending the terms of the Paramont Plans, and the 1988 Paramont Employee Handbook, which stated that Paramont employees continued to be covered by the Paramont Plans.

Quillen admitted that he learned in the fall of 1987 that Paramont's employees

- 93 -

were not covered by Pittston's employee benefits, including the Pittston Plan, when arrangements were being made to transfer certain Paramont employees to Pyxis. In fact, the evidence shows that Quillen, himself, requested Robinette to prepare a benefit package summary showing the changes these employees would have in their benefits when they became Pyxis employees. Quillen also admitted that he received Robinette's 9-16-87 Memo and attached benefit comparison chart, which clearly showed that Paramont employees continued to be covered by only the Paramont Plans. Robinette's 9-16-87 Memo also stated that the transferring Paramont employees would receive credit under the Pittston Plan for their years of service with Paramont "for vesting purposes." Despite this evidence, and despite Quillen's testimony that he would have attempted to correct any misrepresentations he had known about, Quillen admitted that he never went back to any Paramont employees to inform them that they were not covered by the Pittston Plan upon Pyxis's acquisition of Paramont. Quillen also testified that, despite Robinette's 9-16-87 Memo, he believed that when these employees transferred to Pyxis, they would receive credit for their years of service with Paramont in the calculation of their pension benefits under the Pittston Plan.

Quillen also insists that he believed that, when the Paramont Plans were merged into the Pittston Plan, Paramont employees would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. Nonetheless, while Quillen could not recall whether he approved the contents in advance, Quillen did admit that he received and reviewed Robinette's 11-10-88 Letter to all Paramont employees and the Paramont Pride Article, both of which were distributed prior to the merger of the plans and both of which

- 94 -

clearly explained that Paramont employees would begin accruing pension benefits under the Pittston Plan effective January 1, 1989. Quillen also admitted that he signed the 11-18-88 Consent of Paramont Directors, to which was attached Exhibit G, the amendment that was added to the Pittston Plan to effect the merger of the Paramont Plans into the Pittston Plan. Quillen further admitted that he sent Quillen's 4-13-97 Letter to Parsley, and he authorized the filing of a Motion for Judgment and Second Amended Motion for Judgment against Pittston in the Russell County Circuit Court, in which he makes no claim of being entitled to pension benefits under the Pittston Plan based on all his years of service with Paramont.

Based on all this evidence, I am persuaded by the testimony of four of the five plaintiffs in this case that Quillen did not tell them anything more than that their years of service with Paramont would count under the Pittston Plan. I further find that this statement was not a misrepresentation in that the Paramont employees' years of service with Paramont do count for vesting purposes under the Pittston Plan.

I also specifically find that Spindler did not tell any of these plaintiffs that Paramont employees would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. Only three of the five plaintiffs currently before the court attended the January 1990 meeting at Clinch Valley College at which Spindler spoke. Both Lawson and Meade were not employees of any Pittston-related entity at the time and did not attend this meeting. Each of the three plaintiffs who did attend the meeting -- Ratliff, Addington and Blanton -- admit that, while Spindler represented that their years of work with

- 95 -

Paramont would be counted under the Pittston Plan, Spindler did not say how these years would be counted and he did not specifically address how their benefits would be calculated. Furthermore, plaintiffs offered no evidence that Spindler specifically represented that their years of service with Paramont prior to January 1, 1989, would be included in their Benefit Accrual Service for calculation of their monthly benefits under the Pittston Plan.

I further find that Fox did not tell these plaintiffs that Paramont employees would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. Meade claims that Fox advised him in late 1990 or early 1991 that his time with Paramont would be included in determining his eligibility for certain employee benefits, including retirement benefits under the Pittston Plan. Again, this statement is not a misrepresentation in that Meade's years of service with Paramont are counted for vesting purposes to determine eligibility for benefits under the Pittston Plan.

