# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JIMMY ADAMS,** *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:02cv00044 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **THE BRINK'S COMPANY,** *et al.*, | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |
| Defendants. | ) | |

This case involves the claims of 124 plaintiffs[1] against their current or former employer, Paramont Coal Corporation, ("Paramont"), its parent company, the Brink's Company, ("Brink's"), the Brink's Company Pension-Retirement Plan, ("the Brink's

---

[1] This court previously stated that this case involves the claims of 123 plaintiffs. After reviewing the court's docket with the List of Plaintiffs Pursuing Their Claims filed on September 9, 2005, (Docket Item No. 189), it appears that the case involves the claims of 124 plaintiffs. These plaintiffs include:
   • The five plaintiffs whose claims were tried to the court on February 22 to March 21, 2005;
   • Each of the additional plaintiffs listed on the List of Plaintiffs Pursuing Their Claims, with the exception of Richard Hughes, whose claims were terminated by order of the court dated May 4, 2005, (Docket Item No. 99), and Martin Bledsoe and Mike Falin, who were not listed as plaintiffs in the Complaint or Amended Complaint and who have not subsequently been added as plaintiffs by court order; and
   • The claims of Martin Jessee, whose claims have not been dismissed, but whose name is not listed on the List of Plaintiffs Pursuing Their Claims. It should be noted that, while Martin Jessee's name is not listed on the List of Plaintiffs Pursuing Their Claims, the docket reflects that this document as well as the Plaintiffs' Response To Defendants' Second Motion For Summary Judgment were filed on his behalf.

Plan"), and the Administrative Committee for Brink's Company Pension-Retirement Plan, ("the Administrative Committee"). The plaintiffs seek declaratory and equitable relief as well as damages under various claims related to the administration of the Brink's Plan. Jurisdiction over this matter is based upon federal question jurisdiction, *see* 28 U.S.C. § 1331, under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 *et seq.* The case is before the undersigned magistrate judge by consent of the parties pursuant to 28 U.S.C. § 636(c) (1).

The Complaint sought recovery based on claims alleging breach of contract, estoppel, the creation of an informal plan, the reduction of accrued benefits and breach of fiduciary duty. By Memorandum Opinion and Order entered November 18, 2003, the court granted in part and denied in part the defendants' Motion For Summary Judgment. (Docket Item No. 85.) As a result, the court granted summary judgment in favor of the defendants on the plaintiffs' claims alleging breach of contract, estoppel, the creation of an informal plan and the reduction of accrued benefits. The court, at that time, denied the defendants' Motion For Summary Judgment on the plaintiffs' claims alleging breach of fiduciary duty.

By agreed order entered October 7, 2004, the parties agreed to sever the claims of five of the 124 plaintiffs to be tried to the court first. (Docket Item No. 112.) The remaining breach of fiduciary duty claims of those five plaintiffs, Christopher "Brooks" Addington, Jack Blanton, Alton Lawson Jr., Ricky D. Meade and Donald Ratliff, were tried to the court February 22 to March 1, 2005. By Findings of Fact and Conclusions of Law issued June 3, 2005, the court found that the Administrative Committee had breached its fiduciary duty owed Addington when it inaccurately

- 2 -

informed him that his monthly early retirement benefits under the Pittston Plan would be $2,140. The court found no breach of fiduciary duty to the other four plaintiff whose claims were tried.

This case is currently before the court on the Defendants' Second Motion For Summary Judgment, (Docket Item No. 190), ("the Motion"), seeking entry of summary judgment in the defendants' favor on the breach of fiduciary duty claims of the remaining 119 plaintiffs, ("the Remaining Plaintiffs"). The defendants argue that summary judgment should be entered in their favor on the remaining claims because there is no genuine issue of material fact as to the following:

1. The Remaining Plaintiffs' claims rely on alleged oral representations made by persons who were not acting in a fiduciary capacity;

2. The Remaining Plaintiffs' claims are barred by the applicable statute of limitations;

3. There was no breach of fiduciary duty to the Remaining Plaintiffs in that there were no misrepresentations to these plaintiffs; and

4. There is no appropriate equitable remedy available to the Remaining Plaintiffs.

The defendants also argue that the claims of deceased plaintiff Ray Taylor should be dismissed because he failed to respond to discovery requests. The defendants further argue that the court should dismiss the claims of any other plaintiff who did not provide supplemental discovery responses as ordered by the court.

- 3 -

In support of their Motion, the defendants have filed discovery responses from each of the Remaining Plaintiffs, as well as several affidavits and excerpts of deposition testimony. The Remaining Plaintiffs state that they rely on all of the evidence previously put before the court when the claims of the Initial Plaintiffs were tried as well as their discovery responses filed by the defendants.

*Facts*

The Pittston Company, ("Pittston"), changed its name to The Brink's Company, and the Pension-Retirement Plan of The Pittston Company and its Subsidiaries changed its name to The Brink's Company Pension-Retirement Plan in 2003. Therefore, any references to "Pittston" and "Brink's" will be interchangeable and refer to The Brink's Company, and any references to the "Brink's Plan" or the "Pittston Plan" will be interchangeable and refer to the Brink's Company Pension-Retirement Plan.

Pyxis Resources, ("Pyxis"), then a subsidiary of Pittston, acquired Paramont on July 7, 1986. Pyxis was a Participating Company in the Pittston Plan since before January 1, 1988. At the time of its acquisition by Pyxis, Paramont's employees all were participants in one of two identical defined-benefit pension plans, the Salaried Employees' Pension Plan of Paramont Coal Corporation or the Hourly Employees' Pension Plan of Paramont Coal Corporation, (collectively, "the Paramont Plans"). The Paramont Plans did not require any employee contributions and provided a maximum monthly retirement benefit of $350 for 20 years of service with Paramont. Under the Paramont Plans, all Paramont employees, regardless of their salary, earned the same

- 4 -

retirement benefit for the same years of service.

The Pittston Plan also is a defined-benefit plan. Under the Pittston Plan, a Participant's retirement benefits are calculated based on multiplying a percentage of an Average Salary by the number of years of "Benefit Accrual Service." Section 4.04 of the December 11, 1987, and the January 1, 1989, Plans, states: "Service Prior to Participation. The Board [of Directors] shall determine to what extent Benefit Accrual Service shall be credited to any Participant for service for any Subsidiary or Division prior to the date such Subsidiary or Division became a Company."

On September 9, 1988, Pittston's Board of Directors amended the 1987 Plan to allow the Administrative Committee to adopt amendments to the Plan. On November 18, 1988, the Administrative Committee amended the 1987 Plan to add Exhibit G. Exhibit G merged the Paramont Plans into the Pittston Plan effective January 1, 1989. Exhibit G is entitled "Special Provisions Applicable to Former Participants in the Pension Plans of Paramont Coal Corporation." The initial paragraph of Exhibit G states: "In connection with such mergers, the provisions of this Exhibit G shall apply, effective January 1, 1989, notwithstanding any provisions elsewhere in the Plan to the contrary." Exhibit G further states in part:

> (ii)  The accrued pension benefit of each Paramont Participant under the Plan in respect of periods of service prior to January 1, 1989 shall be determined solely in accordance with the provisions of the Paramont Plan in which he was a Participant, as in effect immediately prior to January 1, 1989, based solely on his "Benefit Service" (as defined in such Paramont Plan) on December 31, 1988 or any earlier date on which the Paramont Participant ceases to be an employee of Paramont

- 5 -

Coal Corporation....

(iii)  The accrued pension benefit of each Paramont Participant in respect of periods of service as an employee of Paramont from and after January 1, 1989 ... shall be determined solely in accordance with the provisions of the Plan....

This court previously found that the language of Exhibit G is clear and unambiguous and does not provide for the inclusion of plaintiffs'  years of service with Paramont prior to January 1, 1989, in the Benefit Accrual Service used to calculate a portion of their retirement benefits under the Pittston Plan. *See Adams v. The Brink's Co.*, Civ. No. 2:02cv00044, Docket Item No. 80 (W.D. Va. July 28, 2003) (Report and Recommendation), Docket Item No. 85 (W.D. Va. Nov. 18, 2003) (Order adopting Report and Recommendation) and Docket Item No. 130 (W.D. Va. Jan. 18, 2005) (Memorandum Opinion on Plaintiffs' Motion for Reconsideration).

Thus, under the amended Pittston Plan, and this court's rulings, Paramont employees are entitled to receive the retirement benefit that they accrued under the Paramont Plans through December 31, 1988, and the benefits they accrued under the Pittston Plan for periods of service after January 1, 1989.  Paramont employees also received vesting credit under the Pittston Plan for all of their years of service with Paramont.

The Remaining Plaintiffs, with the exception of Jerry W. Baird, Glenda Brady, Scotty Hamilton, Danny Hayes, James Roger Jones, Robin Lovell, Roger Morgan, Franklin D. Mullins and Dennis Rasnick, base their breach of fiduciary duty claims on

- 6 -

various alleged oral misrepresentations. Of the 119 Remaining Plaintiffs, 108 refer to a meeting with all the employees of Pyxis's operating companies, including all Paramont employees, held at Clinch Valley College at the conclusion of the Pittston-UMWA strike in early 1990, ("the Clinch Valley Meeting"). At this meeting, Gerald Spindler, President of Pittston Coal Group, responded to questions raised by audience members. Most of the Remaining Plaintiffs base their claims, at least in part, on representations they allege that Spindler or others made at this meeting. Many of the Remaining Plaintiffs also cite other alleged oral representations made on other occasions. Each of the Remaining Plaintiffs, with the exception of the Estate of Ray Taylor, has provided responses to defendants' discovery requests which identified the following former Pittston and Paramont employees, some of whom are plaintiffs in this case, as making these alleged misrepresentations: Michael Quillen, Gerald Spindler, Eddie Neely, Rhonda Miller, Randy Robinette, Kathy Fox, Christopher "Brooks" Addington, Jim Campbell, Mike Clark, Cline Childress, Harry Boone, Wendell Collinsworth, Ralph Dado, James M. Davis, Carl Dotson, Joseph Farrell, Steve Horton, James Roger Jones, R. Dwane McConnell, Ron Orender, Scott Perkins, Dennis Rasnick, Donald Ratliff and Gary Swiney.

In consideration of the Motion, the court has reviewed the discovery responses provided by each of the Remaining Plaintiffs. While these discovery responses contain allegations of various oral statements made by various former Pittston and Paramont employees on various occasions, the substance of many of these statements is similar.

Jimmy Adams attended the Clinch Valley Meeting, but he has provided no evidence as to any specific misrepresentation made to him at this meeting or who made

the misrepresentation. In particular, Adams has stated only that, "I understood that our Paramont years would carry over to the Pittston plan." Appendix 2(1) to the Defendants' Memorandum In Support Of Second Motion For Summary Judgment, (hereinafter referred to as "Appendix"). Adams further alleges that, "I remember Scott Perkins also being at that meeting. I don't remember who made the statements, but I do remember what was said about the Paramont years carrying over to the Pittston Plan." Adams does not provide any evidence, however, of what he remembers was said.

Willie Thacker, ("W. Thacker"), states that, at the Clinch Valley Meeting, "Spindler told us that our time with Paramont would carry over into the Pittston plan for retirement benefit purposes." Appendix 2(107). Robert L. Smallwood states that, at the Clinch Valley Meeting, "Johnny Castle asked Gerry Spindler about our retirement benefits. Spindler told Johnny Castle that the Pittston pension plan was better than the Paramont plan and that we would all be covered under the Pittston plan. Johnny then asked if our Paramont time would carry over to the Pittston plan and Spindler said it would." Appendix 2(98). Danny C. Hayes also states that, at the Clinch Valley Meeting, Spindler stated that "our Paramont years would carry over to the Pittston plan for benefit purposes." Appendix 2(44).