Ratliff is the only plaintiff who claims that Fox told him that he would receive credit for his years of service with Paramont prior to January 1, 1989, in the calculation of his benefits under the Pittston Plan. Ratliff claims that this misrepresentation was made to him by Fox in the fall of 1987 in a meeting with 10 to 12 Paramont employees who were to be transferred to Pyxis effective January 1, 1988. Lawson also was present at this meeting, but he does not recall any representations made by Fox. In fact, he does not even recall Fox being present. Instead, Lawson claims that Quillen stated at this meeting that the Paramont employees' time with Paramont would count

- 96 -

for retirement benefits under the Pittston Plan, but he also admits that Quillen did not explain how this time would count. Neither Addington, Blanton nor Meade were present at this meeting. Robinette and Miller also were present at this meeting, and they each testified that Fox did not make any misrepresentation that their years of service with Paramont prior to January 1, 1989, would be included in the calculation of their benefits under the Pittston Plan. Furthermore, while Fox did not recall the specific meeting, Fox testified that she did not tell any Paramont employee that years of service with Paramont prior to January 1, 1989, would be used to calculate retirement benefits under the Pittston Plan. Based on this evidence, I do not find Ratliff's testimony on this issue credible, and I find that Fox made no such misrepresentation to Ratliff.

The plaintiffs also base their claim on certain written representations. Lawson, Meade and Ratliff each received four or more Annual Benefit Statements on which was listed an estimated monthly pension benefit which the parties stipulate was calculated based on Benefit Accrual Service that included all or part of their years of service with Paramont prior to January 1, 1989. Addington received the Administrative Committee's 1-27-95 Letter, which stated that he would receive monthly pension benefits for life in the amount $2,140.43, an amount that the parties stipulate was calculated based on Benefit Accrual Service which included all of Addington's prior service with Paramont prior to January 1, 1989. Lawson and Ratliff both received a copy of the comparison of benefits chart prepared for those Paramont employees transferring to Pyxis effective January 1, 1988. Lawson received Miller's 12-3-90 Memo and Miller's 6-24-91 Memo. Meade received Neely's 12-21-92 Memo.

- 97 -

Based on my review of these documents, I find that, with the exception of the Administrative Committee's 1-27-95 Letter received by Addington, none of these documents contained any misrepresentation concerning the plaintiffs' retirement benefits. In particular, the incorrect Annual Benefit Statements received by these plaintiffs did not indicate how the estimated monthly pension benefit provided had been calculated and did not state that their years of service with Paramont prior to January 1, 1989, were included in the calculation of their benefits under the Pittston Plan. Furthermore, each of these Annual Benefit Statements contained a provision which stated:

> ...Please remember that the figures shown are only estimates....
> This summary does not determine the benefits you are able to receive. Only the official plan documents and the exact data applicable to you can determine your benefits. In the case of a conflict or omission, the formal plan texts will prevail.

(Exhibit 452) (Ratliff's 1988 Annual Benefit Statement).[3] Also Miller's 12-3-90 Memo did not contain any misrepresentation with regard to Lawson's retirement benefits because it stated that Lawson's adjusted hire date would be used only for calculating vacation benefits. Furthermore, while Miller's 6-24-91 Memo and the comparison of benefits chart prepared for those Paramont employees transferring to Pyxis effective

---

[3]  At least one federal district court in the Fourth Circuit has found a breach of fiduciary duty based upon misrepresentations made to pension fund beneficiaries in annual benefit statements, and the Fourth Circuit has affirmed this ruling. *See Schaffer v. Westinghouse Savannah River Co.*, 2005 WL 567812 (4th Cir. March 11, 2005). I find that the facts of this case justify a different holding, however, based on the specific content of the Annual Benefit Statements at issue.

- 98 -

January 1, 1988, could have spelled out these employees' retirement benefits more clearly, I find that neither of these documents contained any misrepresentation that these employees would receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of the benefits under the Pittston Plan. The comparison chart simply stated that benefits would be calculated based on "yrs. service" without saying how an employee's years of service would be determined. Miller's 6-24-91 Memo stated that all hours worked by Lawson for Pittston and its subsidiaries would count toward years of service for retirement benefits. It did not say that these years of service would be used to calculate benefits under the Pittston Plan. Furthermore, Neely's 12-21-92 Memo stated only that Meade's "benefit and vesting service date" should be adjusted to October 28, 1991, as a result of Meade's agreement with Neely upon his rehire. Neely's 12-21-92 Memo did not state that this date would be used as the Benefit Accrual Service date for calculation of Meade's retirement benefits under the Pittston Plan. Also, Meade testified that he understood that Neely's 12-21-92 Memo was addressing Pittston's break in service rules, which were used for determining seniority and vacation benefits. He further testified that he and Neely had no conversations about what, if any, effect this would have on his pension benefits.