Johnny Ray Mullins, ("J. Mullins"), states that, at the Clinch Valley Meeting, Spindler "told us that Pittston had bought Paramont and the Paramont retirement would continue. Also that Paramont years of service would carry over into the Pittston plan and would be honored." Appendix 2(77). Johnny W. Farmer, ("J. Farmer"), states that, at the Clinch Valley Meeting, Spindler said that "my Paramont Time would be

- 8 -

carried over to the Pittston Retirement...." Appendix 2(34). J. Farmer also alleges that Quillen and Robinette told workers that "our time with Paramont would carry into the Pittston Retirement Plan" at a meeting in either late 1987 or early 1988 at the Ramsey Preparation Plant.

Billy Bullion states that, at the Clinch Valley Meeting, Spindler said "that my years of service with Paramont would carry over to the Pittston plan and count toward my retirement." Appendix 2(13). Bullion alleges that Quillen came to the Dorchester job site and made the same representation, but he provides no date for this representation other than to say that it occurred "around the same time" as the Clinch Valley Meeting.

Thelmer Lee Cantrell, ("T. Cantrell"), states that, "Rhonda Miller told me that my years of service with Paramont would be carried over and be part of the calculation of my Pittston retirement benefit. Mike Quillen also spoke to me and others and told me that my retirement benefits would be based on my years worked with Pittston and Paramont." Appendix 2(20). T. Cantrell does not provide a date for these representations. He does state that he attended the Clinch Valley Meeting and that the same representation was made at that meeting, but he does not remember who made the representation.

Vernus Allen Culbertson states that, at the Clinch Valley Meeting, Spindler said that "my years with Paramont would be carried over and included in the Pittston Plan when calculating my pension benefit. I was told that the Pittston Plan was a better retirement plan than the Paramont Plan." Appendix 2(28). Culbertston also claims this

- 9 -

same representation was made periodically by Quillen, Miller, Perkins and Ratliff on the job site in the late 1980s.

Larry Gilliam, ("L. Gilliam"), states that, at the Clinch Valley Meeting, Spindler, Quillen and Perkins all said that "the Pittston Plan was better and paid more than the Paramont plan. We were also told that your time with Paramont would carry over with Pittston in calculating retirement benefit." Appendix 2(37).

Phil Thacker, ("P. Thacker"), states that, at a quarterly meeting at the Ramsey Preparation Complex in 1987, "Quillen was asked if the years of service we had with Paramont prior to the buyout would count under the Pittston plan. Quillen said that the years would carry over." Appendix 2(106).

Donald M. Mullins, ("D. M. Mullins"), states that, at the Clinch Valley Meeting, Quillen and Clark said that "Paramont years of service would be included under the Pittston retirement plan." Appendix 2(74). D. M. Mullins also states that Quillen made the same representation at a meeting at Deep Mine 13 in the early 1990s. Robert S. Stapleton Jr. states that, at the Clinch Valley Meeting, Spindler talked about the merger of the Paramont and Pittston Plans. Stapleton states that Spindler said "that my Paramont time would be included in my Pittston retirement benefit." Appendix 2(100). According to Stapleton, Quillen made the same representation, but he did not provide a date for this representation.

Floyd Cantrell, ("F. Cantrell"), states that, at the Clinch Valley Meeting, Spindler said "that my years with Paramont would be included in the calculation of

retirement benefits under the Pittston Plan." F. Cantrell also alleges someone "made this representation at the plant." He does not remember who made the representation and does not provide the date of the representation.

Denver Hall and R. Dwane McConnell, ("R. McConnell"), also state that Spindler said "that my Paramont years of service would be included in the calculation of retirement benefits under the Pittston Plan" at the Clinch Valley Meeting. Appendix 2(41) & (64). Hall also states, "I believe I was told this by other person[s] but cannot remember who." R. McConnell states that Ratliff also made the same representation in a meeting at the Esserville laboratory in the early 1990s. R. McConnell also states that he was riding with Quillen in a car once when they passed union members picketing and Quillen told him that Pittston would recognize his service with Paramont so that he would not have to go through what the union employees were going through. R. McConnell does not provide a date for this statement.

Mitchell Salyers states that, "Mike Quillen, Rhonda Miller, and Donnie Ratliff told me that my Paramont time, previous to the purchase, would be included in the calculation of my Pittston pension." Appendix 2(93). Salyers does not state when these representations occurred. Salyers also states that he attended the Clinch Valley Meeting where Spindler said "the same thing."

Woodrow Lee Lovell, ("W. Lovell"), states that, at the Clinch Valley Meeting, "Spindler told me that my years with Paramont would be included in the calculation of my pension benefits under the Pittston Plan." Appendix 2(62). According to W. Lovell, "[t]his representation was also made at a Paramont Training Center Insurance

- 11 -

meeting. I do not remember who made this representation at the training center but the person was Rhonda Miller's boss." W. Lovell does not provide a date for this representation.

John Cantrell, ("J. Cantrell"), states that, at the Clinch Valley Meeting, Spindler said "my time with Paramont would be included in the calculation of my Pittston Pension." Appendix 2(19). J. Cantrell also alleges, "I was also told by others that my Paramont years of service would be included in the calculation of my Pittston pension but [I] do not remember who made these representations to me." James Roger Jones, ("J. Jones"), states, "I was told that my Paramont time would be included in the calculation of my Pittston pension." Appendix 2(52). J. Jones states that this representation was made by Spindler at the Clinch Valley Meeting.

Carl Thurman Dotson states that Quillen, Ratliff, Spindler, Neely, Addington and "a lady" told him that "my years with Paramont would be included in calculating my pension benefit under the Pittston Plan. I was also told that the Pittston Plan was a better plan than the Paramont Plan." Appendix 2(30). Dotson claims that these representations occurred at the Clinch Valley Meeting and at the job sites in the late 1980s. Gregory L. Clark, ("G. Clark"), attended the Clinch Valley Meeting and states that Ratliff and Spindler "told those present that years of service with Paramont would be used in calculating pension benefits under the Pittston Plan." Appendix 2(23).

James E. Cooke states, "Mike Quillen, Donnie Ratliff and Rhonda Miller told me that my years worked with Paramont would be included in the calculation of my Pittston pension." Appendix 2(26). Cooke claims these statements were made at

Paramont's Esserville office, but he does not provide a date for these statements. Cooke also alleges that the same representation was made by Spindler at the Clinch Valley Meeting. Ival Mack Meade Jr., ("I. Meade"), states that, at the Clinch Valley Meeting, Spindler said "our Paramont time would be included in the calculation of our Pittston retirement benefit." Appendix 2(68). Meade also states that Davis made the same representation at the Clinch Valley Meeting.

Teddy Dean stated that, at the Clinch Valley Meeting, "[a] representative of Pittston whose name I can't remember told the group that the Paramont employees would be included in the Pittston retirement plan, which had better benefits than the Paramont plan. He also told us that our total years of employment, including time worked for Paramont, would be used in calculating our pension benefits under the Pittston Plan." Appendix 2(29). Dean also claims that he was present at several other smaller meetings held at job sites after the Clinch Valley Meeting, at which the same representations were made by other "management representatives."

Ronnie L. Lawson, ("R. Lawson"), states that, at the Clinch Valley Meeting, Spindler said, "my time spent with Paramont would be included in the Pittston retirement plan when calculating my pension." Appendix 2(58). Lawson also states that Ratliff and Neely told him this as well, but he does not provide a date for these statements. Donald E. Mullins, ("D. E. Mullins"), states that, at the Clinch Valley Meeting, Perkins and Spindler said that "our time from Paramont would be included in the Pittston plan and our years of service started with our employment date with Paramont." Appendix 2(73). Charles Osborne states that, at the Clinch Valley Meeting, Spindler and Perkins said, "my prior years of service at Paramont would be included

- 13 -

in the calculation of my retirement benefits under Pittston Plan." Appendix 2(82). Osborne also states, "I was told that my pension with Pittston would be secure." According to Osborne, Perkins also made these representations at various work locations, including the Paramont Shop in the late 1980s or early 1990s.

Jerry Tignor states that, at a meeting at the Paramont office in Esserville, Quillen said, "my Paramont time would be included in the calculation of my Pittston pension." Appendix 2(108). Michael Hopkins states that Quillen, Ratliff and Horton told him that "my time spent with Paramont would be included in the calculation of my Pittston pension benefits" at a meeting at the Ramsey Preparation Plant. Appendix 2(48). Hopkins does not provide a date for this meeting. Hopkins also states that he attended the Clinch Valley Meeting where "Spindler made similar representations."

Clarence Whisenhunt states that Rasnick and Quillen made representations at safety meetings that his years with Paramont "would be included" in the calculation of his Pittston pension. Appendix 2(111). Whisenhunt does not indicate when these statements were made. According to Whisenhunt, Spindler also made this same representation at the Clinch Valley Meeting. Whisenhunt also states that he "understood that Paramont employees were being offered their Paramont time in the Pittston Plan in order to remain non-union." Michael Whitaker states that he attended a meeting for the Paramont engineering department and office staff held by "the human resources staff" at the Paramont office in Esserville in the summer of 1986, at which he was told that his Paramont time "would be included in the calculation of" his Pittston pension. Appendix 2(112). Whitaker claims that he attended the Clinch Valley Meeting, at which Perkins and Spindler spoke, but he does not provide any

- 14 -

specific representations made at that meeting. Whitaker also states, "I had several individual conversations with my supervisor, Roger Jones, regarding the merger and Pittston's representation that all years worked for Paramont would be included in Pittston's retirement plan."

Homer E. Phipps states that a speaker at the Clinch Valley Meeting "told us that all of our Paramont time would be recognized as time served under the Pittston Pension Plan." Appendix 2(84). Phipps does not remember who the speaker was. Phipps states that the same representation was made at a retraining class at the Esserville offices taught by Rasnick between the time of Pyxis's acquisition of Paramont and the end of 1987. Phipps also states that he was told "that the Pittston Pension Plan was a much better plan."

Denver Sanders states that, at the Clinch Valley Meeting, Spindler said that "Pittston would recognize all of our Paramont time regarding the Pittston retirement plan." Appendix 2(94). Sanders also states that Perkins made the same representation at the Ramsey bathhouse and that Dado made the same representation at an annual retraining meeting. Sanders did not provide a date for these representations other than to say that the meeting at the Ramsey bathhouse occurred shortly after the Clinch Valley Meeting.

Oakley Michael Adkins attended the Clinch Valley Meeting, and he alleges that at this meeting, "Gerald Spindler stated that our Paramont years of service would count as Pittston time in calculating pension benefits under the Pittston plan." Appendix 2(2). Adkins further alleges that "Randy Robinette and Mike Quillen also represented that

- 15 -

my years with Paramont would be included in the Pittston retirement plan." Adkins alleges that these representations were made at the Ramsey bathhouse, but he provides no date for these representations other than to say that they occurred prior to the Clinch Valley Meeting. He also alleges, "[s]imilar representations were made at annual retraining meetings by Mike Quillen, Donnie Ratliff and Rhonda Miller over the years."

Gary Mullins, ("G. Mullins"), states that, at the Clinch Valley Meeting, Spindler said that "our time with Paramont would count as time with Pittston." Appendix 2(76). G. Mullins also states that Gary Swiney[2] and Perkins made the same statements at meetings at Deep Mine 17, but he does not provide dates for these meetings.

According to Michael A. Bledsoe, ("M. Bledsoe"), Spindler told those in attendance at the Clinch Valley Meeting that "our time with Paramont would be counted as time for Pittston for purposes of the retirement plan." Appendix 2(4). M. Bledsoe states that he recalls Ratliff, Quillen and Miller making the same representation but does not provide a date for these representations. According to Robert F. Bledsoe, Spindler told those in attendance at the Clinch Valley Meeting that "our years of service under the Paramont plan would count toward the Pittston plan." Appendix 2(5).