That leaves the court to address the misrepresentation made to Addington in the Administrative Committee's 1-27-95 Letter. In the fall of 1994, Addington completed paperwork to take early retirement effective January 1, 1995. Addington testified that he did not receive any pension calculation or estimate of his pension benefit at the time that he applied to take early retirement. Addington stated that, at the time he applied

- 99 -

for early retirement, all he knew was that his monthly benefits should have been more than the maximum $350 a month under the Paramont Plans.

Addington admitted that he received some Annual Benefit Statements, but he also admitted that he never paid any attention to the information contained in these statements. The parties have stipulated that Addington's 1991, 1992, 1993 and 1994 Annual Benefit Statements listed estimated future monthly retirement benefits calculated based on years of service from January 1, 1989, although this date was not printed on the Annual Benefit Statements. None of these Annual Benefit Statements estimated Addington's total pension benefits at more than $1,243 a month, if he continued to work until his Normal Retirement Date of November 1, 1997. Even if Addington had paid attention to these estimates, however, Addington's Annual Benefit Statement, like all of Pittston's Annual Benefit Statements, included the warning set out above which stated that the figures provided were only estimates and that actual benefits would be determined in accordance with the plan documents.

After applying to take early retirement effective January 1, 1995, and quitting work effective December 31, 2004, Addington received the Administrative Committee's 1-27-95 Letter, which informed him that the Administrative Committee had approved his application for early retirement. The Administrative Committee's 1-27-95 Letter also informed Addington that "the Administrative Committee ... has determined that you are eligible for a lifetime monthly actuarially reduced benefit of $2,140.43." Furthermore, Addington began receiving monthly pension benefits in the amount of $2,140.43, and continued to do so for approximately five years. In 1999,

- 100 -

Addington was notified that there had been an error in the calculation of his benefits, and his monthly pension benefits were reduced to $806.91.

The parties agree that, based on six years of Benefit Accrual Service (January 1, 1989, to December 31, 1995) and a January 1, 1995, early retirement date, Addington's total monthly pension benefits under the Pittston Plan New Formula would be $806.91. The parties also agree that, if 19 years of Benefit Accrual Service were used to calculate Addington's benefits under the Pittston Plan New Formula, Addington's total monthly pension benefits would be $2,140.43. Therefore, it is undisputed that, based on this court's previous interpretation of the clear language of the Pittston Plan, the Administrative Committee's 1-27-95 Letter misrepresented Addington's monthly pension benefits to be $2,140.43.

There is no evidence before the court that the Administrative Committee's misrepresentation to Addington was a purposeful attempt to deceive. To the contrary, Parsley testified that he performed the pension benefit calculation for Addington in late 1994 or early 1995. Parsley further testified that he used a computer program to perform such calculations of pension benefits. Parsley stated that, after he forwarded the calculation of Addington's pension benefits to Pittston's corporate headquarters for approval, he was notified to change Addington's Benefit Accrual Service date to January 1, 1989, and to recalculate his benefits. Parsley stated that he went back and changed Addington's service date to January 1, 1989, in one field of the computer program, but he failed to change the date in another field. Parsley stated that, by failing to change the service date in both fields, Addington's benefits were again

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 101 of 117   Pageid#: 654

calculated based upon the years of service from his original Paramont hire date. Parsley then forwarded this calculation to Pittston's corporate headquarters, no one discovered the error and the Administrative Committee awarded Addington early pension benefits based on this calculation and sent Addington the Administrative Committee's 1-27-95 Letter misrepresenting his monthly pension benefits under the Pittston Plan.

The lack of any intent to deceive, however, does not insulate the Administrative Committee from liability based on this misrepresentation. As stated above, the Fourth Circuit has recognized that, under ERISA, a fiduciary has a duty to give beneficiaries accurate information. *See Griggs*, 237 F.3d at 380; *Faircloth*, 91 F.3d at 656; *see also Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) ("a fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally"). It is undisputed that the Administrative's Committee's 1-27-95 Letter did not contain accurate information concerning Addington's monthly pension benefits under the Pittston Plan. Therefore, if the court determines that the Administrative Committee was acting in a fiduciary capacity when it sent this letter to Addington, the misrepresentation contained in this letter clearly would violate an ERISA fiduciary's duty to communicate accurately with a beneficiary.