Roy Ronald Gilliam, ("R. Gilliam"), states that, at the Clinch Valley Meeting, Spindler said that "our years of service with Paramont would count toward our pension

_____

[2] G. Mullins's discovery responses actually refer to representations made by Gary "Sweeney." It is assumed that this is a misspelling of Swiney's name.

benefits with Pittston." Appendix 2(38). R. Gilliam also asserts that Ratliff and Rasnick told him that his years of service with Paramont would count under the Pittston Plan during annual retraining. Dane R. Hamilton, ("D. Hamilton"), states that "a Pittston representative" at the Clinch Valley Meeting said "that the Paramont retirement plan would merge with the Pittston retirement plan and that our years at Paramont would be added in with Pittston time. I also received a letter from Pittston in November 1988 signed by Robinette, which said the same thing." Appendix 2(42). D. Hamilton also states, "[w]e were told that our years with Paramont would be counted with Pittston time in calculating our retirement benefits."

Claude W. Cox states that, at the Clinch Valley Meeting, Spindler said that "all our years of service with Paramont would count toward our Pittston retirement and that the Pittston [Plan] was superior to our Paramont plan." Willie M. Falin states that, at the Clinch Valley Meeting, Spindler "told us that our Paramont years of service would be counted at Pittston time." Appendix 2(32). Falin also alleges that Quillen told him that "the buyout was a blessing and that the benefits would be better than not being bought out." Donald Kennedy states that, at the Clinch Valley Meeting, Spindler said "all my time with Paramont would be counted in with Pittston's retirement plan." Appendix 2(54). Kennedy also states that Spindler said that "the company time went with all Paramont time rolled to Pittston retirement plan." Kennedy claims that Perkins and Miller said the "same thing at the tipple," but he does not provide a date for these statements.

Michael Erwin Boggs, ("M. Boggs"), states that, at the Clinch Valley Meeting, Spindler said that "my time that I had with Paramont would count on my Pittston

- 17 -

retirement." Appendix 2(7). M. Boggs also alleges that Quillen made the same representation from the back of a pickup truck at the Deep Mine 6 jobsite, but he does not provide a date for this representation. Gregory L. Ireson states that, at the Clinch Valley Meeting and at "safety breaks" thereafter, "[w]e were told that all of our employment time with Paramont would count and be added to our time under The Pittston Retirement Plan." Appendix 2(50). Ireson does not recall who made these statements.

Randall A. Clark, ("R. Clark"), states that, at the Clinch Valley Meeting, Ratliff and Spindler "told us that our years of service with Paramont would count toward our pensions under the Pittston Plan." Appendix 2(25). R. Clark also alleges that he attended a meeting in the mid 1980s in the red conference room of the Paramont office, during which "Quillen and a lady from Pittston told us that our years of service with Paramont would count toward our pension benefits under the Pittston Plan." Michael W. Clark, ("M. Clark"), states that he attended the Clinch Valley Meeting, and that Spindler and Perkins "spoke to the employees and explained the merger and told us that our Paramont years of service would be counted in calculating our pension benefits under the Pittston Plan." Appendix 2(24).

Ottis M. Mullins, ("O. Mullins"), states that, at the Clinch Valley Meeting, Spindler and Miller said that "our time counted in the retirement plan from the time that we started at Paramont." Appendix 2(78). O. Mullins also states that Spindler, Miller, Addington and Childress told him that "our Paramont years would be counted under Pittston's Plan." O. Mullins states that the representations by Addington and Childress occurred at the Esserville Shop, but he did not provide dates for these

- 18 -

representations.

Roger Morgan states that Spindler, Miller, Quillen and others told him that "my time with Paramont would be counted in calculating my benefit under the Pittston Plan." Appendix 2(72). Morgan stated that this representation was made in the late 1980s at the Clinch Valley Meeting and by Miller at a company meeting on the job site. Morgan states that he also received benefit statements that confirmed this representation. Randy D. Mullins, ("R. Mullins"), states that "I was told ... that our time with Paramont would count just like we had worked for Pittston all the time." Appendix 2(79). R. Mullins states that he was told this by Brooks Addington at the Esserville Shop and by Spindler and Ratliff at the Clinch Valley Meeting.

Kenneth Meade, ("K. Meade"), states that, at the Clinch Valley Meeting, Spindler was asked about retirement benefits after the sale of Paramont to Pittston. "...Spindler told us that our time with Paramont would count under the Pittston plan." Appendix 2(69). K. Meade further states, "The same question was asked at group meetings held at the mines both before and after the sale. We were told the same thing - that our time with Paramont would be included in our pension benefits under the Pittston plan. I also remember Ron Orender, a supervisor at Deep Mine 1, telling me that his understanding from Pittston was that all time with Paramont would be included in the Pittston plan."

Judy Thacker, ("J. Thacker"), states that, at the Clinch Valley Meeting, "the question was asked if our time carried when we worked for Paramont and Mr. Spindler said yes it did and our benefits would continue the same." Appendix 2(105). J. Thacker

also states that, soon after Pittston bought Paramont, Miller said that "my time with Paramont would count under the Pittston retirement plan." Gary Swiney states that, at the Clinch Valley Meeting, Spindler said that "the Paramont plan was being 'absorbed' into the Pittston plan and that all of our time with Paramont would count for purposes of my pension benefit under the Pittston plan." Appendix 2(103).

Gary Williams states that he attended a meeting of all Paramont employees at Paramont's Esserville office about one month after the acquisition of Paramont by Pyxis, at which Quillen stated that "the Pittston retirement plan would take over the Paramont plan and that the years we had worked for Paramont would count in the calculation of my pension under the Pittston plan." Appendix 2(114). Ralph Wilson Jr. also states that, at the Clinch Valley Meeting, Spindler said that "our years of service would count toward our pension benefits under the Pittston Plan." Appendix 2(116).

Roy D. Jones also attended the Clinch Valley Meeting, and he remembers that Spindler, Ratliff and Perkins all "made statements to the effect that all years of service with Paramont would count toward my Pittston retirement benefit." Appendix 2(53). George L. Meade, ("G. Meade"), states that, at the Clinch Valley Meeting, Spindler said that "the Paramont Plan would merge with the Pittston Plan. I remember that I was told that my Paramont years of service would count toward my Pittston retirement benefits." Appendix 2(66). G. Meade also states, "[o]ver the years, I remember others making this representation but do not recall anyone in particular." Ronnie N. Mullins states that, at the Clinch Valley Meeting, "Spindler told us that our Paramont time would count toward our Pittston retirement benefit." Appendix 2(80).

- 20 -

Danny S. Moore states that he was told on four separate occasions that "our time with Paramont would count toward our Pittston pension." Appendix 2(71). Moore states that he was told this by Spindler at the Clinch Valley Meeting, as well as by Quillen at Deep Mine 1 in 1986, and by Miller and "another person from the Pittston benefits department" whose name he cannot remember at Deep Mine 17 after the merger and again at a group meeting at the Holiday Inn in Norton. Winston M. Richardson, ("W. Richardson"), states that he attended a meeting in Esserville with other Paramont employees, at which they were told that "years of service with Paramont would be counted toward Pittston retirement benefits." Appendix 2(90). W. Richardson does not provide the name of the person who made this statement, and he does not recall the date of the meeting.

Donald Gene Childress states that, at the Clinch Valley Meeting, Spindler and Quillen "told us that our years worked with Paramont would count under the Pittston Plan." Appendix 2(21). Isaac Wade Cantrell, ("I. Cantrell"), states that, at the Clinch Valley Meeting, Spindler stated "that our time with Paramont would count under the Paramont retirement plan. I was told my hire date with Paramont would be my hire date with Pittston." Appendix 2(18). David Freeman states that, at the Clinch Valley Meeting, Spindler said that "my time with Paramont would count on my Pittston retirement and that the Pittston Plan was better than the Paramont Plan." Appendix 2(36). Homer Hill states that, at the Clinch Valley Meeting, Spindler explained "how the years we worked with Paramont would be counted on our pension when we retired from Pittston." Appendix 2(46). Jerry R. Hylton states that, at the Clinch Valley Meeting, a Pittston representative, whose name he cannot recall, "told us that all of our retirement time with Paramont would count with Pittston on our retirement plan and

- 21 -

that the Pittston retirement plan would be a better package." Appendix 2(49).

Dusty Robinson states that, at the Clinch Valley Meeting, Spindler said that "Pittston would count our time with Paramont toward our pension benefits under the Pittston plan...." Appendix 2(91). Robinson also states that, after the Clinch Valley Meeting, "I remember discussions about our pension benefits at annual safety training meetings. At these meetings members of management would make statements similar to what we were told at the Clinch Valley College meeting - that our Paramont time would be included in the calculation of our pension under the Pittston plan. I remember Dennis Rasnick, Donnie Ratliff and Carl Dotson making these statements at these meetings. I also remember receiving a letter from Randy Robinette in late 1986 or 1987 which stated that our time with Paramont would carry over as Pittston time in the Pittston plan."

Denver L. Winebarger states that, at the Clinch Valley Meeting, "Spindler told us that all of our time with Paramont would count in the Pittston plan for our retirement benefits." Appendix 2(117). Winebarger also states that, prior to the Clinch Valley Meeting, Quillen, at the Esserville shop, "told us that Pittston was buying Paramont and that our time with Paramont would carry over into the Pittston Plan."

Arthur Wilson states, "[w]e were advised at a company-wide meeting at Clinch Valley College that [the] Paramont retirement would be merged with the Pittston Plan and all our time with Paramont would be counted under the Pittston plan. This meeting was held shortly after Pittston bought Paramont." Appendix 2(115). Wilson does not identify who made this representation. Wilson also claims that at a safety meeting at

- 22 -

the Ramsey bathhouse Dado said that "after Paramont people became vested, Paramont time would be counted as Pittston time for purposes of our pension." Wilson states that Ratliff and Wendell Collinsworth also spoke at this meeting. According to Wilson, "we were advised that the Paramont and Pittston plans would be merged and our time would count."

David McConnell, ("D. McConnell"), states that, at the Clinch Valley Meeting, Spindler, Perkins and Miller said that "our Paramont time would count in the Pittston Plan as of our Paramont hire date." Appendix 2(63). D. McConnell also states that Quillen made this same representation at a safety meeting at the Ramsey Preparation Plant in the winter of 1986.

John Browning Jr., ("J. Browing"), states that Mike Quillen in 1988 or 1989 told him and all of the employees at the Paramont truck shop at the Esserville facility that "our years of service with Paramont would count under the Pittston retirement plan and that our retirement would stay in place." Appendix 2(11). J. Browning states that, at the Clinch Valley Meeting, both Spindler and Perkins said "that our years of service with Paramont would count in the Pittston retirement plan." J. Browning also alleges that, after the Clinch Valley Meeting, Ratliff came to the truck shop and said "that our service with Paramont would continue under the Pittston retirement plan when calculating pension benefits." J. Browning does not provide a date for this representation.

Thomas J. Hillman states that, at the Clinch Valley Meeting, "we were told that our years with Paramont would count under the Pittston plan in calculating our

retirement benefits," but he does not specify who made this statement. Hillman also states, "[w]e were told that retirement and benefits would not change after the sale to Pittston and that time with Paramont would count under the Pittston plan." Hillman does not specify who made this statement or when it was made. Arthur W. Jenkins states that, at the Clinch Valley Meeting, Spindler "told the employees present that their years of service with Paramont would be counted in calculating pension benefits under the Pittston Plan." Appendix 2(51). Jenkins also states, "Spindler ... told us that our years of service with Paramont would count under the Pittston Plan when they calculated our pension benefits."