The court will now turn to the issue of whether any of the individuals or entities whom the plaintiffs claim made these misrepresentation were acting in a fiduciary capacity in doing so. As the Fourth Circuit recognized in *Coleman v. Nationwide Life*

- 102 -

*Ins. Co.*, 969 F.2d 54, 60-61 (4th Cir. 1992), "[b]efore one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of 'fiduciary.'"

ERISA §3(21)(A) defines a "fiduciary" as:

> ... a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets....

29 U.S.C.A. § 1002(21)(A) (West 1999). The Fourth Circuit in *Coleman* further held that the inclusion of the phrase "to the extent" in the statutory definition means that "a party is a fiduciary only as to the activities which bring the person within the definition. ... In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue." *Coleman*, 969 F.2d at 61.

The court further recognized that discretionary authority or responsibility is pivotal to the statutory definition of "fiduciary." *Coleman*, 969 F.2d at 61. As the District Court for the Eastern District of Virginia has stated,

> In other words, a fiduciary within the meaning of ERISA 'must be someone acting in the capacity of manager, administrator, or financial adviser to a plan.' ... To determine whether a person is subjcet to ERISA fiduciary duties, the court must determine the extent to which that person exercises discretionary authority, control or responsibility with respect to management or administration of the plan.

- 103 -

*Sentara Va. Beach Gen. Hosp. v. LeBeau*, 182 F. Supp. 2d 518, 523 (E.D. Va. 2002).

Furthermore, performing administrative acts such as answering employees' inquiries or processing claim forms does not amount to discretionary functions which would qualify a person as a fiduciary under ERISA. *See Baxter v. C.A. Muer Corp.,* 941 F.2d 451 (6th Cir. 1991) (a claims processor who had only the power to pay out benefits according to the terms of the established plan was not an ERISA fiduciary); *Weeks v. Western Auto Supply Co.,* 2003 WL 21510822, (W.D. Va. June 25, 2003) (performing ministerial, administrative functions such as providing written materials and answering questions are not exercising discretionary authority); *Hansen v. North Trident Reg'l Hosp., Inc.,* 60 F. Supp. 2d 523 (D.S.C. 1999) (handling the processing of benefit applications, claims and related paperwork were not discretionary functions); *see also Fitch v. Chase Manhattan Bank*, *N.A.,* 64 F. Supp. 2d 212, 229 (W.D. N.Y. 1999) (preparation and issuance of annual benefit statements not a fiduciary activity).

In order to determine whether a party possessed the discretionary authority or responsibility necessary to be a fiduciary, courts first should look to the language of the plan documents themselves and, then, should look to the party's actions to determine if the party, in fact, exercised discretionary authority. *See Coleman*, 969 F.2d at 61; *see also Phelps v. C.T. Enters., Inc.,* Slip Op. No. 04-1198 at 12 (4th Cir. January 12, 2005) (when a party voluntarily assumes responsibility of a fiduciary, the party becomes subject to the obligations of a fiduciary under ERISA).

- 104 -

The defendants in this case contend that no misrepresentations occurred and, further, if they did, that they were not made by a person acting in a fiduciary capacity, and, thus, could not be the basis of a breach of fiduciary duty claim. The defendants nonetheless, concede that, during the period at issue in this case, Pittston was the plan administrator of the Pittston Plan and had delegated responsibility for administration of the Pittston Plan to the Administrative Committee. The defendants also concede that the Administrative Committee had delegated the routine day-to-day administration of the Pittston Plan to Pittston's Human Resources Department and to the Human Resources  Department of the Pittston Coal Management Corporation.  The defendants have further conceded that this routine administration included such functions as responding to questions by participants and calculating benefits.