Tim Lawson, ("T. Lawson"), states that Perkins and Spindler told Paramont employees at the Clinch Valley Meeting that "our Paramont time from our hire date would count under the Pittston retirement plan for benefit purposes." Appendix 2(59). T. Lawson also claims that Quillen made this same representation at a meeting at the Ramsey Preparation Plant and that Ratliff, Quillen, Perkins, Robinette and Miller made this same representation at retraining meetings, but he does not provide any dates for these representations.

Ronald Wayne Large states that, at the Clinch Valley Meeting, Spindler, Miller and Quillen said that "years of service with Paramont would be counted as years of service under the Pittston Plan in calculating our pension benefit under the Pittston Plan." Appendix 2(57). John Livingston states that he does not remember the names of the people who spoke at the Clinch Valley Meeting, but "they were management people from Paramont and Pittston."Appendix 2(60). According to Livingston, "[t]hey told us that our Paramont time would be counted with our Pittston time in calculating

- 24 -

our retirement benefits under the Pittston Retirement Plan."

Ricky A. Shelton states that, "I was told that my Paramont time would count in the Pittston Retirement Plan, but Pittston wasn't exactly sure how it would be done. I was told that the Pittston Retirement Plan would be better. Pittston was supposed to be a more stable company." Appendix 2(95). Shelton does not state who told him this or when he was told this. According to Shelton:

> Donnie Ratliff and Rhonda Miller often explained the future amount of retirement benefits, and always included our Paramont time in those examples and calculations. I believed that my Paramont time would be included in my Pittston retirement because of what they told me. Donnie Ratliff and Rhonda Miller assured us that we would get our Paramont retirement money because the money was "out there" - that it had been paid in and was there for us. Scott Perkins assured us that Pittston was working on a plan to roll the Paramont Plan into the Pittston Plan.

> Gerry Spindler said at the meeting at Clinch Valley that our Paramont time would count on our Pittston retirement; that we would lose no time.

Kenneth S. Sluss states that, at the Clinch Valley Meeting, Spindler said that "my Paramont time would be counted for all purposes in the Pittston Plan." Appendix 2(97). Sluss states that he "was told this at the mine also," but he does not state when or by whom he was told. Sluss also claims that Farrell, Ratliff, Clark and Quillen made the same representation, but he has not provided any dates for these representations.

Danny Ray Taylor states that, at the Clinch Valley Meeting, Spindler, Perkins

- 25 -

and Miller said that "our time with Paramont and Pittston would be counted together to calculate our retirement benefits." Appendix 2(104). Taylor states, "we were told that our Paramont time would count towards our retirement under the Pittston plan."

Ronald L. Slemp states:

I was told that my Paramont time would count in the Pittston Retirement Plan: that Pittston was a bigger company than Paramont and was more stable as far as coal reserves. I, along with the other employees, were concerned about the company being bought out. I was told that the buy-out would benefit, and not hurt me, my income, benefits and retirement.

At various meetings, specifically annual retraining sessions, and at numerous times, Donnie Ratliff always used our Paramont time when he was asked a question about retirement benefits. Because of this, and other representations made by the company, I always counted on my Paramont time being included in my Pittston retirement.

...

At the meeting at [Clinch Valley College] ..., Gerry Spindler told me that my Paramont time would count toward my Pittston retirement. I had 10-11 years with Paramont and was concerned about losing that time in the merger. I was assured that I would not lose that time. One of the employees in the group asked Gerry Spindler if our Paramont time would be recognized in the Pittston Retirement Plan, and he specifically answered, "Yes" to that question.

Appendix 2(96).

Freddy Powers states that, at the Clinch Valley Meeting, "Roger Morgan asked

- 26 -

what would happen to prior service with Paramont and ... Spindler said our time would count under the Pittston plan toward our pension." Appendix 2(85). Powers also states, "Shortly after this meeting I spoke with ...Spindler, ... Ratliff and ... Perkins about what would happen to Paramont years of service and what was said during the meeting at Clinch Valley College. Prior to this meeting I had a conversation with ... Quillen and we talked about what would happen to years of service prior to the buy-out by Pyxis. Mike stated that ... Spindler told him that prior years of service with Paramont would count with Pittston."

David Elam states that, at the Clinch Valley Meeting, "we were told that our retirement benefit under the Pittston plan would be based on all of our time at Paramont. I do not remember who spoke to us at this meeting but they were representatives of Pittston and Paramont." Appendix 2(31).

Freddie G. Cantrell, ("F. G. Cantrell"), states that, at the Clinch Valley Meeting, "we were told that Paramont retirement and service would merge with the Pittston retirement plan and that we would not lose any benefits after the takeover." Appendix 2(17). F. G. Cantrell does not remember who made this representation. F. G. Cantrell also admits that he received Robinette's November 10, 1988, letter stating that the Paramont Plan would merge into the Pittston Plan as of January 1, 1989. According to F. G. Cantrell, this letter stated "your benefits would be a combination of what you earned on the Paramont plan and what you[]earn on the Pittston plan."

Robin Lovell, ("R. Lovell"), states, "I was told that Paramont and the Pittston Plan would be merged and that I would receive[] pension benefits from the Pittston

Plan based on my years of employment with Paramont and Pittston." Appendix 2(61). R. Lovell states that Spindler, Miller, Perkins, Ratliff and Neely made these representations from the late 1980s until the Clinch Valley Meeting, on the job sites and at the training center.

Franklin D. Mullins, ("F. Mullins"), states that, at meetings at the Ramsey Preparation Plant, "[p]romises were made to merge pension plans to benefit Paramont plans and that Paramont years will count on Pittston retirement." Appendix 2(75). F. Mullins states that Dado and Miller made these representations but does not provide a date for the representations. Bobby G. Redman states that Miller and Perkins said "Paramont pension would roll over into Pittston Plan." Appendix 2(87). According to Redman, this statement was made "at the plant," but he does not provide a date for the statement. Redman states that Spindler made the same statement at the Clinch Valley Meeting.

Jeffrey Summers states that, at the Clinch Valley Meeting, Spindler said that "my years of service would rollover into the Pittston Plan for calculating my pension benefit. I was told that the Pittston Plan was a better plan and that I would be taken care of." Appendix 2(101). Bobby Wheeler agrees that a statement was made at the Clinch Valley Meeting that "all time with Paramont would roll-over into the Pittston retirement plan and that the Pittston retirement plan was better than the Paramont plan." Appendix 2(110). Wheeler, however, cannot remember whether it was Spindler or Farrell who made this representation. According to Summers, Perkins and Miller made these same representations at the Ramsey Preparation Plant, but he does not recall the date on which they made these representations. According to Wheeler, Mike

- 28 -

Clark or Quillen also stated that "all time with Paramont would be rolled over to the Pittston retirement plan and that we would lose nothing" at a meeting at Deep Mine 13 in 1986 or 1987.

Jerry W. Baird and Kim Boggs also attended the Clinch Valley Meeting, but they do not remember what was specifically said or by whom. Appendix 2(3) & (6). Each of them states, however, that after the Clinch Valley Meeting, they thought that their time with Paramont would count under the Pittston Plan. According to Baird, "I also received annual benefit statements through 1998 which reaffirmed what I believed had been represented regarding my pension benefits." Baird also alleges that he attended a meeting with Fox and Miller in the red conference room at Paramont's Esserville office in late 1986. According to Baird, "I do not recall what was specifically said at the meeting but I do recall leaving the meeting with the impression that my Paramont years of service would be credited toward my retirement Pittston benefits."

Donald Greear also attended the Clinch Valley Meeting, and he remembers that Spindler spoke, but he has not provided any particular representation made by Spindler at this meeting. Appendix 2(40). Instead, Greear states, "[i]t was my understanding after the meeting that my time with Paramont would be included in the calculation of pension benefits under the Pittston plan." Greear also alleges that Ratliff made a similar representation to him at a training meeting, but he does not recall the date of this meeting.

Lawrence Reeves states that he attended the Clinch Valley Meeting, but he does

not provide any specific statements made by any specific person. Instead, he states, "[w]hen I left this meeting I believed that my time with Paramont was going to be counted in the Pittston retirement plan." Appendix 2(88). Reeves also states, "[a]t the Esserville retraining center after the Clinch Valley meeting, I asked Donnie Ratliff was there any chance that the union half of the company would challenge the non-union [employees'] participation in the Pittston plan. Donnie told me no. Donnie also told me that my Paramont time was going to be counted in the Pittston retirement plan. These representations were also made at several safety meetings. I believe that ... Donnie Ratliff and Wendell [Collinsworth] made these representations."

Holly Meade, ("H. Meade"), states that she attended the Clinch Valley Meeting where Spindler and Ratliff spoke. According to H. Meade, "[s]omeone present at the meeting asked whether time with Paramont would count under the Pittston retirement plan. I understood that my time with Paramont would count under the Pittston Plan." Appendix 2(67). H. Meade states that she also had conversations with her supervisor, R. McConnell, at the Ramsey Laboratory Complex. According to H. Meade, "[w]e discussed the retirement plan generally, and no one ever questioned that our Paramont time would not count under the Pittston plan." H. Meade further states, "[w]hen I was considering retirement, Jim Campbell told my husband, Rick Meade, ... to tell me to stay at Pittston until 'I got my 25 years' because my pension benefits would be better than if I retired with 23 years. This meant to me that my 11 years of service with Paramont were being counted under the Pittston plan."

Don Clark states that, at the Clinch Valley Meeting, "[w]e were told that Paramont time would equal Pittston time under the Pittston retirement plan. We were

- 30 -

also told that all of our Paramont time would go over into the Pittston retirement plan." Appendix 2(22). Clark states that Spindler made this representation. Frank L. Farmer, ("F. Farmer"), states that, at the Clinch Valley Meeting, "they told us the years we worked for [Paramont] would be added to our Pittston work to figure our retirement." Appendix 2(33). F. Farmer does not indicate who made this representation. F. Farmer also claims that Quillen made the same representation to him at a meeting "at the back of the Paramont Truck Shop," but he does not remember when this meeting took place.

Jeffrey Petro states that, at the Clinch Valley Meeting, a representation was made that "our retirement would go on with Pittston and that our time with Paramont would count under the Pittston Plan toward our retirement benefits." Appendix 2(83). Petro does not remember the name of the man who made this statement but believes it was a member of management. Petro also states, "at annual safety meetings the question about our retirement benefits would come up and we would be told that our Paramont time counted as Pittston time." Petro does not identify the person who made these statements or when they were made.

James Harry Boone Jr. states that, at the Clinch Valley Meeting, Spindler said, "our time with Paramont would count as Pittston time for our retirement." Appendix 2(8). Boone also alleges that Ratliff told him that Farrell had asked Quillen what could be done to keep the union out of Paramont and that Quillen told Farrell that the Paramont pension was not very good, to which Farrell responded "we will give them the Pittston pension." Boone does not provide a date for this representation.

William D. Breeding states that, at the Clinch Valley Meeting, Spindler said, "our time with Paramont Mining would continue with Pittston Coal for our retirement benefits." Appendix 2(10). Billy D. Cantrell, ("B. D. Cantrell"), states that both Spindler and Perkins said "that our years of service would be figured in with our Pittston retirement" at the Clinch Valley Meeting. Appendix 2(15). Bennett Lee Cantrell, ("B. L. Cantrell"), states that, at the Clinch Valley Meeting, Spindler and Rhonda Miller said "that my Paramont years would be counted under Pittston's Plan." Appendix 2(14).