Based on the evidence presented in this case, I find that the Administrative Committee was a fiduciary of the Pittston Plan and that it was acting as a fiduciary when it sent the Administrative Committee's 1-27-95 Letter to Addington.  The evidence before the court shows that the Administrative Committee possessed authority for the administration of the Pittston Plan, including the ability to amend the plan, as was illustrated by its adoption of Exhibit G which merged the Paramont Plans into the Pittston Plan.  The evidence also shows that it was the Administrative Committee which retained discretion to determine eligibility for benefits under the Plan and the amount of benefits payable under the Plan. (Pension-Retirement Plan of The Pittston Company And Its Subsidiaries as Amended and Restated Effective August 15, 1993, (Exhibit 502), Art. X, §10.02(j).)

On the other hand, based on the evidence before the court, I also find that none of the individuals who the plaintiffs allege made misrepresentations possessed any discretionary authority to alter the terms of the Pittston Plan or to determine eligibility for benefits or the amount of benefits a participant was entitled to under the Pittston Plan. Those individuals would include Quillen, Fox, Spindler, Robinette, Miller and Neely. The evidence before the court shows that, at most, Fox, Robinette and Miller performed certain administrative duties for the Pittston Plan. However, none of these individuals possessed any discretionary authority to determine eligibility for benefits or the amount of benefits to which a participant was entitled. There is no evidence that Quillen, Spindler or Neely performed any functions, administrative or otherwise, with regard to the Pittston Plan.

In reaching its conclusions on this issue, the court has reviewed those cases cited by the defendants for the proposition that an employer does not breach any fiduciary duty by providing an incorrect estimate or calculation of retirement benefits. *See Denniston v. Taylor*, 2004 WL 226147 (S.D.N.Y. Feb. 4, 2004) (preparation and dissemination of annual benefit statements is a ministerial nonfiduciary task); *Fitch* 64 F. Supp. 2d at 229 (W.D.N.Y. 1999) (preparation and issuance of annual benefit statements not a fiduciary activity because figuring employees' benefits estimates pursuant to plan was a mathematical calculation that did not require exercise of discretion); *Easa v. Florists' Transworld Delivery Ass'n*, 5 F. Supp. 2d 522, 529 (E.D. Mich. 1998) (employee functioned in ministerial not fiduciary capacity when she provided inaccurate estimate of retirement benefits); *Gramm v. Bell Atl. Mgmt. Pension Plan,* 983 F. Supp. 585, 593 (D. N.J. 1997) (mistake in calculating pension

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 106 of 117   Pageid#: 659

benefit did not constitute wilful misconduct or bad faith sufficient to support breach of fiduciary duty claim); *Kuehl v. Chrysler Pension Plan*, 895 F. Supp. 1147 (E.D. Wis. 1995) (mistake in calculating years of service for use in calculating estimate of retirement benefits did not support breach of fiduciary duty claim); *see also Joseph F. Cunningham Pension Plan v. Mathieu,* 1998 U.S. App. LEXIS 15080 (4th Cir. July 6, 1998) (unpublished) (plan administrator not liable as fiduciary for incorrect calculation of benefits). It appears that none of these cases, however, are inopposite to the court's holding that the Administrative Committee performed a fiduciary function when, through the Administrative Committee's 1-27-95 Letter, it notified Addington that it had granted his application for early retirement benefits and had determined the amount of those benefits. It appears from the court's reading of the above cases that they stand for the proposition that there is no breach of a fiduciary duty when a person, who possesses no discretion under the terms of an ERISA plan, incorrectly performs the ministerial function of calculating benefits under the terms of the plan. That is not the case here.

The court believes that its conclusions are further supported by the regulations propounded by the Department of Labor, which has enforcement oversight of ERISA matters. These regulations state in pertinent part:

> [A] person who performs purely ministerial functions such as ... [benefit calculations] for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting the management of the plan ... and has no authority or responsibility to do

so.

29 C.F.R. § 2509.75-8 (2004). As the court pointed out in *Denniston*, 2004 WL 226147, at *10:

> Indeed, although the Department of Labor, ..., has released administrative guidance regarding fiduciary matters indicating that benefit calculations are not a fiduciary function, it has done so in the context of a statement making it clear that such is the case only where the person doing the calculations is not in a policymaking position[.]

The evidence in this case shows that the Administrative Committee was the particular entity to which ultimate discretion had been given to determine eligibility for benefits under the Plan and the amount of benefits payable under the Plan.