Scottie L. Hamilton, ("S. Hamilton"), alleges that, at the Clinch Valley Meeting, Spindler said "that our years of service at Paramont would go toward Pittston retirement benefits." Appendix 2(43). Hamilton also alleges that he received annual benefit statements which "confirmed this."

Edward D. Graham states that, at the Clinch Valley Meeting, Spindler said "that if you had ten years with Paramont, you had ten years with Pittston that would count toward your retirement under the Pittston Plan." Appendix 2(39). Gerald Newton states that, at the Clinch Valley Meeting, Spindler said "if you have ten years of Paramont service you had ten years of Pittston service." Appendix 2(81).

Jimmy W. Rose states that, Boone told him at Deep Mine #7 that "my years with Paramont would be treated as time with Pittston for purposes of the retirement plan." Appendix 2(92). Rose does not state when Boone made this statement. Rose also states that, Spindler, Ratliff, Perkins and Quillen made the same representation at the Clinch Valley Meeting. "I was told if I have 10 years with Paramont, I have 10

- 32 -

years with Pittston."

Charles Richardson Jr., ("C. Richardson"), states that, at the Clinch Valley Meeting, Spindler said, "if I had 10 years of service with Paramont, I had 10 years of service with Pittston." Appendix 2(89). C. Richardson also states, "I was also told at safety retraining meetings by Donnie Ratliff, Dennis Rasnick, Wendell Collinsworth, Brooks Addington and Mike Quillen that time with Paramont would count as Pittston time under the Pittston retirement plan. I also attended a meeting at the Esserville truck shop where I was told that my years of service with Paramont would be counted toward [my] Pittston retirement benefit." C. Richardson states that the safety retraining meetings were held every year, but he does not provide a date for the statements made at these meetings.

Hezekiah N. Franklin states that "[i]n approximately 1987 or 1988 Scott Perkins explained to the employees at the Ramsey prep plant ... that our prior years of service with Paramont would be credited under the Pittston Plan." Appendix 2(35). Clegg G. Hess states that, at the Clinch Valley Meeting, both Spindler and Quillen stated that "we would get credit for our years at Paramont." Appendix 2(45). Hess also states, "I also remember a meeting at the Paramont training center where Donnie Ratliff gave us several scenarios to show how much better our pension benefits would be under the Pittston Plan and that our Paramont years of service would be included. My supervisor was Brooks Addington and when he retired he told me the reason he was able to retire from a financial standpoint was because of what he would receive under the Pittston retirement formula with his Paramont years of service included."

- 33 -

Willis R. Surrett Jr. states that, at the Clinch Valley Meeting, Spindler said that "all prior time with Paramont Coal would be credited to the Pittston retirement plan." Appendix 2(102). Surrett also states that, during a mine tour in the early 1990s, Perkins said "the new plan would be better than the previous one with all time credited." Surrett futher states that, at a dayshift safety break at Deep Mine # 20 in the mid-1990s, Dado said that the "benefit changes would not affect the retirement plan, that it would stay the same."

David P. King states that, at the Clinch Valley Meeting, "[o]ne of the Pittston men, whose name I can't remember, told us that Paramont years of employment would add into Pittston years to figure our retirement benefit." Appendix 2(55).

Rasnick states, "[i]t was represented to me that my entire time of vested service at Paramont Coal Company would count toward my vested service in Pittston Coal Company after Pittston bought us." Appendix 2(86). Rasnick claims that this representation was made by: "Mike Quillen in June of 1986, and for at least the following 12 months; Donald Ratliff, my supervisor, from June of 1986 through July of 1988; Gerald Spindler, in a meeting at [Clinch Valley College] in 1988 or 1989; Eddie Neely, the financial officer in 1987, in the hall, just outside of his office in Esserville. I worked in the Safety Department, we traveled to various mine sites and had safety meetings, picnic, etc. and heard repeatedly these representations made for months by Donnie Ratliff, Mike Quillen, and others."

Oscar Ray Watson states that, at the Clinch Valley Meeting, "Spindler told us the retirement plan with Paramont would be changed to coincide with the Pittston

plan." Appendix 2(109). Watson also states, "[l]ater at a yearly training class, ... Mike Quillen came in and told us that the Parmont plan would be frozen and put into the Pittston plan. He also said this meant better benefits to us and that Pittston would back up and count our time with Paramont as far back as 1977." Watson states that Addington later stopped by the truck shop and told him the same thing.

Jerry Wayne White claims that representations were made to him on several occasions. Appendix 2(113). White states that on one occasion after the acquisition of Paramont, Rasnick and Ratliff spoke to a group of about 20 to 25 people in the Paramont training room. White states, "I was told that we would have all the same benefits as the Pittston people." White does not identify who made these statements, although it can be inferred that either Rasnick, Ratliff or both made these statements. White also claims that representations that Paramont employees would get the same benefits "as the Pittston people" were "made on an almost daily basis" by Quillen, Ratliff and others. White also states that on one occasion Quillen spoke to a large crowd at the Esserville Shop and told them that they "would get credit for our Paramont time toward a pension figured like the Pittston employees." White states that, during annual retraining in 1986 or 1987, Rasnick told him and others that they would get "credit for our years of service with Paramont figured at the Pittston rate."

Donald Ray Stair states that, at the Clinch Valley Meeting, Spindler said that "Paramont would be added to Pittston Plan so everything would be 100 % vested and years of service plus age would go toward our retirement." Appendix 2(99).

Glenda Brady did not provide any information in her discovery responses

- 35 -

regarding any alleged misrepresentations. Appendix 2(9). John Kelly Browning Sr., ("Browning"), Charles Keith Lane, Henry McFadden and Terry Mitchell state that, due to health problems, they can no longer remember any details of any representations made to them about their pension benefits. Appendix 2(12), (56), (65), (70).

In addition to various oral representations, Rasnick states that, in October 1994, he received a letter from Pittston's Lebanon office informing him that upon his retirement, at age 65, he would receive monthly benefits of approximately $1,300.00. In April 1995, Rasnick received a second letter from the same person at the Lebanon office, informing him that a mistake had been made in calculating his benefits and that the correct amount of his monthly benefits would be $520 per month.

Hayes states that he received annual benefit statements that reflected a projected pension benefit which included his years of service with Paramont. Appendix 2(44). Hayes does not specify when he received these statements. R. Lovell and F. Mullins also allege the receipt of annual benefit statements. Appendix 2(61).

Charles Keith Lane retired in 1993 and began receiving benefits from the Pittston Plan. Appendix 2(56). Danny Ray Taylor began receiving disability retirement benefits in 1991 from the Pittston Plan. Appendix 2(104). Neither Taylor nor Lane has produced any evidence that he was ever paid benefits at a rate, which included his Paramont time prior to 1989 in his Benefit Accrual Service.

Defendants assert that none of the individuals who made these alleged

- 36 -

representations were fiduciaries, in that none of them had any discretionary authority over the interpretation of the Pittston Plan or the determination of Plan benefits. In support of this assertion, the defendants have provided the Affidavit of Kathy Yeager, (Appendix 3 to Memorandum in Support of Defendants' Second Motion for Summary Judgment) ("Yeager Affidavit"). Yeager is the Human Resources Administrator of Pittston Coal and the custodian of the personnel files of the former employees of Pittston Coal's operating coal companies. Yeager reviewed and summarized the work histories for Addington, Boone, Campbell, Clark, Childress, Collinsworth, Dado, Davis, Dotson, Horton, Jones, McConnell, Miller, Neely, Orender, Perkins, Quillen, Rasnick, Ratliff, Robinette, Spindler and Swiney. Yeager listed the following positions and employers for these individuals for the pertinent time period:

Addington:        General Superintendent, Surface Superintendent and Manager Of Surface Operations, Pyxis;

Boone:            Assistant Superintendent, Deep Mine, and Surface Foreman, Paramont;

Campbell:         Manager of Mines, Ranger Fuel Corp., and General Manager, Elkay Mining Co.;

Childress:        Maintenance Superintendent, Paramont;

Clark:            Engineer, Section Foreman, Assistant Superintendent and Operations Manager, Paramont, and Virginia Underground Operations Manager, Pyxis;

Collinsworth:     Section Foreman and Safety Analyst, Paramont;

Dado:             General Manager Contract Coal, Pittston Coal Group and Pittston Coal Management Co., and Vice President of Operations, Pyxis;

Davis:            Treasurer, Pittston; Executive Vice President, Pittston Coal Sales; Vice President of Finance, Pyxis;

Dotson:           Surface Foreman, Paramont;

Horton:           Preparation Engineer, Pittston Coal Group, Pittston Coal Management Co. and Pyxis, and Plant Superintendent, Clinchfield Coal Co.;

- 37 -

| | |
|---|---|
| Jones: | Chief Engineer, Paramont, Pyxis, and Pittston Coal Management Co.; |
| McConnell: | Foreman, Quality Control Supervisor, Preparation Plant Superintendent and Coal Distribution Supervisor, Paramont and Pyxis; |
| Neely: | Vice President of Finance, Paramont; Manager of Financial Systems, Pyxis and Pittston Coal Management Co.; and Vice President and Treasurer of Pittston Coal Managment Co.; |
| Orender: | Superintendent, Paramont; |
| Miller: | Insurance, Benefits & Public Relations Manager, Paramont and Pyxis; |
| Perkins: | Project Manager, Operations Manager, Vice President of Operations, Pyxis; and President, Paramont; |
| Quillen: | Vice President of Operations, President and Chief Executive Officer, Paramont and Pyxis; |
| Rasnick: | Safety Inspector and Tipple Foreman, Paramont; |
| Ratliff: | Safety Director, Paramont; and Health & Safety Director and Personnel Manager, Safety & Employee Relations, Pyxis; |
| Robinette: | Paramont and Pyxis;[3] |
| Spindler: | Vice President, Pittston; President, Pyxis; and Senior Vice President, Pittston Coal Management Co.; |
| Swiney: | Mine Foreman, Assistant Superintendent and Superintendent, Paramont. |

In support of the Motion, the defendants also have provided the affidavit of Frank T. Lennon, a member of the Administrative Committee for the Pittston Plan since 1980 (Appendix 4 to Memorandum in Support of Defendants' Second Motion for Summary Judgment) ("Lennon Affidavit"); deposition testimony from Neely; the affidavit of Conley Parsley, the Personnel Manager of Pittston Coal Management Co. in 1995-96; the affidavit of Miller; and a portion of deposition testimony from Miller.

---

[3] Yeager's affidavit states that the information in Robinette's personnel file is incomplete and does not include the position held.

According to Lennon, none of the following persons had any authority to act in any way on behalf of the Pittston Plan: Addington, Boone, Campbell, Clark, Childress, Collinsworth, Dado, Davis, Dotson, Horton, Jones, McConnell, Neely, Orender, Quillen, Rasnick, Spindler and Swiney. Lennon Affidavit at 3. Lennon also states that the following persons had no discretionary responsibility over the Pittston Plan or authority to grant benefits under the Pittston Plan beyond those described in the Plan: Miller, Perkins, Ratliff and Robinette. Lennon Affidavit at 3.

This court previously has heard testimony that Paramont's Director of Human Resources, Robinette, sent a letter to all Paramont employees explaining the changes in their retirement benefits to be effective January 1, 1989, ("Robinette's 11-10-88 Letter"). Robinette's 11-10-88 Letter states in part:

> On January 1, we will merge the [Paramont] plans into The Pension-Retirement Plan of The Pittston Company and its subsidiaries. *On that date you will* automatically become a member of The Pittston Plan and *begin to earn pension accruals under The Pittston Plan. When you retire, your pension benefit under this plan will be the combination of what you earned under the Paramont ... Plan prior to January 1, 1989, and what you earn under the Pittston Plan for service beyond January 1, 1989.*
>
> ...
>
> <u>Benefits Accrued Under The Paramont Plan Prior to January 1, 1989</u>
>
> When you retire, all pension benefits you have accrued under The Paramont Plan up to January 1, 1989, will be determined in accordance with the provisions of The Paramont Plan as in effect on December 31,

- 39 -

1988.