That being the case, the court must now determine what, if any, relief is appropriate to remedy the Administrative Committee's breach of its fiduciary duty to Addington. Under 29 U.S.C. § 1132(a)(3), the courts may award "appropriate equitable relief" for breach of fiduciary duty under ERISA. *See Griggs*, 237 F.3d at 384. In determining what would be an "appropriate equitable" remedy under this section, it is important to note that ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in pension and welfare benefit plans. *See Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 989-90 (7th Cir. 1993). The Supreme Court in *Varity* recognized as much when it stated, "We should expect that courts in fashioning 'appropriate' equitable relief will keep in mind the special nature and purpose of employee benefit plans.'" *Varity*, 516 U.S. at 515

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 108 of 117   Pageid#: 661

(quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987)). Thus, while it is "appropriate" in this situation to offer a remedy to redress the injury to the individual beneficiary who received the inaccurate information, it is equally "appropriate" in crafting such a remedy to consider the interests of all the Plan's beneficiaries in ensuring that benefits are paid as provided for under the Plan.

Furthermore, the courts have held that the phrase "appropriate equitable relief" in § 502(a)(3) encompasses only "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages.)" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1992) *(quoted in Griggs*, 237 F.3d at 384). In this case, the plaintiffs seek reformation of the Pittston Plan to include their years of service with Paramont prior to January 1, 1989, in the calculation of the benefits under the Pittston Plan. Assuming that reformation is the type of equitable relief that could be imposed under § 502(a)(3), I do not find that reformation would be "appropriate" or even "equitable" under the facts of this case.

As set forth above, I have specifically found that there were no misrepresentations made to these plaintiffs regarding the inclusion of their years of service with Paramont prior to January 1, 1989, in the calculation of their benefits under the Pittston Plan. Instead, the only misrepresentation I found made to any of these plaintiffs regarding their pension benefits was the Administrative Committee's 1-27-95 Letter to Addington. Although the Administrative Committee's 1-27-95 Letter incorrectly stated that Addington's monthly pension benefit under the Pittston Plan would be $2,140.43, it did not state how the Administrative Committee had arrived at

- 109 -

this figure, and, specifically did not state that Addington's years of service with Paramont prior to January 1, 1989, were included in the calculation of his benefits. Furthermore, to order reformation of the Plan to redress the Administrative Committee's breach of fiduciary duty owed to Addington would, in essence, order the remedy sought and rejected by this court when it granted summary judgment on the plaintiffs' estoppel claim. As the district court recognized in *Benton v. Westinghouse Savannah River Co.*, Civ. No. 01:02-0055-22 (D.S.C. Sept. 24, 2002), to allow this relief in a such a case would

> run afoul of the numerous cases precluding relief under an equitable estoppel theory. *See generally Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54 (4th Cir. 1992) (rejecting reliance on estoppel principles to modify the terms of a written employee benefit plan); *Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1452 (4th Cir. 1992) ("[R]esort to federal common law generally is inappropriate when its application would . . . threaten to override the explicit terms of an established ERISA benefit plan.").
>
> Further, because it would work an end run around the clear body of law enforcing the terms of plans as written, ... [it also] would run afoul of the guidance given by the Supreme Court in *Varity* as to what equitable relief might be appropriate. *See Varity,* 516 U.S. at 514-15 (stating the belief "that courts, in fashioning 'appropriate' equitable relief, will keep in mind the 'special nature and purpose of employee benefit plans,' and will respect the 'policy choices reflected in the inclusion of certain remedies and the exclusion of others'").

Therefore, I find that the more appropriate and equitable remedy in this situation would be to restore Addington, as much as possible, to the position he would have been in had this misrepresentation never been made. Addington testified that, had he known that his monthly pension benefits under the Pittston Plan were only $806.91,

- 110 -

he would not have taken early retirement effective January 1, 1995. The defendants argue that no equitable relief is appropriate in this case because Addington could not have relied on the information contained in the Administrative Committee's 1-27-95 Letter because it was received after he took early retirement. The facts before the court, however, show that, while Addington quit working effective December 31, 1994, and applied for early retirement benefits, those benefits were not approved until the Administrative Committee's 1-27-95 Letter. In fact the Letter states, "The Administrative Committee has approved your application for early retirement benefits...."