Benefit Accruals After January 1, 1989

Your pension benefits accrued from and after January 1, 1989, will be determined in accordance with the provisions of The Pittston Pension Plan. ...

(Emphasis added.) This letter continues to explain that the Pittston Plan, like the Paramont Plan, then required five years of vesting service. The letter further states that "[a]ll vesting service under The Paramont Plan will also constitute and count as vesting service under The Pittston Plan." Robinette's 11-10-88 Letter also states:

We all know that pensions are very complicated and technical documents and can be difficult to explain in simple terms. While we have tried hard to explain in simple language how these Plans work, and have written the pension booklet in as relatively clear and simple language as possible, we understand that you may have questions about your pension from time to time. If you have any questions of any kind about your pension under either the Paramont or Pittston Plan, please address your questions in writing to the Human Resources Department.

It is also undisputed that a company newsletter, the Paramont Pride, containing an article identical to Robinette's 11-10-88 Letter, ("the Paramont Pride Article"), was distributed to all Paramont and Pyxis employees in December 1988. The Paramont Pride Article also stated the following:

On January 1, we will merge the [Paramont] plans into The Pension-Retirement Plan of The Pittston Company and its Subsidiaries. *On that date you will* automatically become a member of The Pittston Plan and *begin to earn pension accruals under The Pittston Plan. When*

- 40 -

*you retire, your pension benefit under this plan will be the combination of what you earned under the Paramont ... Plan prior to January 1, 1989, and what you earn under The Pittston Plan for service beyond January 1, 1989.*

*...*

Benefits Accrued Under The Paramont Plan Prior to January 1, 1989

When you retire, all pension benefits you have accrued under The Paramont Plan up to January 1, 1989, will be determined in accordance with the provisions of The Paramont Plan as in effect on December 31, 1988.

Benefit Accruals After January 1, 1989

Your pension benefits accrued from and after January 1, 1989, will be determined in accordance with the provisions of The Pittston Pension Plan. ...

(Emphasis added).

Robinette testified that the Paramont Pride was distributed to all Paramont and Pyxis employees. Robinette also testified that, to his knowledge, Quillen reviewed the content of all editions of the Paramont Pride before it was distributed to the employees.

At the time of Pyxis's acquisition of Paramont in 1986, Miller, worked in Paramont's human resources department. In April 1990, Miller served as Paramont's Manager of Employee Benefits and Insurance. This court previously has heard testimony that, in this role, Miller sent a letter to all Paramont employees with a benefit statement for the Paramont Production Incentive Plan, (Exhibit 8) ("Miller's

4-10-90 Letter").  Miller's 4-10-90 Letter states in part:

> Attached you will find your Production Incentive Plan benefit statement for 1989. ... Please remember this is just one portion of your retirement plan. ...
>
> You will receive a statement on the other two parts of your pension retirement plan in early May as well as a sample form showing how your retirement benefit is calculated.  These two parts consist of your pension benefit from the Paramont Plan through December 31, 1988 and your pension benefit from the Pittston Plan from January 1, 1989.  You will recall that the Paramont Defined Benefit Plan was frozen on December 31, 1988. All vested Paramont employees will receive a fixed amount calculated as of this date upon retirement.  Everyone employed beginning January 1, 1989 will also receive a pension-retirement benefit from the Pittston Plan if vested.  Employees vested in the Paramont Plan are also vested in the Pittston Plan. ...
>
> We all realize that pension-retirement plans are not easily understood. We try to provide you with as much information on the plans as possible.  A summary plan description booklet which explains the Pittston Pension-Retirement Plan will be available soon and will be mailed to you.  In the meantime, if you have specific questions, please do not hesitate to contact the Employee Benefits Department.

Miller also helped prepare and sent a May 15, 1990, letter from Perkins, then the President of Paramont, to all Paramont employees, ("Perkins's 5-15-90 Letter"). Perkins's 5-15-90 Letter further explained the Paramont employees' pension benefits and included a sample benefit calculation for a sample employee who worked at Paramont both before and after January 1, 1989. The formula used only time worked for Paramont after January 1, 1989, in the calculation of benefits under the Pittston Plan.

Through 1998, the Pittston Plan provided Annual Benefit Statements to each of the Pittston Plan Participants. These Annual Benefit Statements included an estimate of a participant's future Pittston Plan retirement benefit assuming the participant continued to work at a Pittston Plan Participating Company until his Normal Retirement Date (age 65) and elected a single life annuity benefit at that time. Annual Benefit Statements estimated benefits as of January 1 of the year stated on the benefit statement. Annual Benefit Statements also included an estimate of the participant's accrued benefit as of January 1 of the year stated on the benefit statement. This accrued benefit is the benefit that a participant would receive at age 65 if the participant did not earn any additional Benefit Accrual Service after the year reflected in the Annual Benefit Statement.

These Annual Benefit Statements did not indicate how a participant's monthly pension benefit estimate had been calculated. Nor did these Annual Benefits Statements state that Paramont employees' years of service with Paramont prior to January 1, 1989, were included in the calculations of benefits under the Pittston Plan. Each of these Annual Benefits Statements also contained the following:

> ...Please remember that the figures shown are only estimates... This summary does not determine the benefits you are able to receive. Only the official plan documents and the exact data applicable to you can determine your benefits. In the case of a conflict or omission, the formal plan texts will prevail.

Three of the Remaining Plaintiffs received some Annual Benefit Statements containing incorrect estimates of their future pension benefits. Baird received incorrect Annual Benefit Statements in 1992, 1996-98; Baird received correct Annual

Benefit Statements in 1988-91, 1993-95. Brady received incorrect Annual Benefit Statements in 1996-98; Brady received correct Annual Benefit Statements in 1993-95. J. Jones received incorrect Annual Benefit Statements in 1996- 98; J. Jones received correct Annual Benefit Statements in 1988-95.

Several of the Remaining Plaintiffs have admitted that they received specific notice regarding the discrepancy in the way their pension benefits were to be calculated. Rasnick received a letter in October 1994 from Pittston informing him that at age 65 he would receive monthly pension benefits of approximately $1,300. In April 1995, Rasnick received a second letter from Pittston stating that the first letter had contained an incorrect calculation of his pension benefits and that the correct amount of his pension benefits at age 65 would be $520 per month.

On October 19, 1992, Miller sent a letter to an attorney for Franklin correctly explaining his pension benefits. Miller sent another letter on June 22, 1993, to another attorney for Franklin again correctly explaining his pension benefits. On August 24, 1987, F. Farmer received a letter informing him that he was not entitled to any pension benefit from the Pittston Plan and that his only pension came for the Paramont Plans. Browning received a February 26, 1996, letter from the Administrative Committee approving his application for normal retirement benefits in the amount of $453.83 per month. Charles Lane received a January 27, 1994, letter from the Administrative Committee approving his application for late retirement benefits in the amount of $325.20 per month. George Meade received a April 23, 1993, letter from the Administrative Committee approving his application for disability retirement benefits in the amount of $487.92 per month.

- 44 -

Michael Clark, Vernus Culbertson, Scottie Hamilton, Greg Ireson, Ricky Shelton and Gary Swiney each received a statement of their vested retirement benefits that did not include credit for service with Paramont prior to January 1, 1989, when they terminated their employment with Pittston. Clark received a letter dated February 20, 1996, explaining that he had accrued an estimated monthly pension benefit of $1,025.18 as of October 13, 1995, the day he terminated his employment with participating companies under the Pittston Plan. Culbertson received a similar letter dated December 20, 1995, explaining that he had accrued an estimated monthly pension benefit of $388.35 as of April 16, 1995, the day he terminated his employment with participating companies under the Pittston Plan. Hamilton received a letter dated December 6, 1996, estimating that his vested monthly pension benefit would be $656.33. Ireson received a letter dated December 6, 1996, estimating that his vested monthly pension benefit would be $620.10. Shelton received a letter dated December 19, 1995, explaining that he had accrued an estimated monthly pension benefit of $888.70 as of October 13, 1995, the day he terminated his employment with participating companies under the Pittston Plan. Swiney received a letter dated February 20, 1996, estimating that his vested monthly pension benefit would be $852.12 These estimated monthly benefits did not include any Benefit Accrual Service under the Pittston Plan formula for the employees' time with Paramont prior to January 1, 1989.

Each of the Remaining Plaintiffs received a cover letter dated September 25, 2000, from James Spurlock, Pittston's Vice President of Human Resources, enclosing a September 23, 2000, letter from Robert A. McGregor, Paramont's Vice President,

("McGregor's 9-23-00 Letter").[4] McGregor's 9-23-00 Letter states:

> Several employees have come to me with questions related to their benefits under the Pittston Pension-Retirement Plan, the former Paramont Pension Plan and the former Paramont Production Incentive Plan. I have discussed this matter with the people who are responsible for administering these benefits, and I can assure you that the Company takes your concerns seriously. I hope the information included in this letter will help answer any questions and alleviate any concerns you may have.

> One question seems to stem from issues related to the merger of the Paramont Pension plans into the Pittston Pension Plan as of January 1, 1989.

> ...

> At the time of the merger of these Plans, benefits under the Paramont Pension Plans were frozen and protected under the terms of the Plan based on employees' benefit service with Paramont up to December 31, 1988. Beginning January 1, 1989, any benefit that Paramont employees accrue based on their continued service with Paramont, or with another Pittston company (e.g., Pyxis) that participates in the Pittston Pension Plan, are determined in accordance with the provisions of the Pittston Pension Plan.

> ...

> Some people seem to be confused over the difference between "Benefit Accrual Service" and "vesting service." In general, Benefit Accrual

---

[4] The Remaining Plaintiffs state in their response that it is "undisputed" that each of them received these letters. Remaining Plaintiffs claim that these letters were submitted as Trial Exhibit 18; however, the court's records show that Trial Exhibit 18 was a July 11, 1986, Letter from Quillen. According to the court's records, these letters were contained in Trial Exhibit 45, and Spurlock testified that these letters were sent to all then-current and former Paramont Employees.

- 46 -

Service is used to determine the amount of the annual retirement benefit to which a participant is entitled under the Pittston Pension Plan. Vesting service is used to determine when a participant has a non-forfeitable right to a benefit under the Plan. Under the Pittston Pension Plan, a participant with five years of vesting service has a non-forfeitable right to 100% of his vested interest in the retirement benefit he has accrued under the terms of the Pittston Pension Plan. For the benefit of the Paramont employees, when the Paramont Pension Plans were merged into the Pittston Pension Plan in 1989, all of an employee's vesting service under the Paramont Pension Plan prior to 1989 was counted for purposes of determining vesting service under the Pittston Pension Plan. For example, if an employee had worked for Paramont for three years prior to January 1, 1989, he would become 100% vested under the Pittston Plan Pension Plan after earning only an additional two years of vesting service. As clarified above, when the Pension Plans were merged, Paramont employees began accruing Benefit Accrual Service under the Pittston Pension Plan for service beginning January 1, 1989.

The Remaining Plaintiffs assert that as a result of the defendants' alleged breach of fiduciary duties, they did not vote to unionize, work for another company or save more money for retirement.

*Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087

- 47 -

(4th Cir. 1990) (en banc), *cert. denied*, 498 U.S. 1109 (1991); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587; *Nguyen v. CNA Corp.,* 44 F.3d 234, 237 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir. 1990); *Ross*, 759 F.2d at 364; *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980). In other words, the nonmoving party is entitled to have "'the credibility of his evidence as forecast assumed.'" *Miller*, 913 F.2d at 1087 (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Therefore, in reviewing the Motion in this case, the court must view the facts and inferences in the light most favorable to the Remaining Plaintiffs.