The Fourth Circuit in *Griggs*, 237 F.3d at 385, recognized reinstatement of employment would be an appropriate equitable remedy when an employee had been induced to accept early retirement based on incomplete or inaccurate information for which the plan administrator could be held responsible. "We believe that reinstatement, as a general equitable concept, is within the range of redress permitted by the phrase other appropriate equitable relief.'" *Griggs*, 237 F.3d at 385. On subsequent appeal, the Fourth Circuit also recognized that rescission was an appropriate equitable remedy under §502(a)(3). *Griggs v. E.I. Dupont De Nemours & Co.*, 385 F.3d 440, 441-42(4th Cir. 2004) *("Griggs II")*. Thus, it appears that, if the court should find it appropriate to do so, the court in this case could order rescission of Addington's election to take early retirement and reinstatement to his previous position.

In this case, Addington took early retirement effective January 1, 1995. Thus, Addington has been out of the work force for more than 10 years. Also, Addington, who was 62 years old at the time that he took early retirement, is currently 72 years

- 111 -

old. Furthermore, the evidence before the court is that Pittston, subsequent to Addington's early retirement, sold all of its coal mining operations and is no longer in the business of mining coal. Therefore, based on these facts I find that rescission of Addington's election to take early retirement and reinstatement to his former position is neither appropriate or even possible.

That does not, however, necessarily mean that rescission of Addington's election to take early retirement is inappropriate. Addington testified that, if he had been given accurate information concerning the amount of his monthly pension benefits, he would not have taken early retirement. That being the case, it appears fair to assume in crafting an equitable remedy that Addington would have continued to work until at least his normal retirement date of November 1, 1997. The parties have stipulated that, based on Addington's 1995 Average Salary and Covered Compensation Base and 8.333 years of Benefit Accrual Service (from January, 1, 1989, to November 1, 1997), his combined monthly retirement benefits under the Pittston Plan would be $1,256.00. Therefore, it appears appropriate and equitable for the court to order that Addington be allowed to rescind his election for early retirement benefits and to reinstate him to the benefits he would be entitled to under the Pittston Plan if he had continued to work until his normal retirement date of November 1, 1997, which, based on the evidence before the court, would be $1,256.00.

In so holding, the court is cognizant of the fact that equitable rescission usually involves a restoration of the parties to the status quo as it existed before the rescinded transaction. *See Pinter v. Dahl*, 486 U.S. 622, 642 n.18 (1988) (noting that equitable rescission provides for restoration of the status quo). However, as the Fourth Circuit

- 112 -

recognized in *Griggs II*, "the complete-restoration requirement is a general one that is subject to certain exceptions." *Griggs II*, 385 F.3d at 447-48. Instead, the court in *Griggs II* stated that courts of equity may order rescission "where the equities of the situation so demanded." *Griggs II*, 385 F.3d at 448-49. The court in *Griggs II* continued:

> Although this formulation of the exception is somewhat broad, we believe that it gives federal courts the flexibility necessary to appropriately balance the interests of participants and beneficiaries of ERISA plans against the interests and obligations of ERISA employers and fiduciaries. ... A rule generally requiring full restoration of benefits to accompany a grant of rescission protects the financial integrity of ERISA plans, while permitting an exception to this rule when the equities of the situation demand provides a necessary incentive for ERISA fiduciaries to take seriously their obligations to protect the interests of the participants and beneficiaries.

*Griggs II,* 385 F.3d at 449.

When applying this rule, and its exception, to the facts of this case, I find that it would be both unreasonable and inequitable to order Addington to return any of the early retirement benefits he received in order to rescind his early retirement election. The Pittston Plan has not sought any reimbursement from Addington for the overpayment of benefits it made to him. Addington had no role in the miscalculation of the amount of his early retirement benefits. To the contrary, the entire blame for the miscalculations of Addington's early retirement benefits lies with the Pittston Plan and with the Pittston employees who were entrusted with the task. While I have found that the evidence in this case failed to prove any purposeful scheme to deceive, I,

nonetheless, note that the evidence is replete with examples of careless inattention to detail in the administration of this ERISA plan, which resulted in numerous errors including the inaccurate calculation of benefits provided to Addington which is the basis of this claim. Thus, I find that the equities of the situation demand an exception to the full restoration rule in order to provide a necessary incentive for these ERISA fiduciaries to take seriously their obligations to protect the interests of the participants and beneficiaries in the future.