When faced with a motion for summary judgment, however, a plaintiff cannot simply rely on the allegations contained in his pleadings. For a plaintiff's claim to survive a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 250. In this case, the Remaining Plaintiffs rely on their responses to the defendants' interrogatories and the evidence produced at the trial of the Initial Plaintiffs' claims in an effort to survive the Motion.

- 48 -

As stated above, the only claim remaining before the court is the plaintiffs' claim that the defendants breached their fiduciary duties by providing plaintiffs inaccurate and untruthful information about the inclusion of their years of service with Paramont prior to January 1, 1989, in the Benefit Accrual Service used to calculate a portion of their retirement benefits under the Pittston Plan. Plaintiffs bring this claim under ERISA § 502(a)(3), which provides:

> A civil action may be brought --
> (3)    by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C.A. §1132(a)(3) (West 1999). This court previously has held that, to establish a claim for breach of fiduciary duty under ERISA §502(3)(a), the plaintiffs in this case must show: 1) that a defendant was a fiduciary of the ERISA plan; 2) that a defendant breached its fiduciary responsibilities under the plan; and 3) that the participant is in need of injunctive or "other appropriate equitable relief" to remedy the breach. *See Adams*, Civ. No. 2:02cv00044, Docket Item No. 169 (citing *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 470 (M.D. N.C. 2002) (citing *Griggs v. E.I. Dupont De Nemours & Co.*, 237 F.3d 371, 379-80 (4th Cir. 2001))).[5] This court further recognized that misrepresentations, whether intentional or not, would violate a fiduciary's duty not to misinform plan beneficiaries. *See Adams*, Civ. No. 2:02cv00044, Docket Item No. 169 (citing *Varity v. Howe*, 516 U.S. 489, 506 (1996); *Griggs*, 237 F.3d at 380-84.)

---

[5] For brevity's sake, the court will not repeat here the legal analysis of the applicable case law contained in its earlier Findings Of Fact And Conclusions Of Law. This analysis, however, is incorporated by reference as if set forth fully in this Memorandum Opinion.

- 49 -

The defendants in this case have never contested the assertion that they were fiduciaries of the ERISA plan at issue. Instead, the defendants argue that summary judgment should be entered in their favor on the Remaining Plaintiffs' breach of fiduciary duty claims because there is no genuine issue of material fact, and they are entitled to judgment as a matter of law. In particular, the defendants argue that there was no breach of fiduciary duty in that there were no misrepresentations made to the Remaining Plaintiffs and, furthermore, that the alleged representations were made by persons who were not acting in a fiduciary capacity. The defendants further assert that they are entitled to summary judgment in that the claims of the Remaining Plaintiffs are barred by the statute of limitations. The court will address each of these issues in turn, starting with the issue of whether anyone provided the Remaining Plaintiffs with inaccurate and untruthful information concerning their benefits under the Pittston Plan.

Throughout this case, the plaintiffs have represented to the court that they were told on numerous occasions by different Pittston representatives that they would receive credit for their years of service with Paramont prior to January 1, 1989, in the Benefit Accrual Service used to calculate a portion of their benefits under the Pittston Plan. After hearing the evidence at trial, however, the court held that no misrepresentation had been made to any of the Initial Plaintiffs. A review of the evidence now before the court shows a lack of evidence of any misrepresentation made to any of the Remaining Plaintiffs, other than K. Sluss, Adkins, J. White, Hess and Shelton.

The Remaining Plaintiffs have offered evidence regarding a number of oral representations, including statements that the employees' time with Paramont would

- 50 -

be counted for vesting purposes under the Pittston Plan, the employees would not lose any benefits when the plans merged and that their time with Paramont would be "figured in," "added to," "included," "credited," "absorbed," "counted," "count in calculating" or "counted together." Evidence also has been offered that some of the Remaining Plaintiffs were told that their time with Paramont would "carry over," "go over," "roll over," or "merge." Another Remaining Plaintiff has stated that he was told that the "years we worked for Paramont would be added to our Pittston work." Several Remaining Plaintiffs assert that the defendants represented that their time with Paramont would equal, count as or be recognized as Pittston time.

Whether these statements were made or not, of course presents an issue of fact. This issue of fact is not material, however, in that I find that none of these statements is a misrepresentation, in that none of these statements contains false information about the Remaining Plaintiffs' rights under the Pittston Plan. It is important to note that none of the Remaining Plaintiffs has produced any evidence that anyone told them specifically that their time with Paramont would be included in their Benefit Accrual Service used in calculating a portion of their retirement benefits under the Pittston Plan. Under the terms of the Pittston Plan, the Remaining Plaintiffs' time with Paramont, prior to January 1, 1989, is counted for vesting purposes. Also, the Remaining Plaintiffs did not lose any benefits when the plans merged. Furthermore, general statements that the Remaining Plaintiffs' time with Paramont would be "figured in," "added to," "included," "credited," "absorbed," "counted together," "carry over," "go over," "roll over," "counted," or would "count in calculating," or "merge" for purposes of calculating their benefits under the Pittston Plan do not contain false information. Under the Pittston Plan, the Paramont employees are given credit for their

time with Paramont in calculating benefits under the plan. Under the terms of the Pittston Plan, the amount of monthly retirement benefits payable to a former Paramont employee depends on both the amount of time employed by Paramont prior to January 1, 1989, and the amount of time employed by a Participating Company after January 1, 1989.

Only five of the Remaining Plaintiffs have provided evidence of statements that do contain false information. Sluss has stated that Spindler, Farrell, Ratliff, Clark and Quillen made statements that his time with Paramont "would count for all purposes in the Pittston Plan." Adkins has stated that Spindler said "our Paramont years of service would count as Pittston time in calculating pension benefits." J. White has stated that Quillen said that Paramont employees "would get credit for our Paramont time toward a pension figured like the Pittston employees." J. White also has said that Rasnick said that Paramont employees would "credit for our years of service with Paramont figured at the Pittston rate." Hess has said that Ratliff actually provided him with calculations of his retirement benefits under the Pittston Plan that included his years with Paramont prior to January 1, 1989. Shelton has said Ratliff and Miller also provided calculations of retirement benefits under the Pittston Plan that included years of service with Paramont prior to January 1, 1989, in the calculation of those benefits.

I find that each of these statements, if made, contains false representation. In particular, time spent working for Paramont prior to January 1, 1989, does not count "for all purposes" in the Pittston Plan. Also, all years spent working for Paramont do not count the same as time spent working for Pittston in the calculation of benefits under the Pittston Plan. Former Paramont employees' pensions are not "figured like the

- 52 -

Pittston employees," nor do they get credit for all years of service with Paramont "figured at the Pittston rate" under the Pittston Plan. Finally, if anyone performed calculations of estimated pension benefits, including time for service with Paramont prior to January 1, 1989, in the Benefit Accrual Service, this was inaccurate under the terms of the Pittston Plan.[6]

That being the case, the court will now turn to the issue of whether any of the individuals whom the plaintiffs claim made these misrepresentation were acting in a fiduciary capacity in doing so. As the Fourth Circuit recognized in *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 60-61 (4th Cir. 1992), "[b]efore one can conclude that a fiduciary duty has been violated, it must be established that the party charged with the breach meets the statutory definition of 'fiduciary.'"

ERISA §3(21)(A) defines a "fiduciary" as:

> ... a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets....

29 U.S.C.A. § 1002(21)(A) (West 1999). The Fourth Circuit in *Coleman* further held

------

[6] Neither Hess nor Shelton has produced any evidence that specifically states that they were provided pension calculations that included their years of service with Paramont prior to January 1, 1989, in the Benefit Accrual Service used to calculate their estimated pension benefits. Nevertheless, at this stage of the proceedings, the court has given these Remaining Plaintiffs the benefit of this inference.

that the inclusion of the phrase "to the extent" in the statutory definition means that "a party is a fiduciary only as to the activities which bring the person within the definition. ... In other words, a court must ask whether a person is a fiduciary with respect to the particular activity at issue." *Coleman*, 969 F.2d at 61.

The court further recognized that discretionary authority or responsibility is pivotal to the statutory definition of "fiduciary." *Coleman*, 969 F.2d at 61. As the District Court for the Eastern District of Virginia has stated,

> In other words, a fiduciary within the meaning of ERISA 'must be someone acting in the capacity of manager, administrator, or financial adviser to a plan.' ... To determine whether a person is subject to ERISA fiduciary duties, the court must determine the extent to which that person exercises discretionary authority, control or responsibility with respect to management or administration of the plan.

*Sentara Va. Beach Gen. Hosp. v. LeBeau*, 182 F. Supp. 2d 518, 523 (E.D. Va. 2002). Furthermore, performing administrative acts such as answering employees' inquiries or processing claim forms does not amount to discretionary functions, which would qualify a person as a fiduciary under ERISA. *See Baxter v. C.A. Muer Corp.,* 941 F.2d 451, 455 (6th Cir. 1991) (a claims processor who had only the power to pay out benefits according to the terms of the established plan was not an ERISA fiduciary); *Weeks v. West. Auto Supply Co.,* No. Civ. A. 7:02cv00724, 2003 WL 21510822 at *6-7, (W.D. Va. June 25, 2003) (performing ministerial, administrative functions such as providing written materials and answering questions are not exercising discretionary authority); *Hansen v. N. Trident Reg'l Hosp., Inc.,* 60 F. Supp. 2d 523, 527-28 (D.S.C. 1999) (handling the processing of benefit applications, claims and related paperwork

- 54 -

were not discretionary functions); *see also Fitch v. Chase Manhattan Bank*, *N.A.,* 64 F. Supp. 2d 212, 229 (W.D. N.Y. 1999) (preparation and issuance of annual benefit statements not a fiduciary activity).

In order to determine whether a party possessed the discretionary authority or responsibility necessary to be a fiduciary, courts first should look to the language of the plan documents themselves and, then, should look to the party's actions to determine if the party, in fact, exercised discretionary authority. *See Coleman*, 969 F.2d at 61; *see also Phelps v. C.T. Enters., Inc.,* Slip Op. No. 04-1198 at 12 (4th Cir. January 12, 2005) (when a party voluntarily assumes responsibility of a fiduciary, the party becomes subject to the obligations of a fiduciary under ERISA).

The defendants in this case contend that no misrepresentations occurred and, further, if they did, that they were not made by a person acting in a fiduciary capacity, and, thus, could not be the basis of a breach of fiduciary duty claim.    Based on the evidence before the court, I find no genuine issue of material fact in that none of the individuals who the plaintiffs allege made misrepresentations, other than Joseph Farrell, possessed any discretionary authority to alter the terms of the Pittston Plan or to determine eligibility for benefits or the amount of benefits a participant was entitled to under the Pittston Plan.  This court previously has held that Quillen, Fox, Spindler, Robinette, Miller and Neely possessed no discretionary authority to determine eligibility for benefits or the amount of benefits to which a participant was entitled. The plaintiffs have produced no new evidence to the contrary. Also, there is no evidence that any of the remaining individuals, other than Farrell, performed any functions, administrative or otherwise, with regard to the Pittston Plan.