The defendants also have alleged that the plaintiffs' breach of fiduciary claim is barred by ERISA's statute of limitations. *See* 29 U.S.C. §1113 (West 1999). Section 1113 provides:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of --
>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
>> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. §1113 (West 1999).

The only breach of fiduciary duty found in this case was the misrepresentation contained in the Administrative Committee's 1-27-95 Letter to Addington. The

- 114 -

evidence before the court shows that Addington did not know that this letter contained any misrepresentation until some time in the fall of 1999, when Spurlock called him to inform him that his monthly retirement benefits had been miscalculated and soon would be reduced to the correct amount. In fact, the evidence shows that the Pittston Plan continued to pay Addington the monthly benefits awarded in the Administrative Committee's 1-27-95 Letter through December 1999. The plaintiffs filed this case in the Eastern District of Tennessee on December 19, 2001. Thus, Addington's claim was filed more than six years after the misrepresentation was made to him, but less than three years after he learned of the misrepresentation.

Section 1113 provides a statute of limitations of the earlier of six years from the date of the last action constituting a breach or three years from the date on which the plaintiff had knowledge of the breach. Section 1113 also provides, however, that in cases of "fraud or concealment," a breach of fiduciary duty claim may be commenced within six years of discovery of the breach. At least one circuit court has held this six-year statute of limitations is not limited to only those cases of fraudulent concealment, but rather applies to breach of fiduciary duty claims based on misrepresentations where the defendant engaged in acts which hindered the plaintiff's discovery of the breach. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 188-90 (2nd Cir. 2001). In this case, the Administrative Committee's misrepresentation of Addington's monthly retirement benefits was concealed by the fact that the Pittston Plan continued to pay Addington at the rate awarded in the Administrative Committee's 1-27-95 Letter through November 1999. Thus, the Administrative Committee's misrepresentation which is the basis of its breach of fiduciary duties was, in essence, concealed from Addington until he received notice from Spurlock in the fall of 1999 that the Administrative

- 115 -

Committee's representations were wrong. Thus, I find that the six-year period of limitation in cases of concealment under § 1113 should be applied in this case and that Addington filed his breach of fiduciary duty claim within six years of his discovery of the breach.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The only misrepresentation made to any of these five plaintiffs concerning their retirement benefits under the Pittston Plan was the Administrative Committee's 1-27-95 Letter to Addington, which inaccurately informed him that his monthly early retirement benefits under the Pittston Plan would be $2,140;

2. The Administrative Committee was acting as a fiduciary under the Pittston Plan when it sent its 1-27-95 Letter to Addington;

3. The misrepresentations regarding the amount of Addington's monthly pension benefits contained in the Administrative Committee's 1-27-95 Letter breached the Administrative Committee's fiduciary duties owed to Addington as a beneficiary of the Pittston Plan under ERISA;

4. The appropriate and equitable remedy in this case is to order that the Pittston Plan rescind Addington's election to take early retirement effective January 1, 1995, and reinstate him to his full retirement benefits of $1,246 a month effective his normal retirement date of November 1, 1997, and continuing;

5. The six-year period of limitation in cases of concealment under 29 U.S.C. § 1113 should be applied to Addington's breach of fiduciary duty claim; and

6. Addington's breach of fiduciary duty claim is not barred by the statute of limitations because he filed his claim within six years of his discovery of the

- 116 -

breach.

## IV. CONCLUSION

Based on the above, the court finds that the Administrative Committee of the Pittston Plan breached its fiduciary duty to Addington when it inaccurately informed him that his monthly early retirement benefits would be $2,140.43 per month. The court further finds that the appropriate and equitable remedy of that breach is to order that the Pittston Plan rescind Addington's election to take early retirement effective January 1, 1995, and reinstate him to his full retirement benefits of $1,246 a month effective his normal retirement date of November 1, 1997, and continuing.

An appropriate order will be entered.

ENTER: June 3, 2005.

/s/ Pamela Meade Sargent

UNITED STATES MAGISTRATE JUDGE

Case 2:02-cv-00044-PMS   Document 169-1   Filed 06/03/05   Page 117 of 117   Pageid#: 670