- 55 -

Two of the Remaining Plaintiffs, Bobby Wheeler and Sluss, claim that misrepresentations were made to them by Farrell, Pittston's Senior or Executive Vice President. The defendants concede that Farrell became Chairman of Pittston's Board of Directors and Chief Executive Office of Pittston in 1991. The defendants further concede that the Board of Directors is a fiduciary of the Pittston Plan and that, if Farrell were speaking on behalf of the Board of Directors, Farrell could act as a fiduciary. Wheeler claims that either Spindler or Farrell stated that "all time with Paramont would roll-over into the Pittston retirement plan and that the Pittston retirement plan was better than the Paramont plan." Again, this statement is not a misrepresentation. Therefore, it cannot be the basis for a breach of fiduciary duty claim regardless of whether it was made by a person acting in a fiduciary capacity. Sluss claims that Farrell stated that his Paramont time "would be counted for all purposes in the Pittston Plan." As held above, this statement does contain false information, in that, under the Pittston Plan, Paramont employees' time working for Paramont prior to January 1, 1989, is not counted as Benefit Accrual Service time. Also, this false statement was made by a person who was a fiduciary of the Pittston Plan. Sluss has not, however, provided the court with any evidence as to the facts and circumstances or date of Farrell's misrepresentation.

Since the Remaining Plaintiffs have provided evidence of at least one misrepresentation made by a fiduciary, the court must address the defendants' argument that the Remaining Plaintiffs' breach of fiduciary duty claims are barred by ERISA's statute of limitations. *See* 29 U.S.C.A. §1113 (West 1999). Section 1113 provides:

- 56 -

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of --

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C.A. §1113 (West 1999).

Section 1113 provides a statute of limitations of the earlier of six years from the date of the last action constituting a breach or three years from the date on which the plaintiff had knowledge of the breach. Section 1113 also provides, however, that in cases of "fraud or concealment," a breach of fiduciary duty claim may be commenced within six years of discovery of the breach. At least one circuit court has held this six-year statute of limitations is not limited to only those cases of fraudulent concealment, but rather applies to breach of fiduciary duty claims based on misrepresentations where the defendant engaged in acts which hindered the plaintiff's discovery of the breach. *See Caputo v. Pfizer, Inc.*, 267 F.3d 181, 188-90 (2nd Cir. 2001). On the other hand, a claim of fraudulent concealment only succeeds where a plaintiff, despite reasonable diligence, has no notice of a fiduciary's wrongdoing. *See J. Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir. 1996), *cert. denied*, 519 U.S. 823 (1996). Where a breach of fiduciary duty is alleged without fraud, actual knowledge on the part of the plaintiff of the defendant's breach brings his claim under

- 57 -

the three-year statute of limitation of § 1113. *Davis v. Bowman Apple Prods., Co., Inc.*, No. Civ. A. 5:00cv00033, 2002 WL 535068 at *8 (W.D. Va. March 29, 2002). Actual knowledge is defined as "actual knowledge of all material facts necessary to understand that some claim exists." *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999) (citing *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)).

The plaintiffs filed this case in the Eastern District of Tennessee on December 19, 2001. Therefore, even assuming the application of the six-year statute of limitations, the Remaining Plaintiffs' causes of action must have accrued on or after December 19, 1995, to survive the Motion. As stated above, the Remaining Plaintiffs' breach of fiduciary duty claim is based on alleged misrepresentations. The majority of the Remaining Plaintiffs have identified the mid-to late 1980s or the date of the company-wide meeting held at Clinch Valley College in January 1990 as the time period of the alleged misrepresentations. No Remaining Plaintiff has identified any misrepresentation occurring more recent than the mid-1990s. Fifty-three Remaining Plaintiffs did not identify a date for at least one of the misrepresentations they allegedly heard; 15 of those Remaining Plaintiffs, however, identified speakers who left employment with Pittston prior to December 19, 1995. Specifically, Sluss has not provided evidence of the date on which he claims that Farrell said that his Paramont time "would be counted for all purposes in the Pittston Plan."

The defendants argue that the Remaining Plaintiffs claims also are barred because they were filed more than three years after they received actual knowledge of their claims. In particular, the defendants argue that the Remaining Plaintiffs received actual knowledge of their breach of fiduciary duty claims when they received the four

- 58 -

accurate written communications explaining their pension benefits, the most recent of which was sent in the spring of 1990. Defendants argue that if these written communications differed from the alleged oral representations made to the Remaining Plaintiffs, then they had actual knowledge that either the written communications or the oral representations were wrong. Defendants also argue that the claims of certain of the Remaining Plaintiffs whose unique circumstances establish that they had actual knowledge of their claims more than three years prior to filing this action are barred by the three-year limitations period.

Remaining Plaintiffs argue that their claims are not barred by the statute of limitations. In particular, the Remaining Plaintiffs argue that the "fraud or concealment" exception should apply to this case. They further argue that they did not discover a breach of fiduciary duty had occurred until they received McGregor's 9-23-00 Letter explaining that their time with Paramont prior to January 1, 1989, would not be included in their Benefit Accrual Service. They further argue that, even if the "fraud or concealment" exception should not apply, the last action constituting the breach of fiduciary duty was McGregory's 9-23-00 Letter stating that the Remaining Plaintiffs' Benefit Accrual Service would not include their time with Paramont prior to January 1, 1989.

Unlike with Addington, I find that there has been no evidence proffered by any of the Remaining Plaintiffs from which the court could find that the "fraud or concealment" exception's six-year discovery statute of limitations should apply. Specifically, the Remaining Plaintiffs have not provided any evidence that the defendants engaged in any acts which hindered the Remaining Plaintiffs' discovery of

the alleged breach. To the contrary, the undisputed evidence shows that between 1988 and 1990 four separate communications were sent to all Paramont employees, each of which accurately stated that employees would not begin to earn pension accruals under the Pittston Plan until January 1, 1989.

The uncontradicted evidence shows that, in the fall of 1988, prior to the merger of the Paramont Plans into the Pittston Plan, every then-current employee of Paramont received notice on at least two occasions that they would not receive credit for their years of service with Paramont prior to January 1, 1989, in the calculation of their retirement benefits under the Pittston Plan. These notices came in the form of Robinette's 11-10-88 Letter and the Paramont Pride Article. Two other accurate communications also were distributed to Paramont employees after the merger of the Paramont Plans into the Pittston Plan on January 1, 1989. Miller's 4-10-90 Letter was distributed to all Paramont employees. Miller's 4-10-90 Letter states that Paramont employees' pension benefits consisted of two parts, "your pension benefits from the Paramont Plan through December 31, 1988, and your pension benefit from the Pittston Plan from January 1, 1989." Perkins's 5-15-90 Letter also was distributed to all Paramont employees. Attached to Perkins's 5-15-90 Letter was a sample pension benefits calculation. This sample calculation used a hypothetical individual who had 14 years prior service with Paramont and eight years service under the Pittston Plan. The sample did not include the employee's time with Paramont in the calculation of benefits under the Pittston Plan, but instead used only the eight years of service under the Pittston Plan.

As stated above, a claim of fraudulent concealment only succeeds where a

plaintiff has no notice of a fiduciary's wrongdoing. Here the accurate communications transmitted in 1988 and 1990 gave the Remaining Plaintiffs notice of a potential breach of fiduciary duty in that, based on their claims, they were receiving inconsistent information concerning how their pension benefits would be calculated. Thus, I find that the "fraud and concealment" exception should not apply to the Remaining Plaintiffs' claims.

That being the case, the court must decide whether the defendants are entitled to judgment as a matter of law because the Remaining Plaintiffs did not file their claims within the earlier of six years after the date of the last action which constituted the breach or within three years after the earliest date on which the Remaining Plaintiffs had actual knowledge of the breach.

The Remaining Plaintiffs mistakenly claim that the last action that constituted the breach of fiduciary duty was McGregor's 9-23-00 Letter notifying them that they would not receive Benefit Accrual Service credit under the Pittston Plan for their years of service with Paramont prior to January 1, 1989. The Remaining Plaintiffs, however, base their breach of fiduciary duty claims on various "misrepresentations" which they claim were made to them regarding how their pension benefits would be calculated. McGregor's 9-23-00 Letter contains no misrepresentation. The undisputed evidence shows that the alleged misrepresentations on which the Remaining Plaintiffs base their claims occurred no later than the "mid-90s." In particular, none of the Remaining Plaintiffs have produced any evidence that any of these misrepresentations occurred on or after December 19, 1995. Specifically, the one Remaining Plaintiff who has provided evidence of a misrepresentation by a fiduciary, Sluss, has provided no

- 61 -

evidence of the date of this representation. Furthermore, the uncontradicted evidence shows that four separate communications were sent to each of the Remaining Plaintiffs between 1988 and 1990 accurately stating that the Remaining Plaintiffs would not receive Benefit Accrual Service for their time with Paramont prior to January 1, 1989. For any Remaining Plaintiff who claims he received misrepresentations before these communications, these communications should have put him on notice that there had been previous misrepresentations. For any Remaining Plaintiff who claims he received misrepresentations after the date of these accurate communications, the misrepresentations conflicting with this information should have put him on notice that there had been a misrepresentation. Thus, each Remaining Plaintiff had actual notice of a breach no later than the mid-1990s. That being the case, I find that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law because the Remaining Plaintiffs' breach of fiduciary duty claims are barred by the statute of limitations in that they were not filed within three years of this notice.

The Remaining Plaintiffs also argue that they had no notice of any breach of fiduciary duty until they received McGregor's 9-23-00 Letter. It is important to note, however, that much of the language of McGregor's 9-23-00 Letter is very similar to Robinette's 11-10-88 Letter and the Paramont Pride Article. In particular, Robinette's 11-10-88 Letter and the Paramont Pride Article stated: "[O]n January 1 ... you will ... begin to earn pension accruals under The Pittston Plan. ... Your pension benefits accrued from and after January 1, 1989, will be determined in accordance with the provisions of The Pittston Pension Plan...." McGregor's 9-23-00 Letter states: "Beginning January 1, 1989, any benefit that Paramont employees accrue based on

- 62 -

their continued service with Paramont, or with another Pittston company ... are determined in accordance with the provisions of the Pittston Pension Plan. ... Paramont employees began accruing Benefit Accural Service under the Pittston Pension Plan for service beginning January 1, 1989." Therefore, if, as the Remaining Plaintiffs argue, McGregor's 9-23-00 Letter put them on notice of prior misrepresentations, Robinette's 11-10-88 Letter and The Paramont Pride Article also should have done so.

The plaintiffs also have repeatedly argued that they are entitled to equitable relief in this case because the defendants' actions were similar to those found to be a breach of fiduciary duty by the Supreme Court in *Varity*. The disputed evidence before the court, however, shows that the facts of this case are not similar to those in *Varity*. In *Varity*, the evidence showed that a plan administrator, who was also the employer, purposefully and intentionally deceived a group of beneficiaries to persuade them into voluntarily withdrawing from their financially sound employee benefit plan and transferring to another employer and benefit plan which were insolvent from their inception. *Varity*, 516 U.S. at 493-94. In the end, these beneficiaries lost all nonpension benefits as a result of this transfer.

The undisputed evidence in this case shows that Paramont's employees did not have a choice of whether to remain under the Paramont Plan or to transfer to the Pittston Plan. The plans were merged effective January 1, 1989. The undisputed evidence also shows that the Pittston Plan provided better benefits than the $250 a month maximum pension benefit available under the Paramont Plan. As a matter of fact, none of the plaintiffs in this case have attempted to argue that their pension benefits are less under the Pittston Plan than they would have been entitled to under the

- 63 -

Paramont Plan. Furthermore, none of the plaintiffs have sought reinstatement of benefits under the Paramont Plan. Instead, the plaintiffs argue that their benefits under the Pittston Plan are not as good as they *thought* they would be. As I have stated before in this case, I cannot find many of Pittston's actions laudable. Nonetheless, I find that the facts of this case are a far cry from the facts of *Varity*.

## IV.  CONCLUSION

Based on the above, the court will grant the Motion and enter summary judgment in favor of the defendants.

An appropriate order will be entered.

ENTER: March 17, 2006.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

- 64 -